1

2

3

4

5

6

7

8       **UNITED STATES DISTRICT COURT**

9       **EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11  CRISTOBAL GARCIA, an individual, on behalf of himself and all others similarly situated, | )  Case No.: 1:18-cv-01261-DAD JLT |
| 12 | )  FINDINGS AND RECOMMENDATIONS |
| 13          Plaintiff, | )  GRANTING PLAINTIFF'S MOTION FOR FINAL )  APPROVAL OF CLASS SETTLEMENT |
| 14     v. | )  (Doc. 53) |
| 15  SCHLUMBERGER LIFT SOLUTIONS, et al. | ) |
| 16          Defendants. | ) |
| 17 | ) |

18          Cristobal Garcia asserts that he and others employed by Defendants Schlumberger suffered

19  wage and hour violations, including lost wages.  Plaintiff now seeks final approval of a class

20  settlement related only the claim for "payment of safety bonuses by the Defendants which were not

21  used in calculating overtime."  (Doc. 41-1 at 6; *see also* Doc. 53 at 4)  In addition, Plaintiff seeks an

22  award of attorneys' fees and costs from the settlement fund, fees for claims administration, and a class

23  representative enhancement payment.  (*See generally* Doc. 53)

24          Because Plaintiff carries his burden to demonstrate the Settlement is fair, reasonable, and

25  adequate, the Court recommends final approval be **GRANTED**.  In addition, the Court recommends

26  the request for attorney fees in the amount of $175,000 and costs in the amount of $14,670.01 be

27  **GRANTED**; Plaintiff's class representative award be **GRANTED** in the modified amount of $1,500;

28  and a claims administration costs be **GRANTED** in the modified amount of $6,000.

1

## BACKGROUND

Plaintiff asserts that he was "employed in Kern County by Defendants as a non-exempt employee." (Doc. 1-3 at 5, ¶ 1) According to Plaintiff, "Defendants failed to pay [employees] for all hours worked." (*Id.* at 12, ¶ 32) For example, he reports the employees were "instructed … to arrive at their base office to perform work and to then board company vehicles that would transport them to a second job location away from their base office," and if employees failed to arrive early enough, they generally would not be permitted to work that day. (*Id.* at 9, ¶ 20) He alleges employees were not permitted to clock in "until they reached their assigned field locations," approximately 45 minutes to 1 hour after they arrived at the base camp, although there was a clock at the base office, and were not paid for that time. (*Id.* at 9-10, ¶¶ 21, 23) In addition, Plaintiff contends the employees were not paid for time at the base office waiting for training courses. (*Id.* at 11, ¶ 30)

He alleges Defendants also failed to provide "duty-free meal periods in a timely manner." (Doc. 1-3 at 15, ¶ 46) He contends Defendants "failed to provide… meal periods within the first five hours of their work" and "frequently failed to provide Plaintiff and other[s] …with required meal periods of not less than 30 minutes in duration." (*Id.*, ¶¶ 47-48) Plaintiff reports the employers were not permitted "to leave the workplace during purported meal breaks and did not count their time worked through breaks for regular and overtime wage purposes." (*Id.*, ¶ 50) He also reports that when employees worked in excess of ten-hour shifts to attend classes after the shift, Defendants provided food during the class but failed to provide a second meal break. (*Id.*, ¶¶ 51-52) Similarly, Plaintiff asserts employees were not provided "with the required duty-free rest periods… to which they were entitled." (*Id.* at 17, ¶¶ 58, 60)

According to Plaintiff, Defendants "failed to maintain and furnish Plaintiff and Class members with accurate and complete wage statements regarding their gross wages earned, total hours worked, total net wages earned, the name and address of the entity that is the legal employer, and all applicable hourly rates in effect…" (Doc. 1-3 at 20, ¶ 67) He contends this failure to provide accurate wage statements resulted in "the non-payment of all their regular and overtime wages and deprived them of the information necessary to identify the discrepancies in Defendants' reported data." (*Id.*, ¶ 68)

Furthermore, Plaintiff asserts Defendants had unlawful policies related to their uniforms, and

"failed to indemnify Plaintiff and other Class members for necessary expenditures and bosses incurred by the employees in the direct discharge of their duties." (Doc. 1-3 at 23, ¶ 83) He alleges employees were "required to wear uniforms and were required to pay for costs associated with the laundering and upkeep of those uniforms." (*Id.* at 22, ¶ 81) He asserts employees were also "liable for costs associated with damage of the uniforms," and the "damage liability was broadly described to include normal wear and tear or other accidental, incidental or inadvertent damage that may have occurred during the execution of… duties." (*Id.*) Plaintiff reports he and other employees were required to sign a document that acknowledged he was "just using the jacket" but was "responsible for the maintenance of the jacket, including laundering," and "agree[d] to follow the laundry instructions included with the garment." (*Id.* at 23, ¶ 81)

On June 5, 2018, Plaintiff initiated this action by filing a complaint in Kern County Superior Court, Case No. BCV-18-101388. (Doc. 1 at 2, ¶ 1) He filed a First Amended Complaint on August 7, 2018, in which Plaintiff asserted the following claims: (1) failure to pay compensation due, (2) meal period violations, (3) rest break violations, (4) failure to furnish itemized wage statements, (5) failure to pay wages timely upon termination, (6) failure to indemnify business expenses, (7) violation of California Business and Professions Code § 17203, and (8) civil penalties pursuant to the California Private Attorney General Act. (*See generally* Doc. 1-3 at 4-5, 8-25) He asserted the first seven cause of action were brought "for himself and on behalf of a class and sub-class initially defined as follows:

> <u>Class</u>: All non-exempt employees of any of the Defendants who, at any time within the period beginning four years prior to the filing of this action through the date of class certification, worked in California.

> <u>Termination Pay Sub-Class</u>: All members of the Class whose employment terminated at any time within the period three years prior to the filing of this action through the date of certification.

(*Id.* at 6-7, ¶ 8) After Defendants were served with the First Amended Complaint, they filed a Notice of Removal on September 13, 2018, thereby initiating the action in this Court. (Doc. 1)

The Court issued its Scheduling Order governing the action on November 29, 2018. (Doc. 12) The parties engaged in discovery, including the production of "extensive payroll and time-keeping data." (Doc. 41-1 at 16) Plaintiff was deposed and took the deposition of Defendants' Rule 30(b)(6) designee. (*Id.* at 17)

On March 25, 2020, the parties engaged in mediation with Jeffrey Krivis.  (Doc. 41-1 at 7) Plaintiff reports that "[a]s a result of a mediator's proposal, the Parties were able to partially resolve the action with respect to the claim for unpaid overtime on safety bonuses and related derivative claims." (*Id.*)  Specifically, the parties agreed:

> Plaintiff's first and seventh causes of action survive as to Settlement Class Members insofar as they rely upon any theory of recovery other than miscalculation of regular rate/unpaid overtime on safety bonuses. The fifth cause of action shall be resolved, settled and released in full, for the Settlement Class Members only. The fourth cause of action shall be resolved, settled and released in full, for the Settlement Class Members only, as to any claims arising prior to January 19, 2019.

(Doc. 41-2 at 38-39, Settlement § 10, ¶ 51)  Further, the parties agreed the PAGA penalties of $30,000 "satisfies in full all PAGA penalties … attributable to the first and fourth causes of action or claims alleged therein limited to the time period prior to January 19, 2019, and all penalties attributable to the fifth cause of action or claims alleged therein through the date of Final Approval."  (*Id.*)

The Court granted preliminary approval of the proposed settlement agreement on July 16, 2020. (Doc. 44)  The Court granted conditional certification of the Settlement Class, which was defined as:

> All non-exempt employees of Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. who do not opt out of the settlement and who, at any time within the period beginning June 5, 2014 and ending on January 19, 2019 ("Class Period"), worked in California and received a safety bonus by Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. pursuant to a safety bonus program of Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. at any time within the Class Period.

(*Id.* at 20; *see also* Doc. 41-2 at 20, Settlement ¶ 6)  Plaintiff Cristobal Garcia was appointed as the Class Representative, and authorized to seek enhancement payments up to $7,500 for his representation of the class.  (Doc. 44 at 20)  Lonnie Blanchard III and Peter Dion-Kindem were appointed as Class Counsel, and authorized to seek fees that did not "exceed 33 1/3% of the gross settlement amount and costs up to $20,000."  (*Id.*)  Finally, Simpluris, Inc. ("Simpluris") was appointed the Settlement Administrator and with administration costs authorized up to $6,000.  (*Id.*)  The Court approved a Class Notice Packet that conveyed this information to class members on July 20, 2020.  (Doc. 46)

On September 6, 2020, Simpluris mailed the Class Notice Packet to 250 class members.  (Doc. 53-4 at 3, Cita Decl. ¶ 7) Simpluris reported only one Notice Packet remained undeliverable. (*Id.* at 4, ¶ 8)  No exclusion requests were received from Class Members.  (Doc. 53-4 at 4, Cita Decl. ¶ 4)  In

addition, the Settlement Administrator did not receive any objections to the proposed settlement terms from Class Members. (*Id.*, ¶ 11) On November 2, 2020, Plaintiff filed the motion for final approval now pending before the Court. Defendants have not opposed the motion, and the Court did not receive any objections from Class Members.

**SETTLEMENT TERMS**

Pursuant to the proposed settlement ("the Settlement"), the parties agree to a gross settlement amount of $525,000.00 for the class defined as follows:

> All non-exempt employees of Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. who do not opt out of the settlement and who, at any time within the period beginning June 5, 2014 and ending on January 19, 2019 ("Class Period"), worked in California and received a safety bonus by Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. pursuant to a safety bonus program of Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. at any time within the Class Period.

(Doc. 41-2 at 20, Settlement ¶ 6) Defendants agree to deposit the funds necessary "to make all payments approved by the Court" following the final approval and fairness hearing date. (*See id.* at 21-22, 29, Settlement ¶¶ 15, 40)

**I.       Payment Terms**

The settlement fund will cover payments to class members with additional compensation to the Class Representative. (Doc. 41-2, Settlement ¶ 18) In addition, the Settlement provides for payments to Class Counsel for attorneys' fees and costs, to the Settlement Administrator, and the California Labor & Workforce Development Agency. (*Id.*) Specifically, the settlement provides for the following payments from the gross settlement amount:

- The Class Representative will receive an incentive award up to $7,500;
- Class counsel will receive $175,000 for attorneys' fees, which equals 33.33% of the gross settlement amount, and $20,000 for costs;
- The California Labor and Workforce Development Agency shall receive $22,500 from the total PAGA payment of $30,000; and
- The Settlement Administrator will receive up to $6,000 for fees and expenses.

(*Id.* at 7, Settlement ¶¶ 21-26) After these payments are issued, the remaining money ("Net Settlement Amount") will be distributed as settlement shares to Class Members. (*Id.* at 22, ¶ 18)

Payments from the gross settlement fund "will be divided among three gross Sub-funds: the

Overtime Sub-fund, the Wage Statement Sub-fund, and the 203 Sub-fund," and calculated as follows:

**Overtime Sub-fund**: The gross Overtime Sub-fund amount will be calculated by multiplying the total number of safety bonuses received by the Class Members during the Class Period by $4.00. Defendants' records show that between June 5, 2014 and January 19, 2019, approximately 1,337 safety bonus payments were issued to Class Members. Based on pay records produced by Defendants in this action, Plaintiff's counsel estimates that the average amount of unpaid overtime on the average bonus payment is approximately $10.59. The gross Overtime Sub-fund will be calculated by multiplying the total number of safety bonus payments made during the Class Period by $4.00, which totals approximately $5,348. The net Overtime Sub-fund will be calculated by reducing the gross Overtime Sub-fund by the same percentage that the Net Settlement Amount bears to the Total Settlement Amount. The net Overtime Sub-fund will be distributed to the Settlement Class Members on a pro rata basis based on the number of safety bonuses they received during the Class Period, as reflected in Defendants' records.

**Wage Statement Sub-fund**: The gross Wage Statement Sub-fund will be calculated by multiplying the total number of safety bonuses received by the Class Members during the period from June 5, 2015 to January 19, 2019 by $50.00, which calculation is based on the assumption that there was one wage statement for each safety bonus paid. Defendants' records show that between June 5, 2015 and January 19, 2019, approximately 1,240 safety bonus payments were issued to Class Members. The gross Wage Statement Sub-fund will be calculated by multiplying the total number of safety bonus payments made between June 5, 2015 and January 19, 2019 by $50.00, which totals $62,000. The net Wage Statement Sub-fund will be calculated by reducing the gross Wage Statement Sub-fund by the same percentage that the Net Settlement Amount bears to the Total Settlement Amount. The Wage Statement Sub-fund will be distributed to Settlement Class Members based on the number of safety bonuses they received during the period from June 5, 2015 to January 19, 2019.

**203 Sub-fund**: The gross 203 Sub-fund will be calculated by subtracting the gross Overtime Sub-fund and the gross Wage Statement Sub-fund from $525,000. The net 203 Sub-fund will be calculated by reducing the gross 203 Sub-fund by the same percentage that the Net Settlement Amount bears to the Total Settlement Amount. The net 203 Sub-fund will be distributed on a pro rata basis to Settlement Class Members terminated between June 5, 2014 and June 25, 2020. According to counsel for Defendants, there are approximately 174 class members in Overtime Sub-fund class who have been terminated between June 5, 2014 and May 22, 2020.

(Doc. 41-1 at 9-10; *see also* Doc. 41-2 at 32-34, Settlement § 6, ¶ 46)  Thus, the exact amount each

Class Member will receive depends on which, and how many, sub-funds they are entitled to, as well as

the number of individuals receiving the funds.

**II.      Releases**

The Settlement provides that Plaintiffs and Class Members, other than those who elect not to

participate in the Settlement, at the time final judgment is entered, shall release Defendants from

several claims in the First Amended Complaint.  Specifically, the release for class members provides:

"Class Released Claims" are the claims of the Class Members only for unpaid

overtime on safety bonuses (related to first cause of action and seventh cause of action), all claims for waiting time penalties under 203 (fifth cause of action) in full as to Class Members who are terminated on or prior to June 25, 2020 and all claims for wage statement penalties under Section 226 (fourth cause of action) between June 5, 2015 and January 19, 2019.

(Doc. 41-2 at 38, Settlement ¶ 51) With these releases, the parties also agree:

Plaintiff's first and seventh causes of action survive as to Settlement Class Members insofar as they rely upon any theory of recovery other than miscalculation of regular rate/unpaid overtime on safety bonuses. The fifth cause of action shall be resolved, settled and released in full, for the Settlement Class Members only. The fourth cause of action shall be resolved, settled and released in full, for the Settlement Class Members only, as to any claims arising prior to January 19, 2019.

(*Id.*)

## III.   Objections and Exclusion Procedure

Any class member who wished had an opportunity object to the Settlement terms or request exclusion from the Settlement.  (Doc. 41-2 at 50, Settlement § 12, ¶ 53) The Notice of Proposed Settlement ("the Notice") explained the procedures to object to the settlement, request exclusion from the settlement, or dispute the employment information.  (*See* Doc. 45 at 3, 9-11) The Notice also explained the claims that are released as part of the Settlement.  (*Id.* at 8)  Because the Notice also informed Class Members of the nature of the action, settlement class, claims to be resolved, and the binding effects, the Notice complied with the requirements of Rule 23.  (*See* Doc. 46 at 1)

## IV.   Service of the Notice Packets and Responses Received

The Court ordered the Settlement Administrator, Simpluris, to mail the Class Notice—which was revised and approved on July 20, 2020— to class members no later than September 1, 2020.  (Doc. 44 at 21; Doc. 46 at 1)

According to Cassandra Cita, a case manager for Simpluris, the Settlement Administrator received the class information from Defendants on August 17, 2020.  (Doc. 53-4 at 3, ¶ 5)  She reports Defendants identified 250 individuals as Class Members, and "Simpluris processed each of the mailing addresses contained in the Class Information utilizing the National Change of Address Database ("NCOA") maintained by the U.S. Postal Service."  (*Id.*, ¶¶ 5-6)  Ms. Cita notes Simpluris identified updated addresses for 46 Class Members, after which it mailed the Notice via the U.S. Postal Service First Class Mail on September 6, 2020.  (*Id.*, ¶¶ 6-7)  The Postal Service returned 16 packets as

1  undeliverable.  (*Id.*, ¶ 8)  Simpluris located updated addresses for 13 individuals, and two Class

2  Members notified Simpluris of their current addresses.  (*Id.* at 3-4, ¶ 8)  Thus, only one Notice

3  remained undeliverable.  (*Id.*)

4        Ms. Cita notes that the expected Net Settlement Amount is approximately $293,200.00 after

5  deducting the requested attorneys' fees and costs, settlement administration costs, and class

6  representative enhancement from the Gross Settlement.  (Doc. 53-4 at 4, ¶ 14)  She reports "the average

7  gross Class Payment is expected to be approximately $1,172.80."  (*Id.* at 5, ¶ 15) (emphasis omitted)  In

8  addition, Ms. Cita indicates: "The highest gross Class Payment is estimated to be approximately

9  $2,089.99, the lowest gross Class Payment is estimated to be approximately $5.27."  (*Id.*) (emphasis

10  omitted). Ms. Cita reports that no objections or requests for exclusion were received from Class

11  Members as of November 2, 2020.  (*Id.* at 4, ¶¶ 10-11)

12  **FINAL APPROVAL OF THE CLASS SETTLEMENT**

13        Class actions require the approval of the district court prior to settlement.  Fed. R. Civ. P. 23(e)

14  ("claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of

15  settlement—may be settled, voluntarily dismissed, or compromised only with the court's approval").

16  The Court "must peruse the proposed compromise to ratify both the propriety of the certification and

17  the fairness of the settlement."  *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).

18        Approval under Rule 23(e) involves a two-step process: "the Court first determines whether a

19  proposed class action settlement deserves preliminary approval and then, after notice is given to class

20  members, whether final approval is warranted."  *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221

21  F.R.D. 523, 525 (C.D. Cal. 2004).  In addition, Rule 23 requires that:  (i) notice be sent to all class

22  members; (ii) the court hold a hearing and make a finding that the settlement is fair, reasonable, and

23  adequate; (iii) the parties seeking approval file a statement identifying the settlement agreement; and

24  (iv) class members be given an opportunity to object. Fed. R. Civ. P. 23(e)(1)-(5). The decision to

25  approve or reject a settlement is within the Court's discretion.  *Hanlon v. Chrysler Corp.*, 150 F.3d

26  1011, 1026 (9th Cir. 2998).

27  ///

28  ///

1    **I.        Certification of the Settlement Class[1]**

2            Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure, which

3    provides that "[o]ne or more members of a class may sue or be sued as representative parties on behalf

4    of all." Fed. R. Civ. P. 23(a).  Under the terms of the Settlement, the class is comprised of:

5            All non-exempt employees of Schlumberger Lift Solutions LLC or Schlumberger Rod
             Lift, Inc. who do not opt out of the settlement and who, at any time within the period
6            beginning June 5, 2014 and ending on January 19, 2019 ("Class Period"), worked in
             California and received a safety bonus by Schlumberger Lift Solutions LLC or
7            Schlumberger Rod Lift, Inc. pursuant to a safety bonus program of Schlumberger Lift
             Solutions LLC or Schlumberger Rod Lift, Inc. at any time within the Class Period.

8

9    (Doc. 41-2 at 20, Settlement § 1, ¶ 6)  The "Class Period" is defined as the period from June 5, 2014 to

10   January 19, 2019.  (*Id.* at 31, ¶ 9) The parties agreed no other non-exempt employees of Defendants

11   shall be considered class members.  (*Id.* at 20-21, ¶ 6)  Previously, Plaintiff sought certification of this

12   settlement class pursuant to Fed. R. Civ. P. 23(c)(1), under which the Court may "make a conditional

13   determination of whether an action should be maintained as a class action, subject to final approval at a

14   later date." *See Fry v. Hayt, Hayt & Landau*, 198 F.R.D. 461, 466 (E.D. Pa. 2000)).

15           Parties seeking class certification bear the burden of demonstrating the elements of Rule 23(a)

16   are satisfied, and "must affirmatively demonstrate … compliance with the Rule." *Wal-Mart Stores,*

17   *Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Doninger v. Pacific Northwest Bell, Inc.*, 563 F.2d 1304, 1308

18   (9th Cir. 1977).  If an action meets the prerequisites of Rule 23(a), the Court must consider whether the

19   class is maintainable under one or more of the three alternatives set forth in Rule 23(b).  *Narouz v.*

20   *Charter Communs., LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010).

21           **A.        Rule 23(a) Requirements**

22           The prerequisites of Rule 23(a) "effectively limit the class claims to those fairly encompassed

23   by the named plaintiff's claims." *General Telephone Co. of the Southwest. v. Falcon*, 457 U.S. 147,

24   155-56 (1982).  Certification of a class is proper if:  "(1) the class is so numerous that joinder of all

25   members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or

26   defenses of the representative parties are typical of the claims or defenses of the class; and (4) the

27

28           [1] Because the class was only conditionally certified upon preliminary approval of the Settlement, final certification
     of the Settlement Class is required.

representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). These prerequisites are generally referred to as numerosity, commonality, typicality, and adequacy of representation. *Falcon*, 457 U.S. at 156.

### 1. Numerosity

A class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). This requires the Court to consider "specific facts of each case and imposes no absolute limitations." *General Telephone Co. v. EEOC*, 446 U.S. 318, 330 (1980). Courts have found the requirement satisfied when the class comprised as few as thirty-nine members or where joining all class members would serve only to impose financial burdens and clog the court's docket. *See Murillo v. Pac. Gas & Elec. Co.*, 266 F.R.D. 468, 474 (E.D. Cal. 2010) (citation omitted) (discussing Ninth Circuit thresholds for numerosity); *In re Itel Securities Litig.*, 89 F.R.D. 104, 112 (N.D. Cal. 1981).

Here, Plaintiff reports 250 Class Members were identified in the information provided by Defendants to Simpluris. (Doc. 53 at 8) Therefore, the Court finds the numerosity requirement is satisfied. *See Immigrant Assistance Project of Los Angeles Cnt. Fed'n of Labor v. INS*, 306 F.3d 842, 869 (9th Cir. 2002) (finding the numerosity requirement was "satisfied solely on the basis of the number of ascertained class members").

### 2. Commonality

Rule 23(a) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy the commonality requirement, the class representatives must demonstrate common points of facts and law. *See Wal-Mart Stores*, 564 U.S. at 350. Thus, "commonality requires that the class members' claims depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke," and the "plaintiff must demonstrate the capacity of classwide proceedings to generate common answers to common questions of law or fact that are apt to drive the resolution of the litigation." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks and citations omitted); *see also Parsons v. Ryan*, 754 F.3d 657, 684 (9th Cir. 2014) (finding commonality satisfied where "[t]he factual and legal questions that [plaintiffs] present can be answered 'yes' or 'no' in one stroke as to the entire class, dissimilarities among class members do not impede the generation of common answers to those

questions, and the capacity of classwide proceedings to drive the resolution of this litigation cannot be doubted").

Previously, Plaintiff reported there are common questions of law and facts in this case, because the class members were subjected to the same payment policies as employees of Defendants.  (*See* Doc. 41-1 at 12)  Specifically, Plaintiff contends common questions of law and fact to the Settlement Class include:

> • Whether Defendants' failure to include safety bonuses in the calculation of overtime due employees resulted in an underpayment of compensation due such employees.
>
> • Whether Defendants failure to include safety bonuses in the calculation of overtime due employees resulted in the provision of inaccurate wage statements.
>
> • Whether Defendants' failure to pay overtime due was willful for purposes of Section 203.

(*Id.*)  Because resolution of these issues would apply to the claims of each of the Class Members, the Court finds the commonality requirement is satisfied for purposes of settlement.  *See Wal-Mart Stores*, 564 U.S. at 350; *Parsons*, 754 F.3d at 684.

### 3.   Typicality

This requirement demands that the "claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Typicality is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  *Armstrong v. Davis*, 275 F.3d 849, 868 (2001); *see also Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995) (the typicality requirement is satisfied when the named plaintiffs have the same claims as other members of the class and are not subject to unique defenses).  While representative claims must be "reasonably co-extensive with those of absent class members," the claims "need not be substantially identical."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998); *see also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

Plaintiff reports that he was "employed in Kern County by Defendants as a non-exempt employee."  (Doc. 1-3 at 5, ¶ 1)  Plaintiff asserts he "received non-discretionary bonus payments for periods during which [he] worked overtime but was not paid overtime on such payments."  (Doc. 41-4

at 2, Garcia Decl. ¶ 4) Because Plaintiff was subjected to the same polices and payment procedure as the Settlement Class Members, the typicality requirement is satisfied.

### 4. Adequacy of Representation

Absentee class members must be adequately represented for judgment to be binding upon them. *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940). Accordingly, this prerequisite is satisfied if the representative party "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "[R]esolution of this issue requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000) (citing *Hanlon*, 150 F.3d at 1020); *see also* Pierce v. County of Orange, 526 F.3d 1190, 1202 (9th Cir. 2008).

### a. *Proposed class representative*

Plaintiff seeks appointment as the Class Representative of the Settlement Class. (*See* Doc. 41-1 at 13-14) Plaintiff asserts that he does not have any conflicts of interest with other class members. (*Id.* at 13, citing Doc. 41-4 at 2, Garcia Decl. ¶ 6) In addition, Plaintiff asserts: "I have and will consider the interests of the other Class Members just as I would my own interests and understand that I may need to put the interests of the other Class Members before my own." (Doc. 41-4 at 2, Garcia Decl. ¶ 5) Thus, the Court finds Plaintiff will fairly and adequately represent the interests of the Settlement Class.

### b. *Proposed class counsel*

Lonnie C. Blanchard, III and Peter R. Dion-Kindem sought appointment as counsel for the settlement class. (Doc. 41-2 at 20, Settlement § 1, ¶ 5) Counsel reported they do not have any conflicts of interest with the class members and "are experienced in handling class action lawsuits." (Doc. 41-1 at 13-14, citing Doc. 41-2 at 2-5, Dion-Kindem Decl., ¶ 5-10; Doc. 41-3 at 2-5, Blanchard Decl., ¶¶ 4-6) In addition, Mr. Blanchard reported "[t]he focus of [his] practice is almost exclusively civil litigation," including "extensive experience in wage and hour litigation, including class actions." (Doc. 41-3 at 2, ¶ 4) Similarly, Mr. Dion-Kindem asserted he has "extensive experience litigating wage and hour and FCRA class actions, employee rights' claims, and other claims in federal and state court." (Doc. 41-2 at 2, ¶ 8) Both attorneys identified numerous class action cases in which they were

counsel of record.  (*See* Doc. 41-2 at 2-5; Doc. 41-3 at 2-3) Defendants have not oppose their

appointment or asserted they are inadequate to represent the interest of the class. Therefore, the Court

finds Mr. Blanchard and Mr. Dion-Kindem satisfy the adequacy requirement.

### B.      Certification of a Class under Rule 23(b)(3)

As noted above, once the requirements of Rule 23(a) are satisfied, a class may only be certified

if it is maintainable under Rule 23(b).  Fed. R. Civ. P. 23(b); *see also Narouz*, 591 F.3d at 1266.

Plaintiff asserts certification of the settlement class is appropriate under Rule 23(b)(3), which requires a

finding that (1) "the questions of law or fact common to class members predominate over any questions

affecting only individual members," and (2) "a class action is superior to other available methods for

fairly and efficiently adjudicating the controversy."  These two requirements are generally called the

"predominance" and "superiority" requirements. *See Hanlon*, 150 F.3d at 1022-23; *see also Wal-Mart*

*Stores*, 564 U.S. at 363 ("(b)(3) requires the judge to make findings about predominance and

superiority before allowing the class").

Plaintiff argued the predominance requirement is satisfied because "[t]he elements of Plaintiff's

substantive claims are subject to proof by generalized, common evidence" given the policies of

Defendants related to calculation of overtime.  (Doc. 41-1 at 14) In addition, he asserted the superiority

requirement was met "because individual litigation is not feasible and the claims are manageable."  (*Id.*

at 15, emphasis omitted) Plaintiff also reported there has been "no interest by class members to

individually litigate" and "absent a class action, most class members simply could not otherwise

enforce their rights." (*Id.* at 16) Indeed, no Class Member has expressed a desire to litigate his or her

own claims, and no requests for exclusion were submitted.  (*See* Doc. 53 at 10) Therefore, the Court

finds certification of the Settlement Class is proper under Rule 23(b)(3).

## II.      Evaluation of the Settlement Terms

At the final approval stage, the Court must determine whether the proposed settlement "is

fundamentally fair, adequate, and reasonable."  *Lane v. Facebook, Inc*., 696 F.3d 811, 818 (9th Cir.

2012); *see also* Fed. R. Civ. P. 23(e)(2). Approval is required to ensure settlement is consistent with

Plaintiff's fiduciary obligations to the class.  *See Ficalora v. Lockheed Cal. Co.*, 751 F.2d 995, 996 (9th

Cir. 1985).  "It is the settlement taken as a whole, rather than the individual component parts, that must

be examined for overall fairness." *Hanlon*, 150 F.3d at 1026 (citing *Officers for Justice v. Civil Serv. Comm'n of S.F.*, 688 F.2d 615, 628 (9th Cir. 1982)); *see also Lane*, 696 F.3d at 818-19.

The Ninth Circuit identified several factors to evaluate the fairness of a class action settlement, including:

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (citing *Hanlon*, 150 F.3d at 1026). A court should also consider whether the settlement agreement is "the product of collusion among the negotiating parties." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 458 (citing *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1290 (9th Cir. 1992)). The Ninth Circuit explained, "the decision to approve or reject a settlement is committed to the sound discretion of the trial judge because he [or she] is exposed to the litigants and their strategies, positions, and proof." *Staton*, 327 F.3d at 953.

### A.      Strength of Plaintiff's Case

When evaluating the strength of a case, the Court should "evaluate objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements." *Adoma v. Univ. of Phoenix, Inc.*, 913 F. Supp. 2d 964, 975 (E.D. Cal. 2012) (quoting *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F.Supp 1379, 1388 (D. Az. 1989)). Notably, "[t]he court need not reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute." *Class Plaintiffs*, 955 F.2d at 1291(internal quotations and citation omitted).

Plaintiff raised eight causes of action that the factfinder would be required to evaluate on the merits. (*See generally* Doc. 1-3) The proposed settlement of many of these claims was reached following the exchange of written discovery and taking depositions, which allowed the parties to assess the strengths and weaknesses of the action. (*See* Doc. 41-1 at 16-17) Accordingly, this factor weights in favor of final approval of the Settlement.

///

**B.      Risks, Expense, Complexity, and Likely Duration of Further Litigation**

"[T]here is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned."  *In re Syncor ERISA Litig.*, 516 F.3d at 1101 (citing *Class Plaintiffs*, 955 F.2d at 1276).  Approval of settlement is "preferable to lengthy and expensive litigation with uncertain results."  *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004).

Notably, employment law class actions are, by their nature, time-consuming and expensive to litigate.  *Hightower v. JPMorgan Chase Bank, N.A.*, 2015 WL 9664959 at *6 (C.D. Cal. Aug. 4, 2015). If the settlement were to be rejected, the parties would have to engage in further litigation related to the resolved claims, including seeking class certification and discovery on the issue of damages. Plaintiff contends that the partial settlement—including "significant settlement payments to the Class now"— is favorable "to risking (i) the Court's denial of certification; and (ii) an unfavorable result on the merits on summary judgment or at trial and/or on an appeal, a process that can take several more years to litigate."  (Doc. 41-1 at 19)  Further, Plaintiff notes the proposed settlement "avoids the risk of non-recovery and the additional accompanying expense associated with an appeal if the case was not certified."  (Doc. 53 at 5)

With regard to the claims resolved through this partial settlement, Plaintiff identified the following risks related to each of the settled claims:

> • **Subclass 1 - Overtime Sub-class:** Defendants contend that the safety bonuses were "discretionary" and therefore not includable in calculating the regular rate of pay. (29 U.S.C. § 207(e)(1).) (Dion-Kindem Decl., ¶ 44.)
>
> • **Subclass 2 – Wage Statement Sub-class:** Defendants contend that because there was no substantive violation with respect to the payment of overtime on the safety bonuses, there are no derivative wage statement violations and that any violation, if proven, was not "knowing and intentional" as required by Section 226(e). (Dion-Kindem Decl., ¶ 44.)
>
> • **Subclass 3 – 203 Sub-class:** Defendants contend that any violation is subject to a good-faith defense. "A willful failure to pay wages within the meaning of Labor Code Section 203 occurs when an employer intentionally fails to pay wages to an employee when those wages are due. However, a good faith dispute that any wages are due will preclude imposition of waiting time penalties under Section 203." (Cal. Code Regs., tit. 8, § 13520). (Dion-Kindem Decl., ¶ 44.)

(Doc. 41-1 at 19)

15

As Plaintiff observes, the time and expense of continued litigation related to these claims could outweigh any additional recovery. On the other hand, the proposed settlement provides for immediate recovery on claims presented by Plaintiff on behalf of the class. Due to the acknowledged risk of the claims of class members, this factor weighs in favor of final approval of the Settlement.

### C.   Maintenance of Class Status throughout the Trial

Plaintiff observes, "Absent settlement, there was a risk that there would not be a certified class at the time of trial." (Doc. 53 at 5) Plaintiff has moved to certify other classes following the partial settlement, and Defendants intend to oppose the motion. (*See* Docs. 43, 51) If the classes were not maintained, the Class Members would not be guaranteed to recover. Thus, this factor supports final approval of the Settlement.

### D.   Amount Offered in Settlement

To evaluate the fairness of the settlement award, the court should "compare the terms of the compromise with the likely rewards of litigation." *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968). "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *In re Mego Fin. Corp. Sec. Litig*., 213 F.3d 454, 459 (9th Cir. 2000). Thus, when analyzing the amount offered in settlement, the Court should examine "the complete package taken as a whole," and the amount is "not to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators." *Officers for Justice v. Civil Serv. Commission*, 688 F.2d 615, 625, 628 (9th Cir. 1982)

The proposed gross settlement amount is $525,000.00. (Doc. 41-2 at 24, Settlement, ¶ 30) Though, generally, orders approving class settlements compare the settlement amount to the estimated total maximum liability, the parties have not identified the total maximum liability for the settled claims. (*See* Doc. 53 at 6-7) Nevertheless, given the time expended by parties with discovery and mediation, it appears the parties agree this amount reflects a fair compromise as to the resolved causes of action. Indeed, in the Settlement Agreement, the parties indicate terms "are the result of lengthy, intensive arms-length negotiations." (Doc. 41-2 at 44, ¶ 58) In addition, as noted above, on average, class members will receive $1,200 each, though some will receive as much two thousand dollars. Based

16

upon the claims at issue, the Court finds these amounts to be fair and reasonable. Accordingly, the Court finds the amount offered supports final approval of the Settlement.

### E.     Extent of Discovery Completed and Stage of the Proceedings

"In the context of class action settlement, 'formal discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information to make an informed decision about settlement." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998) (quoting *In re Chicken Antitrust Litig.*, 669 F.2d 228, 241 (5th Cir. 1982)).  Approval of a class action settlement thus "is proper as long as discovery allowed the parties to form a clear view of the strength and weaknesses of their case." *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 454 (E.D. Cal. 2013).  The Court is "more likely to approve a settlement if most of the discovery is completed because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case." *Adoma*, 913 F. Supp. 2d at 977 (quoting *DIRECTV, Inc.,* 221 F.R.D. at 528).  Further, a settlement agreement is presumed fair if it "follow[s] sufficient discovery and genuine arms-length negotiation." *Id.*

Plaintiff reports that prior to reaching the partial settlement, the parties "conducted sufficient informal and formal discovery to be sufficiently familiar with the facts, merits, and risks of Plaintiff's claims." (Doc. 41-1 at 7)  According to Plaintiff, he received "extensive payroll and time-keeping data" from Defendants.  (*Id.* at 16) In addition, Plaintiff was deposed and took the deposition of Defendants' Rule 30(b)(6) designee.  (*Id.* at 17; *see also* Doc. 53 at 6)  Based upon the information provided, the parties made informed decisions, which lead to partial resolution of the matter following the mediator' proposal.  Consequently, this factor supports final approval of the Settlement.

### F.     Experience and Views of Counsel

As addressed above, Plaintiff's counsel are experienced in class action litigation.  In addition, "Class Counsel believe that the [Settlement] is fair, reasonable, adequate, and is in the best interest of the Class in light of all known facts and circumstances." (Doc. 41-2 at 25, Settlement ¶ 32) In addition, Defendants indicated they "desire fully, finally, and forever to settle, compromise, and discharge all Claims." (*Id.* at 26, ¶ 34) These opinions of counsel are entitled to significant weight and support final approval of the settlement agreement. *See Nat'l Rural Telecomms.*, 221 F.R.D. at 528 ("Great weight is

accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation").

### G.    Presence of a Government Participant

Because the government is not a party in the action, this factor does not weigh for or against final approval of the Settlement.

### H.    Reactions of Class Members to the Proposed Settlement

Plaintiff agreed to the terms of Settlement Agreement.  (Doc. 41-2 at 48)  Cassandra Cita, a case manager for Simpluris, reports that no Class Member objected to the settlement terms or requested exclusion.  (Doc. 53-4 at 4, Cita Decl. ¶¶ 10-11)  Significantly, "[t]he absence of a single objection to the Proposed Settlement provides further support for final approval of the Proposed Settlement." *Nat'l Rural Telecomms.*, 221 F.R.D. at 529  (citations omitted); *see also Barcia v. Contain-A-Way, Inc.*, 2009 WL 587844 at *4 (S.D. Cal. Mar. 6, 2009).  Accordingly, this factor weighs significantly in favor of granting final approval.

### I.    Collusion between Negotiating Parties

The inquiry of collusion addresses the possibility that the settlement agreement is the result of either "overt misconduct by the negotiators" or improper incentives of class members at the expense of others.  *Staton*, 327 F.3d at 960.  The Ninth Circuit observed that "settlement class actions present unique due process concerns for absent class members" because the "inherent risk is that class counsel may collude with the defendants, tacitly reducing the overall settlement in return for a higher attorney's fee." *See In re Bluetooth Headset Prods. Liab. Litig*., 654 F.3d 935, 946 (9th Cir. 2011) (internal quotation marks, citations omitted).  Thus, the Court must consider whether the process by which the parties arrived at their settlement is truly the product of arm's length bargaining, rather than collusion or fraud.  *Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 613 (E.D. Cal. 2015).

The Court notes that the settlement was achieved after a mediation.  Moreover, the parties chose to accept the mediator's proposal, meaning this settlement was one that the third-party mediator proposed, rather than an amount determined through the negotiations of the parties.  Thus, neither party agreed to settle on the terms proposed by the mediator at the mediation session but accepted the

18

settlement terms the mediator believed were fair and reasonable. This suggests the lack of collusion between the negotiating parties.

Nevertheless, where a class action settlement agreement is reached prior to a class being certified, district courts must be watchful "not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 947. These "more subtle signs" include: (1) "when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded"; (2) the existence of a "clear sailing" arrangement, which provides "for the payment of attorneys' fees separate and apart from class funds" and "carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class"; and (3) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund." *Id.* (internal quotations, citations omitted).

### 1.    Whether there is a disproportionate distribution

The typical range of acceptable attorneys' fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value, with 25% considered the benchmark. *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000). Because the fees requested are within the range awarded by the Ninth Circuit from the gross settlement fund, the Court finds the Settlement Agreement does not provide a disproportionate distribution to Class Counsel. *See Millan v. Casvade Water Servs.*, 310 F.R.D. 593, 612 (E.D. Cal. 2015) (finding no disproportionate distribution where class counsel was to receive a third of the settlement fund "although significantly above the benchmark for this Circuit," because it was "not unreasonable as an upper bound" of fees awarded in the Circuit).

### 2.    Existence of a "clear sailing" agreement

In general, a "clear sailing" provision is one in which the parties agree to the "payment of attorneys' fees separate and apart from class funds." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 947. However, the Ninth Circuit recognized also a "clear sailing" arrangement exists when a defendant expressly agrees not to oppose an award of attorneys' fees up to an agreed upon amount. *Lane*, 696 F.3d at 832; *In re Bluetooth Headset Prods.*, 654 F.3d at 947.

Here, the Settlement Agreement indicates "Defendants agree not to oppose a request by Class Counsel of attorney's fees of up to $175,000 and costs of up to $20,000."  (Doc. 41-2 at 37, ¶ 49) Thus, the Settlement includes a version of a "clear sailing agreement." Nevertheless, the existence of a clear sailing provision is not necessarily fatal to final approval.  *See In re Bluetooth Headset Prods. Liab. Litig*., 654 F.3d at 948; *see also In re Toys R Us-Delaware, Inc.–Fair and Accurate Credit Transactions Act (FACTA) Litig*., 295 F.R.D. 438, 458 (C.D. Cal. 2014) ("a clear sailing agreement is one where the party paying the fee agrees not to contest the amount to be awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling").  Rather, "when confronted with a clear sailing provision, the district court has a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class." *Id*. (citing *Staton*, 327 F.3d at 954).  As discussed below, the Court finds that an award from the common fund is appropriate and the recommended award is reasonable in light of the work completed.  Thus, the Court finds this factor does not mandate a finding of collusion.  *See Singh v. Roadrunner Intermodal Servs. LLC*, 2019 WL 316814 at *7-8 (E.D. Cal. Jan 24, 2019) (not finding collusion between the parties, despite a clear sailing agreement, where the fee award was analyzed and determined to be reasonable).

### 3.      Whether there is a reversion to Defendants

Finally, the parties did not arrange for any unawarded fees to revert to Defendants.  Instead, the parties acknowledge in the Settlement Agreement that the Court may approve less than the requested amount, in which case "the Net Settlement Amount will be adjusted."  (Doc. 41-2 at 38, ¶ 49)  Because unawarded fees return to the Net Settlement Amount for distribution to the class, this factor does not support a finding of collusion between the parties.

## III.    Conclusion

The factors set forth by the Ninth Circuit weigh in favor of final approval of the Settlement, which appears to be is fair, reasonable, and adequate as required by Rule 23.  Therefore, the Court recommends final approval of the Settlement Agreement be **GRANTED**.

## REQUEST FOR ATTORNEYS' FEES

Attorneys' fees and nontaxable costs "authorized by law or by agreement of the parties" may be awarded pursuant to Rule 23(h).  As noted above, under the Settlement, Class Counsel may request

1  "attorney's fees of up to $175,000 and costs of up to $20,000."  (Doc. 41-2 at 37, Settlement 9, ¶ 49)

2  Here, Class Counsel request the maximum fees permitted under the Settlement Agreement.  (Doc. 53-1

3  at 6)  In support of these requests, Class Counsel filed declarations setting forth the hours worked and

4  hourly rates, as well as the firms' expenses.  (Docs. 53-2 at 8-10, Dion-Kindem Decl. ¶¶ 25, 31-32;

5  Doc. 53-3 at 2-3, Blachard Decl. ¶¶ 6-7)

6  **I.      Legal Standards**

7          The Court has an "independent obligation to ensure that the award [of attorneys' fees], like the

8  settlement itself, is reasonable, even if the parties have already agreed to an amount."  *In re Bluetooth*,

9  654 F.3d at 941. The Ninth Circuit explained that "fees provisions included in proposed class action

10  settlement agreements are, like every other aspect of such agreements, subject to the determination

11  whether the settlement is 'fundamentally fair, adequate, and reasonable.'" *Staton*, 327 F.3d at 963

12  (*quoting* Fed.R.Civ.P. 23(e)) Thus, the Court must "carefully assess the reasonableness of a fee amount

13  spelled out in a class action settlement agreement." *Id*.

14          The party seeking fees bears the burden of establishing that the fees and costs were reasonably

15  necessary to achieve the results obtained. *See Fischer v. SJB-P.D., Inc.*, 214 F.3d 1115, 1119 (9th Cir.

16  2000); *see also McGrath v. County of Nevada*, 67 F.3d 248, 254 n.5 (9th Cir. 1995) (noting a court may

17  not adopt representations regarding the reasonableness of time expended without independently

18  reviewing the record). Therefore, a fee applicant must document the tasks completed and the amount of

19  time spent. *Hensley v. Eckerhart*, 461 U.S. 424, 424 (1983); *Welch v. Metropolitan Life Ins. Co.*, 480

20  F.3d 942, 945-46 (9th Cir. 2007).  "Where the documentation of hours in inadequate, the district court

21  may reduce hours accordingly."  *Hensley*, 461 U.S. at 433.

22          Significantly, when fees are to be paid from a common fund, as here, the relationship between

23  the class members and class counsel is "turns adversarial."  *In re Washington Pub. Power Supply Sys.*

24  *Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994).  The Ninth Circuit observed:

25          [A]t the fee-setting stage, plaintiff's counsel, otherwise a fiduciary for the class, has
            become a claimant against the fund created for the benefit of the class. It is obligatory,
26          therefore, for the trial judge to act with a jealous regard to the rights of those who are
            interested in the fund in determining what a proper fee award is.

27

28  *Id*. at 1302 (internal quotation marks, citation omitted).  As a result the district court must assume a

fiduciary role for the class members in evaluating a request for an award of attorney fees from the common fund. *Id.*; *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009) ("when fees are to come out of the settlement fund, the district court has a fiduciary role for the class").

The Ninth Circuit determined both a lodestar and percentage of the common fund calculation "have [a] place in determining what would be reasonable compensation for creating a common fund." *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989). Whether the Court applies the lodestar or percentage method, the Ninth Circuit requires "fee awards in common fund cases be reasonable under the circumstances." *Florida v. Dunne*, 915 F.2d 542, 545 (9th Cir. 1990); *see also Staton*, 327 F.3d at 964 (fees must be "fundamentally fair, adequate, and reasonable").

### A.   Lodestar Method

The lodestar method calculates attorney fees by "by multiplying the number of hours reasonably expended by counsel on the particular matter times a reasonable hourly rate." *Florida*, 915 F.2d at 545 n. 3 (citing *Hensley*, 461 U.S. at 433). The product of this computation, the "lodestar" amount, yields a presumptively reasonable fee. *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013); *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 978 (9th Cir. 2008). Next, the court may adjust the lodestar upward or downward using a "multiplier" considering the following factors adopted by the Ninth Circuit in a determination of the reasonable fees:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975). However, the Court has since determined that the "desirability" of a case is no longer relevant. *Resurrection Bay Conservation Alliance v. City of Seward*, 640 F.3d 1087, 1095, n.5 (9th Cir. 2011) (citation omitted).

### B.   Percentage from the Common Fund

As the name suggests, under this method, attorneys who create a common fund for a class may be awarded a percentage of fees from the fund. *Hanlon*, 150 F.3d at 1029; *Boeing Co. v. Van Gemert*,

444 U.S. 472, 478 (1980) ("a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole").  An award from the common fund "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense," and as such application of the doctrine is appropriate "when each member of a certified class has an undisputed and mathematically ascertainable claim to part of a lump-sum judgment recovered on his behalf."  *Boeing Co.*, 444 U.S. at 478.

In the Ninth Circuit, the typical range of acceptable attorneys' fees is 20% to 30% of the total settlement value, with 25% considered the benchmark.  *See Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1047 (9th Cir. 2002); *Hanlon*, 150 F.3d at 1029 (observing "[t]his circuit has established 25 % of the common fund as a benchmark award for attorney fees"); *In re Pacific Enterprises Securities Litigation*, 47 F.3d 373, 379 (9th Cir. 1995) ("Twenty-five percent is the 'benchmark' that district courts should award in common fund cases"). The percentage may be adjusted below or above the benchmark, but the Court's reasons for adjustment must be clear.  *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989).

To assess whether the percentage requested is reasonable, courts may consider a number of factors, including "(1) the results obtained for the class; (2) the risk undertaken by counsel; (3) the complexity of the legal and factual issues; (4) the length of the professional relationship with the client; (5) the market rate; and (6) awards in similar cases."  *Romero v. Produces Dairy Foods, Inc.*, 2007 U.S. Dist. LEXIS 86270, at *8-9 (E.D. Cal. Nov. 14, 2007) (citing *Vizcaino*, 290 F.3d at 1048-1050; *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990)).

## II.    Evaluation of the Fees Requested

"The district court has discretion to use the lodestar method or the percentage of the fund method in common fund cases." *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000) (quoting *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 109 F.3d 602, 607 (9th Cir. 1997)).  Notably, the Court must consider similar factors under either method.  *See Kerr*, 526 F.2d at 70; *Vizcaino*, 290 F.3d at 1048-1050.  Further, the Court may "appl[y] the lodestar method as a crosscheck" to determine whether the amount requested is reasonable.  *Vizcaino*, 290 F.3d at 1050, n.5.

Because the Settlement applies formulas to determine the amount paid to class members, the Court finds application of the common fund doctrine—with a lodestar crosscheck— is appropriate. *See Boeing Co.*, 444 U.S. at 478. Thus, the Court must determine whether the requested percentage of the common fund is reasonable.

### A.     Results Obtained for the Class

Courts have recognized consistently that the result achieved is a major factor to be considered with a fee award. *Hensley*, 461 U.S. at 436; *Wilcox v. City of Reno*, 42 F.3d 550, 554 (9th Cir. 1994). Here, Class Counsel assert they "obtained a substantial recovery for the settlement class." (Doc. 53-1 at 9) According to Ms. Cita, the expected recovery for class members ranges from $5.27 to $2,089.99, with an average award of $1,172.80. (Doc. 53-4 at 4-5, Cita Decl. ¶¶ 14-15) Though these are fair results, there is no showing that the results are exceptional, such that an increase above the benchmark is warranted. *Compare with*

### B.     Risks Undertaken by Counsel

The risk of costly litigation and trial is an important factor in determining the fee award. *Chemical Bank v. City of Seattle*, 19 F.3d 1297, 1299-1301 (9th Cir. 1994). The Supreme Court explained, "the risk of loss in a particular case is a product of two factors: (1) the legal and factual merits of the claim, and (2) the difficulty of establishing those merits." *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992). As a result, the Ninth Circuit approved an award slightly above the benchmark in *Vizcaino* where the case was "extremely risky for class counsel" and the "plaintiffs lost in the district court – once on the merits, once on the class definition – and twice counsel succeeded in reviving their case on appeal." *Id.*, 290 F.3d at 1048.

Class Counsel asserts, "this litigation presented significant risks given the legal uncertainties, nuances, and other complexities of the law governing the claims at issue herein." (Doc. 53-1 at 11) Previously, Class Counsel argued,

> Based upon Defendants' defenses and objections in this case, just some of the specific risks related to each of the claims related to each of these subclasses are as follows:
> • **Subclass 1 - Overtime Sub-class:** Defendants contend that the safety bonuses were "discretionary" and therefore not includable in calculating the regular rate of pay. (29 U.S.C. § 207(e)(1).)
>
> • **Subclass 2 – Wage Statement Sub-class:** Defendants contend that because there was no substantive violation with respect to the payment of overtime on the safety bonuses,

24

there are no derivative wage statement violations and that any violation, if proven, was not "knowing and intentional" as required by Section 226(e).

• **Subclass 3 – 203 Sub-class:** Defendants contend that any violation is subject to a good faith defense. "A willful failure to pay wages within the meaning of Labor Code Section 203 occurs when an employer intentionally fails to pay wages to an employee when those wages are due. However, a good faith dispute that any wages are due will preclude imposition of waiting time penalties under Section 203." (Cal. Code Regs., tit. 8, § 13520).

(Doc. 41-2 at 12, Dion-Kindem Decl. ¶ 44)  In addition, Class Counsel assert that assuming Plaintiff prevailed on a motion for class certification, there would be "a substantial risk that a certified class might have been decertified at a later point in the litigation based on changes in the law or other future developments."  (Doc. 53-1 at 11)  Finally, Class Counsel argue the fees requested are supported by the contingent nature of the action and "it is an established practice to reward attorneys who take on the added risk of a contingency case."  (Doc. 53-1 at 9-10, *citing In re Washington Public Power Supply System Securities Litigation,* 19 F.3d 1291, 1299 (9th Cir. 1994))

Significantly, the legal risks identified by counsel are not *specific* to this action, but rather apply to class action litigation in general. Class Counsel fail to show the case was factually complex or demonstrate extreme risks in pursuing the claims addressed in the partial settlement. For example, in *Vizcaino,* the plaintiffs "lost in the district court—once on the merits, once on the class definition" and the class counsel twice "succeeded in reviving their case on appeal." *Id.,* 290 F.3d at 1048. The court found the pursuit of the case was "extremely risky" given the absence of supporting precedent and the challenges faced in the appeals. *Id.* As such, the risks supported an award of fees slightly above the benchmark. *Id.* at 1048-49. In contrast, Class Counsel did not face such challenges to the merits of the claims that have been settled.

Finally, the Ninth Circuit has suggested the distinction between a contingency arrangement and a fixed fee arrangement alone does not merit an enhancement from the benchmark.  *See In re Bluetooth Headset Prods. Liab. Litig.,* 654 F.3d at 942 n.7. (observing "whether the fee was fixed or contingent" is "no longer valid" as a factor in evaluating reasonable fees); *but see In re Online DVD-Rental Antitrust Litig.,* 779 F.3d at 954-55 (finding the contingent nature of litigation remains a relevant factor to evaluate a request from the common fund). Consequently, the risks undertaken by counsel do not weigh in favor of an upward departure from the benchmark.

25

### C.   Complexity of Issues and Skill Required

The complexity of issues and skills required may weigh in favor of a departure from the benchmark fee award.  *See, e.g., Lopez v. Youngblood*, 2011 U.S. Dist. LEXIS 99289, at *14-15 (E.D. Cal. Sept. 2, 2011) (in determining whether to award the requested fees totaling 28% of the class fund, the Court observed the case involved "complex issues of constitutional law"); *see also Couser v. Comenity Bank,* 125 F.Supp.3d 1034, 1049 (S.D. Cal. 2015) (considering "the complexity of the issues litigated" as a factor in the reduction of the fees to 15% of the common fund).

Class Counsel have not identified any complex issues related to the settled claims.  Though Class Counsel assert they "have extensive experience in employment litigation generally and wage and hour class action litigation specifically" (Doc. 53 at 12), they do not address the level of skill that was required to reach this partial settlement.  (*See generally* Doc. 53-1 at 9-12)  Nevertheless, Class Counsel argue their level of experience may support an upward departure from the benchmark. (*See* Doc. 53-1 at 12, citing *In re Heritage Bond Litig.,* 2005 WL 1594403, at *20 (C.D. Cal. June 10, 2005) [("the novelty, difficulty and complexity of the issues involved are significant factors in determining a fee award")]); *In re Gen. Instrument Securities Litig*., 209 F.Supp.2d 423, 432–433 (E.D. Pa. 2001). Indeed, the experience of counsel is a factor in the lodestar crosschecks performed by courts, which must determine the reasonableness of hourly rates for attorneys with similar experience.  *See Blum v. Stenson*, 465 U.S. 886, 895-96 and n.11 (1984).

Class Counsel have not identified any recent changes to wage and hour law that complicated the issues or created novel issues in this action. Class Counsel do not present any evidence that their investigation—or the prosecution of the settled claims—was hampered by reluctant putative class members. Because Class Counsel do not identify any evidence to support a finding that the factual and legal issues presented were complex or required significant skill, the Court is unable to find this factor supports an award of fees above the benchmark.

### D.   Length of Professional Relationship

Class Counsel do not address the length of the professional relationships between Plaintiff and his attorneys.  Nevertheless, the Court notes counsel initiated the action by filing a complaint in Kern County Superior Court on June 5, 2018.  (Doc. 1 at 2, ¶ 1) Though counsel have spent two years on this

26

action to date, this factor does not weigh in favor of departure from the benchmark. *See Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (finding "the 25 percent standard award" was appropriate although "the litigation lasted more than 13 years").

### E.      Awards in Similar Cases

Class Counsel observe, "Courts in the Ninth Circuit have also found that a request for fees of one-third of the entire common fund is fair and reasonable." (Doc. 53-1 at 8, emphasis omitted). Counsel acknowledge that the "benchmark" award is 25%, but also assert:

> A number of Ninth Circuit courts have indicated that the benchmark may be one-third or higher, however. (*See, e.g., In re Mego Financial Corp. Securities Litigation* (9th Cir. 2000) 213 F.3d 454, 460, *as amended* (June 19, 2000) (affirming award of fees equal to one-third of total recovery); *In re Pacific Enterprises Securities Litigation* (9th Cir. 1995) 47 F.3d 373, 379 (awarding 33% of $12 million common settlement fund); *Syed v. M-I, L.L.C.* (E.D. Cal., July 27, 2017, No. 112CV01718DADMJS) 2017 WL 3190341, at *7 (attorney's fees of $2,333,333.33 equal to one-third of gross settlement approved by Judge Drozd); *Romero v. Producers Dairy Foods, Inc.* (E.D. Cal., Nov. 14, 2007, No. 1:05CV0484 DLB) 2007 WL 3492841 (33% fee awarded); *Singer v. Becton Dickinson and Co.* (S.D. Cal., June 1, 2010, No. 08-CV-821-IEG (BLM)) 2010 WL 2196104, at *8 (approving attorney fee award of 33.33% of the common fund and holding that the award was similar to awards in three other wage and hour class actions where fees ranged from 30.3% to 40%); *In re Heritage Bond Litigation* (C.D. Cal., June 10, 2005, No. 02-ML-1475 DT) 2005 WL 1594403 (33.33% percentage of common fund fee award approved); *Chin v. Wachovia Financial Services Inc. et al.*, No. 08-00684 (N.D. Cal.) (33% award); *Burrows v. Combined Ins. Co. of Am.*, No. 08-01752 (E.D. Cal.) (33% award); *Bejarano v. Amerisave Mortgage Corp.*, No. CV 08-00599 (E.D. Cal.) (33% award); *Weisbarth and List v. H R Block Financial Advisors, Inc.*, No. 07-00236 (C.D. Cal.) (33% award); *Winzelberg v. Liberty Mutual Ins. Co.*, No. CV 07-460 (C.D. Cal) (33% award); *Perry v. SunAmerica*, No. CV 07-1193 (C. D. Cal.) (33% award); *Simpson v. e*Trade*, No. CV 06-156 (C. D. Cal.) (33% award); *Chavez, et al. v. Petrissans, et al.*, No. 08-00122 (E.D. Cal.) (33% award).)

(Doc. 53-1 at 8) Class Counsel do not explain how these cases are similar to the matter now pending before the Court. They offer no analysis as to whether the claims prosecuted were similar to those settled here, whether the results achieved on behalf of the class were similar, the complexities of the issues, or the skill of counsel. Consequently, the citations of Class Counsel offer limited support to their request for fees and an upward departure from the benchmark. On the other hand, the Court notes the typical range of acceptable attorneys' fees in the Ninth Circuit is 20 percent to 33.3 percent of the total settlement value." *Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 448 (E.D. Cal. 2013). Because the percentage requested is within this range—though at the highest end— the cases identified by Class Counsel support a conclusion the percentage requested is reasonable.

**F.      Lodestar Crosscheck and Market Rate**

Class counsel has requested attorneys' fees up to $175,000.00, which is one third of the settlement fund. (Doc. 41-2 at 37, Settlement § 9, ¶ 49) The parties agree that "[i]f less than these amounts are approved by the Court, then the Net Settlement Amount will be adjusted accordingly." (*Id.*)  In preliminarily approving the amount of fees requested, the Court noted the exact amount of the fee award would be determined upon the application of Class Counsel and that "a fee applicant **must provide time records documenting the tasks completed and the amount of time spent on the action**." (Doc. 44 at 14-15, citing *Hensley v. Eckerhart*, 461 U.S. 424, 424 (1983); *Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942, 945-46 (9th Cir. 2007) (emphasis in original).  Despite this explicit instruction, Class Counsel have not provided any time records for the Court's review.  Instead, Class Counsel provided only declarations from Peter Dion-Kindem and Lonnie Blanchard III to support the request for fees, reporting they have worked a total of 444 hours on the action and their total lodestar is $388,500.00. (Doc. 53-2; Doc. 53-3; *see also* Doc. 53-1 at 14)

Nevertheless, when the lodestar is used as a cross-check for a fee award, the Court "may use a 'rough calculation of the lodestar.'" *Bond v. Ferguson Enters., Inc.*, 2011 WL 2648879, at *12 (E.D. Cal. June 30, 2011) (quoting *Fernandez v. Victoria Secret Stores, LLC*, 2008 WL 8150856 (C.D. Cal. July 21, 2008)). Thus, the Court will accept the limited information provided by Class Counsel for purposes of performing the lodestar crosscheck.  *See Schiller*, 2012 WL 2117001 at *20 (the Court is not required to perform an "exhaustive cataloguing and review of counsel's hours" for the crosscheck) (citing *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306 (3d Cir. 2005); *In re Immune Response Sec. Litig.*, 497 F.Supp.2d 1166 (S.D. Cal. 2007)).

### 1.      Hours expended

Previously, Class Counsel reported they "engaged in extensive documentary discovery and Defendants provided extensive payroll and time-keeping data, which Plaintiff's counsel reviewed and analyzed." (Doc. 41-1 at 16)  In addition, "Plaintiff was deposed and Plaintiff deposed Defendants' Rule 30(b)(6) designee." (*Id.* at 16-17)

Mr. Dion-Kindem reports that he has "incurred at least 241 hours in pursuing this litigation up to the date of the mediation, and, after the partial settlement case was reached in principle, in

connection the drafting and finalizing of the settlement agreement, obtaining preliminary approval, and seeking final approval." (Doc. 53-2 at 8, ¶ 25)  In addition, Mr. Blanchard reports he "incurred at least 203 hours in pursuing this litigation up to the date of the mediation, and, after the partial settlement case was reached in principle, in connection the drafting and finalizing of the settlement agreement, obtaining preliminary approval, and seeking final approval." (Doc. 53-3 at 3, ¶ 7)

Because no records have been provided, the Court is unable to determine whether the time reported includes any clerical tasks or duplicative work by counsel.  Nevertheless, the Court will accept the report that the identified tasks required a total of 444 hours of work for purposes of the lodestar crosscheck. *See Syed,* 2019 WL 3564467 at *8 (noting that Mr. Dion-Kindem and Mr. Blanchard reported "invested 4333.25 hours in [the] litigation" and accepting that total for calculating the lodestar).

### 2.    Hourly rate

Lonnie Blanchard and Peter Dion-Kindem each report they have 40 years of experience and seek an hourly rate of $875, reporting the rate is supported by the Laffey Matrix and is appropriate "for attorneys with 20+ years practicing in Los Angeles." (Doc. 53-2 at 10, ¶¶ 25-27; *see also* Doc. 53-3 at 2, ¶2)

Importantly, the Supreme Court explained that attorney fees are to be calculated with "the prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895-96 and n.11 (1984).  In general, the "relevant community" for purposes of determining the prevailing market rate is the "forum in which the district court sits." *Camacho*, 523 F.3d at 979.  Thus, the Eastern District of California is the appropriate forum to establish the lodestar hourly rate. *See Jadwin v. County of Kern*, 767 F.Supp.2d 1069, 1129 (E.D. Cal. 2011).

The fee applicant bears a burden to establish that the requested rates are commensurate "with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum*, 465 U.S. at 895 n.11.  The applicant meets this burden by "produc[ing] satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Id.*; *see also Chaudhry v. City of Los Angeles*, 751 F.3d

1096, 1110-11 (9th Cir. 2014) ("Affidavits of the plaintiffs' attorney[s] and other attorneys regarding prevailing fees in the community . . . are satisfactory evidence of the prevailing market rate.") However, "rates, other than those of the forum, may be employed if local counsel was unavailable, either because they are unwilling or unable to perform because they lack the degree of experience, expertise, or specialization required to handle properly the case." *Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992). Although such outside rates may be used, Class Counsel do not assert local counsel was unavailable. Thus, they fail to meet their burden to show that hourly rates other than those this District should be used for purposes of calculating the lodestar. *See Camacho*, 523 F.3d at 979; *Barjon v. Dalton*, 132 F.3d 496, 500-02 (9th Cir. 1997) (affirming the court's decision to decline an award of out-of-district billing rates where the fee applicants failed "to prove the unavailability of local counsel," and the court instead calculated the award with hourly rates in the relevant community).

Significantly, the hourly rates sought by counsel are not in accord with the market rate for this District and have been rejected by this Court.  In *Syed v. M-I LLC*, this Court observed that the rate requested by Mr. Blanchard and Mr. Dion-Kindem—who were also Class Counsel in that action—was "unreasonably high." *Id.*, 2019 WL 3564467 at *7 (E.D. Cal Aug. 6, 2019).  The hourly rates generally accepted in the Fresno Division for attorneys is between $250 and $400, with the highest rates reserved for those with more than 20 years of experience.  *See Willis v. City of Fresno*, 2018 WL 1071184, at *7 (E.D. Cal.2018); *Silvester v. Harris*, 2014 WL 7239371 at *4 (E.D. Cal. Dec. 2014). In *Syed*, the Court rejected the hourly rate of $875, finding "a more appropriate hourly rate for an attorney with approximately 40 years of experience is approximately $400 per hour." *Id.*, 2019 WL 3564467 at *7 (citing *Willis*, 2018 WL 1071184, at *7 [awarding rate of $400 to attorney with more than forty years of experience]; *Verduzco v. Ford Motor Co.*, 2015 WL 4131384, at *4 (E.D. Cal. July 9, 2015), *report and recommendation adopted*, 2015 WL 4557419 (E.D. Cal. July 28, 2015) [awarding an hourly rate of $380 to an attorney with more than forty years of experience]).

For purposes of the lodestar calculation, the hourly rate for Mr. Blanchard and Mr. Dion-Kindem will be reduced to $400.  *See Syed*, 2019 WL 3564467 at *7.  Based upon the prior survey of the attorney fees in the Fresno Division and the Court's own knowledge, these hourly rates are reasonable.  *See Silvester,* 2014 WL 7239371 at *4; *see also Ingram v. Oroudjian*, 647 F.3d 925, 928

(9th Cir. 2011) (concluding "the district court did not abuse its discretion either by relying, in part, on its own knowledge and experience" to determine reasonable hourly rates).

### 3. Lodestar Calculation

With the hourly rate adjustments set forth above to $400, the lodestar for the 444 hours expended in this action by Class Counsel totals $**177,600.00**.  Significantly, there is a strong presumption that the lodestar is a reasonable fee.  *Gonzalez*, 729 F.3d at 1202; *Camacho*, 523 F.3d at 978.  This lodestar calculation is more than $40,000 greater than the benchmark, and slightly higher than the amount of fees requested. Thus, the lodestar crosscheck supports an award above the benchmark, to the requested third of the common fund.

Based upon the foregoing, the Court **RECOMMENDS** Class Counsel's request for attorney fees be **GRANTED** in the modified amount of 1/3 of the gross settlement fund, or $175,000.00.  The Court finds this amount is fair and reasonable in light of the tasks completed and hours expended by Class Counsel in this action.

## REQUESTS FOR COSTS

### I.      Litigation Expenses

Reimbursement of taxable costs is governed by 28 U.S.C. § 1920 and Federal Rule of Civil Procedure 54.  Attorneys may recover reasonable expenses that would typically be billed to paying clients in non-contingency matters.  *See Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994).  Previously, this Court noted costs "including filing fees, mediator fees …, ground transportation, copy charges, computer research, and database expert fees… are routinely reimbursed in these types of cases."  *Alvarado v. Nederend*, 2011 WL 1883188 at *10 (E.D. Cal. Jan. May 17, 2011); *see also In re Immune Response Secs. Litig.*, 497 F. Supp. 2d 1166, 1177 (S.D. Cal. 2007) (expenses awarded may include: "(1) meals, hotels, and transportation; (2) photocopies; (3) postage, telephone, and fax; (4) filing fees; (5) messenger and overnight delivery; (6) online legal research; (7) class action notices; (8) experts, consultants, and investigators; and (9) mediation fees").

The Court preliminarily approved costs up to $20,000 for Class Counsel.  (Doc. 44 at 20)  Class Counsel now requests reimbursement of their expenses in the amount of $14,670.01.  (Doc. 53-1 at 16)  The Court has reviewed Class Counsel's declarations, which attest to the costs they incurred for

filing, copying, postage, transcripts, travel, and mediation.  (*See* Doc. 53-2 at 10; Doc. 53-3 at 2)  The Court finds all the expenses incurred to be reasonable, and **RECOMMENDS** the request for litigation costs be **GRANTED** in the requested amount of $14,670.01.

## II.     Costs of Claims Administration

Pursuant to the agreement of the parties, the Court appointed Simpluris to serve as the Settlement Administrator.  (*See* Doc. 44 at 16-17, citing Doc. 41-2, Settlement ¶ 28)  Under the terms of the Settlement:

> The duties of the Settlement Administrator shall include, without limitation: the printing and mailing of court-approved Notice Form to Class Members; taking all steps as are reasonably necessary to ensure Class Members timely receive a Notice including conducting a National Change of Address search before mailing the Notice Form; communicating with Class Members and others regarding any reasons as deemed reasonably necessary by the Settlement Administrator in order to ensure that the highest percentage of Class Members receive notice of this Joint Stipulation; the utilization of agreed methods to ensure the most up-to-date and accurate addresses for Class Members; conducting address searches on all returned, undelivered mail and remailing Notices Forms to Class Members for whom addresses are found; the providing of toll-free, live operator telephone support to receive telephone calls from Class Members or others regarding the claims process; the maintenance of appropriate databases to fulfill its duties; the receipt and control of all returned Notices Forms, requests for opt-out, and objections; the calculation of the Settlement Shares; the preparation of all necessary reports listing the Settlement Shares; periodic reporting to Class Counsel and Defendants' Counsel; the timely issuance and, if necessary, re-issuance of Settlement Share checks to Settlement Class Members; conducting address searches for all Settlement Share checks that are returned as undeliverable…

(Doc. 41-2 at 28, Settlement ¶ 39)  The Settlement indicated that $6,000.00 from the gross settlement fund was designated for the Settlement Administrator in anticipation of the administration expenses, (*Id.* at 34, ¶ 46(e)).  Thus, the Court ordered the "[c]osts of settlement administration shall not exceed $6,000" and the Class Members were notified of these estimated administration costs.  (Doc. 44 at 20; Doc. 53-4 at 9, § 7)

Mr. Dion-Kindem now reports in his declaration in support of final approval that "Simpluris' original not-to-exceed bid was $6,800."  (Doc. 53 at 11, ¶ 38)  According to Mr. Dion-Kindem, "Through an inadvertent error, Plaintiff's counsel thought that the bid was $6,000, which was reflected in the preliminary approval motion."  (*Id.*)  Thus, he "believes and requests that Simpluris should be awarded the $6,800."  (*Id.*)

Notably, the increased costs request is not supported by any evidence, because Simpluris only

provided its original estimate from April 9, 2020 that the costs incurred would total $6,796.  (Doc. 53-4 at 16)  This estimate was based upon a class size of 260 individuals and anticipated 15% of the mailed notices would be undeliverable, which would require additional expenses.  (*See id.*)  Further, Simpluris indicated that it anticipated the costs to "Mail Notice Packet" to be $1.25 per Class Member and "postage" to be $0.74 per Class Member, although it is unclear why there are separate entries "mail" "postage."  (*See id.*)  Simpluris has not provided any information regarding its actual costs incurred in mailing the Notice to the 250 Class Members or administration costs.

Furthermore, in the motion for final approval, Class Counsel do not address the issue of the amount requested exceeding the amount preliminarily approved by the Court or why awarding an amount exceeding the total for which the Class Members received notice is appropriate.  (*See generally* Doc. 53, Doc. 53-1) Indeed, now seeking an award greater than the amount for which notice was given deprives the class members of their opportunity to make any objections to the increase of approximately 13% to the administration costs. Accordingly, the Court recommends the costs be **GRANTED** in the modified amount of $6,000.00.

## PLAINTIFF'S REQUEST FOR AN INCENTIVE AWARD

The Settlement provides that "Plaintiff may seek a payment of $7,500 as an enhancement for the Representative Plaintiff's services."  (Doc. 41-2 at 36, Settlement § 7, ¶ 48) Incentive awards, or enhancements, for class representatives are not to be given routinely by the Court.  In *Staton*, 327 F.3d at 975, the Ninth Circuit explained:

> Indeed, '[i]f class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard.' *Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 720 (E.D.N.Y. 1989); *see also Women's Comm. for Equal Employment Opportunity v. Nat'l Broad. Co.*, 76 F.R.D. 173, 180 (S.D.N.Y. 1977) ("[W]hen representative plaintiffs make what amounts to a separate peace with defendants, grave problems of collusion are raised.").

In fact, "'excessive payments to named class members can be an indication that the agreement was reached through fraud or collusion.'"  *Id.* (citation omitted).  In evaluating the enhancement award to a class representative, a court should consider all "relevant factors including the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and

1    reasonable fears of workplace retaliation." *Staton*, 327 F.3d at 977.

2    **I.      Awarding an Incentive Payment**

3           The Settlement explains the enhancement is to be given to Plaintiff for "his service on behalf

4    of the Class, including filing the Complaint, participating in discovery, gathering and/or providing

5    information, responding to other discovery, meeting with Class Counsel, assisting in preparing

6    litigation strategy, submitting to deposition, and assuming the risks of costs and hardships that were

7    not agreed to or experienced by other Class Members."  (Doc. 41-2 at 36, ¶ 48) Plaintiff reported:

8           I have spent many hours of my time in connection with this case to date. The activities I
            have performed have included, but have not been limited to: obtaining legal counsel,
9           speaking with my legal counsel on countless occasions, both in person and over the
            phone, assisting them in gathering information, reviewing documents, giving
10          information for pleadings filed by my lawyers, assisting my lawyers in locating
            witnesses and talking to witnesses, giving information for and reviewing damage
11          calculations, submitting to two days of deposition by Defendants, signing documents
            and making myself available to communicate with my lawyers during a full day of
12          mediation. I have also spent time carefully reviewing the Settlement and other case-
            related documents on my own and with my counsel to make sure that the Settlement and
13          other work my attorneys performed are in the best interest of the Settlement Class.
            Further, I anticipate I will incur additional time even after the Court grants preliminary
14          approval of the Settlement. I believe I have been diligent and acted above and beyond
            that of which is expected of a Class Representative throughout all stages of litigation.

15

16   (Doc. 41-4 at 3, Garcia Decl. ¶ 9)

17          In granting preliminary approval of "an award *up to* $7,500," the Court expressed concern that

18   there was "no evidence related to the actual number of hours Plaintiff spent working with Class

19   Counsel on this action, or even an estimate of the number of meetings Plaintiff had with Class

20   Counsel."  (Doc. 44 at 16)  The Court observed: "It is unlikely that there have been so many meetings

21   with counsel that they can properly be described as "countless." Indeed, the Court would be surprised

22   if counsel have not documented every conversation in their billing records such that they can, in fact,

23   be counted."  (*Id.*, n. 2)  The Court explained, "Without additional information the Court is unable to

24   evaluate the reasonableness of this requested award."  (*Id.* at 16) Thus, the Court ordered: "In seeking

25   final approval, **Plaintiff must provide specific and unambiguous evidence supporting the**

26   **requested enhancement**."  (*Id.*, emphasis in original)

27          Seeking final approval of the Settlement, Plaintiff asserts "asserts the Court "should award an

28   incentive payment to Plaintiff "to compensate [the] class representatives for work done on behalf of the

class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." (Doc. 53-1 at 16)  Notably, however, Plaintiff has not provided a declaration to support the request despite the Court's  explicit instruction that Plaintiff must file evidence to support his request for an incentive payment of $7,500.00, Plaintiff has not provided a declaration to support the request.  (*See generally* Doc. 53)  Instead, Plaintiff provides only general information regarding the tasks undertaken in the action, stating:

> Plaintiff filed this class action to enforce California's labor law through private enforcement. Plaintiff spent many hours assisting Class Counsel in prosecuting this case. Plaintiff's efforts included gathering documents for use in this lawsuit, communicating with Class Counsel on numerous occasions, strategizing with Class Counsel, and communicating with Class Counsel regarding settlement issues. Plaintiff also bore the substantial financial risk associated with class action litigation, potentially being personally responsible for substantial costs if the claims did not succeed.

(Doc. 53-1 at 16, citing Dion-Kindem Decl. ¶ 36)

Notably, Plaintiff would have likely submitted to a deposition and assisted with discovery whether the action was brought on behalf of the class. On the other hand, by gathering documents and assisting with discovery, Plaintiff's actions undoubtedly benefitted the class such that they weigh in favor of class representative incentive payments. Thus, the Court finds an incentive award is appropriate.

## II.      Amount to be Awarded

In determining the amount of an incentive payment, the Court may consider the time expended by the class representative, the fairness of the hourly rate, and how large the incentive award is compared to the average award class members expect to receive.  *See, e.g., Ontiveros,* 303 F.R.D. at 373-74 (E.D. Cal. 2014) (evaluating the hourly rate the named plaintiff would receive to determine whether the incentive award was appropriate); *Rankin v. Am. Greetings, Inc.*, 2011 U.S. Dist. LEXIS 72250, at *5 (E.D. Cal. July 6, 2011) (noting the incentive award requested was "reasonably close to the average per class member amount to be received); *Alvarado*, 2011 WL 1883188 at *10-11 (considering the time and financial risk undertaken by the plaintiff).

For example, in *Alvarado*, the Court noted the class representatives "(1) travelled from Bakersfield to Sacramento for mediation sessions (2) assisted Counsel in investigating and substantiating the claims alleged in this action; (3) assisted in the preparation of the complaint in this

35

action; (4) produced evidentiary documents to Counsel; and (5) assisted in the settlement of this litigation." *Id.*, 2011 WL 1883188 at *11.  Further, the Court noted the plaintiffs "undertook the financial risk that, in the event of a judgment in favor of Defendant in this action, they could have been personally responsible for the costs awarded in favor of the Defendant." *Id.*  In light of these facts, the Court found an award of $7,500 for each plaintiff was appropriate for the time, efforts, and risks undertaken.  Although Plaintiff seeks an award equal to the *Alvarado* class representatives, he was not required to attend the mediation and merely made himself available to be contacted by counsel, and there is no information regarding the extent to which he assisted with this partial settlement of the claims. (*See* Doc. 41-4 at 3, Garcia Decl. ¶ 9)

In addition, the requested amount of $7,500 greatly exceeds the anticipated average of $1,172.80 for Class Members' payments.  *See, e.g., Rankin.*, 2011 U.S. Dist. LEXIS 72250, at *5.  *In Rankin*, this Court approved an incentive award of $5,000, where the "[p]laintiff retained counsel, assisted in the litigation, and was an active participant in the full-day mediation."  *Id.*, 2011 U.S. Dist. LEXIS 72250, at *5.  The Court found the amount reasonable, in part because "the sum is reasonably close to the average per class member amount to be received."  *Id.*  In contrast, here, Plaintiff's requested enhancement is more than $6,000 above the average expected.  Thus, the expected average payment supports an award significantly lower than what Plaintiff has requested.

Finally, as discussed above, Plaintiff has not provided any information regarding the time expended.  Without this information, the Court is unable to determine whether Plaintiff would be compensated at a reasonable hourly rate for the tasks undertaken on behalf of the class. For example, this Court criticized a requested award of $20,000 where the plaintiff estimated "he spent 271 hours on his duties as class representative over a period of six years," because the award would have compensated the class representative "at a rate of $73.80 per hour." *Ontiveros*, 303 F.R.D. at 366. The Court explained that "[i]ncentive awards should be sufficient to compensate class representatives to make up for financial risk . . . for example, for time they could have spent at their jobs." *Id.* (citing *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).  The Court found an award of "$50 per hour fairly compensate[] the named plaintiff for his time and incorporates an extra incentive to participate in litigation," considering that the plaintiff's hourly flat rate while employed by the

defendant was $15 per hour. *Id.*; n.3. Plaintiff's failure to provide information regarding the time he spent on the tasks identified above—and failure comply with the Court's order to do so—supports a reduction in the enhancement payment.

Based upon the limited information provided regarding the tasks undertaken by Plaintiff on behalf of the class, and in recognition of his financial risks, the Court finds an incentive payment of $2,500.00 is appropriate for Plaintiff. This amount is close to the average per class member amount to be received, and adequately compensates Plaintiff for the actions that may have assisted Class Members in this partial settlement. Accordingly, the Court **RECOMMENDS** an incentive payment be awarded in the modified amount of $2,500.

## FINDINGS AND RECOMMENDATIONS

Based upon the foregoing, the Court **RECOMMENDS**:

1.      Plaintiff's motion for final approval of the Settlement Agreement (Doc. 53) be **GRANTED**;

2.      Approval of the Settlement Class be **GRANTED** and defined as:

> All non-exempt employees of Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. who do not opt out of the settlement and who, at any time within the period beginning June 5, 2014 and ending on January 19, 2019 ("Class Period"), worked in California and received a safety bonus by Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. pursuant to a safety bonus program of Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. at any time within the Class Period.

3.      Plaintiff's' request for a class representative incentive payment be **GRANTED** in the modified amount of $2,500.00;

5.      Class Counsel's motion for attorneys' fees be **GRANTED** in the amount of $175,000.00, which is 1/3 of the gross settlement amount;

6.      Class Counsel's request for costs **GRANTED** in the modified amount of $14,670.01;

7.      The request for fees for the Settlement Administrator, Simpluris, be **GRANTED** in the modified amount of $6,000.00; and

8.      The Court retain jurisdiction to consider any further applications arising out of or in connection with the Settlement.

These Findings and Recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within 14 days after being served with these Findings and Recommendations, any party may file written objections with the Court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991); *Wilkerson v. Wheeler*, 772 F.3d 834, 834 (9th Cir. 2014).

IT IS SO ORDERED.

Dated:   **November 23, 2020**                    **/s/ Jennifer L. Thurston**
                                    UNITED STATES MAGISTRATE JUDGE