1
2
3
4
5
6
7

8                    **UNITED STATES DISTRICT COURT**

9                    **EASTERN DISTRICT OF CALIFORNIA**

10

11   CRISTOBAL GARCIA, an individual, on          )   Case No.: 1:18-cv-01261-DAD JLT
     behalf of himself and all others similarly   )
12   situated,                                     )   FINDINGS AND RECOMMENDATIONS
                                                   )   GRANTING IN PART PLAINTIFF'S MOTION
13                    Plaintiff,                   )   FOR CLASS CERTIFICATION
                                                   )
14          v.                                     )   (Doc. 43)
                                                   )
15   SCHLUMBERGER LIFT SOLUTIONS, et al.           )
                                                   )
16                    Defendants.                  )
                                                   )
17   _____       )

18          Cristobal Garcia asserts that he and others employed by Defendants suffered wage and hour law

19   violations, including unpaid wages for required tasks, uncompensated travel time, improper meal

20   periods, failure to pay wages timely after termination, and unfair business practices.  (*See generally*

21   Doc. 1-2.)  Plaintiff seeks class certification pursuant to Rule 23 of the Federal Rules of Civil

22   Procedure.  (Doc. 43.)  Defendants oppose the motion, arguing the Rule 23 factors are not satisfied and

23   Plaintiff would not be a proper class representative for several of the proposed classes.  (Doc. 58.)

24          The Court finds the matter suitable for decision without oral arguments, and the motion is

25   taken under submission pursuant to Local Rule 230(g) and General Order No. 618.  Therefore, the

26   hearing date of April 12, 2021 is **VACATED**.  For the reasons set forth below, the Court recommends

27   Plaintiff's motion for class certification be **GRANTED IN PART.**

28   ///

                                                    1

## I.    BACKGROUND

Plaintiff asserts that he was "employed in Kern County by Defendants as a non-exempt employee," beginning around April 2015.  (Doc. 1-3 at 5, ¶ 1; Doc. 43-5 at 2, ¶ 2.)  Defendants Schlumberger Rod Lift, Inc. and Schlumberger Lift Solutions, LLC "are the successive owner operators of the KBA product line."[1]  (Doc. 58 at 9, n.1.)   "KBA is an oil and gas servicing company that sells, distributes, and maintains customer pumping units throughout Southern California."  (Doc. 58 at 9-10.)  The administrative office and main yard are located in Bakersfield, California.  (*Id.* at 10, citing Sackewitz Depo. 14:18-15:1.)  The company supplies workers for several locations on a regular basis, including locations in Belridge, Taft, Lost Hills, Kern River, San Ardo, and Coalinga.  (*Id.* at 10, citing Sellers Depo. 6:25-17:5.)

Plaintiff contends "Defendants failed to pay [employees] for all hours worked."  (Doc. 1-3 at 12, ¶ 32.)  For example, he reports the employees were "instructed … to arrive at their base office to perform work and to then board company vehicles that would transport them to a second job location away from their base office," and if employees failed to arrive early enough, they generally would not be permitted to work that day.  (*Id.* at 9, ¶ 20.)  He alleges employees were not permitted to clock in "until they reached their assigned field locations," approximately 45 minutes to 1 hour after they arrived at the base camp, although there was a clock at the base office, and were not paid for that time.  (*Id.* at 9-10, ¶¶ 21, 23.)  In addition, Plaintiff contends the employees were not paid for time at the base office waiting for training courses.  (*Id.* at 11, ¶ 30.)

He alleges Defendants also failed to provide "duty-free meal periods in a timely manner." (Doc. 1-3 at 15, ¶ 46.)  He contends Defendants "failed to provide… meal periods within the first five hours of their work" and "frequently failed to provide Plaintiff and other[s] … with required meal periods of not less than 30 minutes in duration."  (*Id.*, ¶¶ 47-48.)  Plaintiff reports the employers were not permitted "to leave the workplace during purported meal breaks and did not count their time worked through breaks for regular and overtime wage purposes."  (*Id.*, ¶ 50.)  He also reports that when

---

[1] After Plaintiff filed his motion for class certification, Schlumberger Rod Lift "sold the KBA product line in October 2020 to KPS Capital Partners, LP operating under Lufkin Industries."  (Doc. 58 at 9, n. 1.)  For the sake of clarity, the Court uses the term "Defendants" to refer to only those parties identified in the complaint: Schlumberger Rod Lift and Schlumberger Lift Solutions.

2

employees worked in excess of ten-hour shifts to attend classes after the shift, Defendants provided food during the class but failed to provide a second meal break. (*Id.*, ¶¶ 51-52.) Similarly, Plaintiff asserts employees were not provided "with the required duty-free rest periods… to which they were entitled." (*Id.* at 17, ¶¶ 58, 60.)

According to Plaintiff, Defendants "failed to maintain and furnish Plaintiff and Class members with accurate and complete wage statements regarding their gross wages earned, total hours worked, total net wages earned, the name and address of the entity that is the legal employer, and all applicable hourly rates in effect…" (Doc. 1-3 at 20, ¶ 67.) He contends this failure to provide accurate wage statements resulted in "the non-payment of all their regular and overtime wages and deprived them of the information necessary to identify the discrepancies in Defendants' reported data." (*Id.*, ¶ 68.)

Furthermore, Plaintiff asserts Defendants had unlawful policies related to their uniforms, and "failed to indemnify Plaintiff and other Class members for necessary expenditures and bosses incurred by the employees in the direct discharge of their duties." (Doc. 1-3 at 23, ¶ 83.) He alleges employees were "required to wear uniforms and were required to pay for costs associated with the laundering and upkeep of those uniforms." (*Id.* at 22, ¶ 81.) He asserts employees were also "liable for costs associated with damage of the uniforms," and the "damage liability was broadly described to include normal wear and tear or other accidental, incidental or inadvertent damage that may have occurred during the execution of… duties." (*Id.*) Plaintiff reports he and other employees were required to sign a document that acknowledged he was "just using the jacket" but was "responsible for the maintenance of the jacket, including laundering," and "agree[d] to follow the laundry instructions included with the garment." (*Id.* at 23, ¶ 81.)

On June 5, 2018, Plaintiff initiated this action by filing a complaint in Kern County Superior Court, Case No. BCV-18-101388. (Doc. 1 at 2, ¶ 1.) He filed a First Amended Complaint on August 7, 2018, in which Plaintiff asserted the following claims: (1) failure to pay compensation due, (2) meal period violations, (3) rest break violations, (4) failure to furnish itemized wage statements, (5) failure to pay wages timely upon termination, (6) failure to indemnify business expenses, (7) violation of California Business and Professions Code § 17203, and (8) civil penalties pursuant to the California Private Attorney General Act. (*See generally* Doc. 1-3 at 4-5, 8-25.) He asserted the first seven causes

of action were brought "for himself and on behalf of a class and sub-class initially defined as follows:

> <u>Class</u>:  All non-exempt employees of any of the Defendants who, at any time within the period beginning four years prior to the filing of this action through the date of class certification, worked in California.
>
> <u>Termination Pay Sub-Class</u>:  All members of the Class whose employment terminated at any time within the period three years prior to the filing of this action through the date of certification.

(*Id.* at 6-7, ¶ 8.)  After Defendants were served with the First Amended Complaint, they filed a Notice of Removal on September 13, 2018, thereby initiating the action in this Court.  (Doc. 1.)

On March 25, 2020, the parties engaged in mediation with Jeffrey Krivis.  (Doc. 41-1 at 7.) "As a result of a mediator's proposal, the Parties were able to partially resolve the action with respect to the claim for unpaid overtime on safety bonuses and related derivative claims."  (*Id.*)  Specifically, the parties agreed:

> Plaintiff's first and seventh causes of action survive as to Settlement Class Members insofar as they rely upon any theory of recovery other than miscalculation of regular rate/unpaid overtime on safety bonuses. The fifth cause of action shall be resolved, settled and released in full, for the Settlement Class Members only. The fourth cause of action shall be resolved, settled and released in full, for the Settlement Class Members only, as to any claims arising prior to January 19, 2019.

(Doc. 41-2 at 38-39, Settlement § 10, ¶ 51.)  Defendants agreed the partial settlement in the amount of $525,000.00 for a class defined as:

> All non-exempt employees of Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. who do not opt out of the settlement and who, at any time within the period beginning June 5, 2014 and ending on January 19, 2019 ("Class Period"), worked in California and received a safety bonus by Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. pursuant to a safety bonus program of Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. at any time within the Class Period.

(Doc. 41-2 at 20, Settlement ¶ 6.)  The Court determined the proposed settlement was fair, reasonable, and adequate.  (Doc. 55 at 20; *see also id.* at 13-20.)  Therefore, the Court granted final approval of the partial settlement on December 15, 2020.  (Doc. 57.)

On July 10, 2020—while the partial settlement was pending evaluation and approval—Plaintiff filed the motion now pending before the Court related to claims that were not encompassed in the agreement.  (Doc. 43.)  Defendants filed their opposition on January 25, 2021, asserting Plaintiff fails to satisfy the requirements of Rule 23 for the proposed classes.  (Doc. 48.)  Plaintiff filed his reply

1   brief and objections to evidence on March 1, 2021.  (Doc. 60.)  On March 22, 2021, Defendants filed a

2   request for leave to file a sur-reply, with the accompanied sur-reply brief.[2]  (Doc. 63.)

## II.   LEGAL STANDARDS FOR CLASS CERTIFICATION

Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure, which

provides that "[o]ne or more members of a class may sue or be sued as representative parties on behalf

of all members."  Fed. R. Civ. P. 23(a).  If an action meets the prerequisites of Rule 23(a), the Court

must consider whether the proposed class is maintainable under one or more of the three alternatives set

forth in Rule 23(b).  *Narouz v. Charter Communs., LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010).

### A.   Rule 23(a) Requirements

The prerequisites of Rule 23(a) "effectively limit the class claims to those fairly encompassed

by the named plaintiff's claims."  *General Telephone Co. of the Southwest. v. Falcon*, 457 U.S. 147,

155-56 (1982).  Certification of a class is proper if:  "(1) the class is so numerous that joinder of all

members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or

defenses of the representative parties are typical of the claims or defenses of the class; and (4) the

representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).

These prerequisites are generally referred to as numerosity, commonality, typicality, and adequacy of

representation.  *Falcon*, 457 U.S. at 156.

#### 1.   Numerosity

A class must be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P.

23(a)(1).  This requires the Court to consider "specific facts of each case and imposes no absolute

limitations."  *Gen. Telephone Co. v. EEOC*, 446 U.S. 318, 330 (1980).  Although there is no specific

numerical threshold, joining more than one hundred plaintiffs is impracticable. *See Immigrant Asst.*

_____

[2] Defendants requested leave to file a sur-reply, noting Plaintiff "introduced three new classes" and "attempted to add a new representative plaintiff… in his Reply."  (Doc. 63 at 4.)  As Defendants observe, courts have granted leave to file a sur-reply where modified class definitions are presented in reply briefs.  *See, e.g., Albante Rooter & Plumbing, Inc. v. Alarm.com, Inc.*, 2017 WL 1806583 at *1, n.1 (N.D. Cal. May 5, 2017) (observing the court granted the defendant "leave to file a brief sur-reply in response to a modified class definition that plaintiffs first raised in their Reply"); *Baker v. Big Lots Stores, Inc.*, 2009 WL 10673045 at *3 (C.D. Cal. Aug. 25, 2009) ("the Court granted Defendants leave to file a surreply to address Plaintiff's proposed amendment to the class definition and any other entirely new arguments raised in the Reply brief").  Accordingly, Defendants' request for leave to file a sur-reply (Doc. 63) is **GRANTED**.  The sur-reply and its attached exhibits are thus incorporated into the record.

*Project of Los Angeles Cnt. Fed'n of Labor v. INS*, 306 F.3d 842, 869 (9th Cir. 2002) (identifying several cases in which courts certified classes with fewer than 100 members").  Courts have found the requirement satisfied when the class comprised as few as thirty-nine members or where joining all class members would serve only to impose financial burdens and clog the court's docket.  *See Murillo v. Pac. Gas & Elec. Co.*, 266 F.R.D. 468, 474 (E.D. Cal. 2010) (citation omitted) (discussing Ninth Circuit thresholds for numerosity); *In re Itel Securities Litig.*, 89 F.R.D. 104, 112 (N.D. Cal. 1981).

### 2.    Commonality

Rule 23(a) requires "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  To satisfy the commonality requirement, the class representatives must demonstrate common points of facts and law.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Thus, "commonality requires that the class members' claims depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke," and the "plaintiff must demonstrate the capacity of classwide proceedings to generate common answers to common questions of law or fact that are apt to drive the resolution of the litigation."  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks and citations omitted); *see also Parsons v. Ryan*, 754 F.3d 657, 684 (9th Cir. 2014) (finding commonality satisfied where "[t]he factual and legal questions that [plaintiffs] present can be answered 'yes' or 'no' in one stroke as to the entire class, dissimilarities among class members do not impede the generation of common answers to those questions, and the capacity of classwide proceedings to drive the resolution of this litigation cannot be doubted").

### 3.    Typicality

This requirement demands that the "claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Typicality is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  *Armstrong v. Davis*, 275 F.3d 849, 868 (2001); *see also Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995) (the typicality requirement is satisfied when the named plaintiffs have the same claims as other class members and are not subject to unique defenses).  While representative claims must be "reasonably co-extensive with those of absent

class members," the claims "need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998); *see also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

### 4.    Adequacy of Representation

Absentee class members must be adequately represented for judgment to be binding upon them. *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940).  Accordingly, this prerequisite is satisfied if the representative party "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "[R]esolution of this issue requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000) (citing *Hanlon*, 150 F.3d at 1020); *see also Pierce v. County of Orange*, 526 F.3d 1190, 1202 (9th Cir. 2008).

### B.    Certification under Rule 23(b)

As noted above, once the requirements of Rule 23(a) are satisfied, a class may only be certified if it is maintainable under Rule 23(b).  *Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614 (1997).*  Under Rule 23(b)(1), a class is maintainable if there is a risk of inconsistent or varying adjudications from "prosecuting separate actions by or against individual class members."  Fed. R. Civ. P. 23(b)(1).  In addition, a class may be certified if "adjudications with respect to individual class members … would be dispositive of the interests of other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." Fed. R. Civ. P. 23(b)(1)(B).

A class is maintainable under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate responding the class as a whole."  Fed. R. Civ. P. 23(b)(2).  The Supreme Court explained, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.... [I]t does not authorize class certification when each member would be entitled to an individualized award of monetary damages." *Wal-Mart,* 564 U.S. at 360-61.

Class certification under Rule 23(b)(3) is an "adventuresome innovation," and allows for class certification in cases "in which class-action treatment is not clearly called for as it is in Rule 23(b)(1)

and (b)(2) situations." *Amchem Prods.,* 521 U.S. at 615.  Thus, a class is maintainable under Rule 23(b)(3) where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and where "a class action is superior to other available methods for fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  Where the issues of a case "require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate." *Zinser v. Accufix Research Inst., Inc*., 253 F.3d 1180, 1189 (9th Cir. 2001) (citation omitted). Thus, the Court must examine "whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods*., 521 U.S. at 623; *Hanlon*, 150 F.3d at 1022.

## C. Burden of Proof and Evidentiary Submissions

The party seeking class certification bears the burden of demonstrating the elements of Rule 23(a) are satisfied, and "must affirmatively demonstrate … compliance with the Rule." *Wal-Mart Stores*, 564 U.S. at 350; *Doninger v. Pacific Northwest Bell, Inc.*, 563 F.2d 1304, 1308 (9th Cir. 1977). The Court must conduct a "rigorous analysis," which may require the Court "to probe behind the pleadings before coming to rest on the certification question."  *Id.*, 564 U.S. at 350 (quoting *Falcon*, 457 U.S. at 160-61). The Court has an affirmative duty to consider the merits of an action  "to the extent that they overlap with class certification issues."  *Ellis v. Costco Wholesale Corp*., 657 F.3d 970, 981 (9th Cir. 2011) ("a district court must consider the merits if they overlap with the Rule 23(a) requirements") (citations omitted).  As a result, the Court may consider material evidence submitted by the parties to determine whether the Rule 23 requirements are satisfied. *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975).

## III. PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Plaintiff reports that he was an employed "as a field technician," and "the job duties of field technicians were to service pumping units in oil fields."  (Doc. 43-1 at 6; *see also* Doc. 43-5 at 2, Garcia Decl. ¶ 4.)  He asserts data received from Defendants indicated that hundreds of field technicians worked for Defendants during the class period.  (*Id.* at 24.)

According to Plaintiff, Defendants' "company policy [was] that all field technicians report to the Bakersfield base office dispatch manager at least one hour before the scheduled clock-in time each

workday in person or by telephone." (Doc. 43-1 at 7, emphasis omitted.) Plaintiff contends "field technicians were told by management that it was company policy that the only field technicians who were allowed to report to the Bakersfield dispatch manager by telephone were field technicians who lived near the Belridge or Taft field locations," and others were required to report in person. (*Id.* at 7-8, emphasis omitted.) He estimates "it could take between 3 to 4 minutes or more to check in with the Bakersfield dispatch manager in person depending on how long the lines were for these personal check-ins." (*Id.* at 8.)

Plaintiff asserts field technicians "performed other uncompensated pre-shift … work with Defendants' knowledge" while at the Bakersfield office before departure to the field locations. (Doc. 43-1 at 8, emphasis omitted.) Specifically, Plaintiff contends the pre-shift activities included:

> checking in with Bobby Sellers (dispatch), talking to HR (including Sara Sackewitz) about employment issues, talking to foremen and other managers about the work assignments, picking up keys, picking up safety equipment, dropping off and picking up uniforms for laundering or that had been laundered; picking up and calibrating H2S monitors, picking up parts, supplies and chemicals at the warehouse, picking up tools, dropping off tools at the repair workshop, picking up paperwork such as job orders, filling out and dropping off paperwork, picking up [iPads], picking up cell phones, discussing customer and customer job issues, discussing equipment and work vehicle maintenance and repair issues, and filling up ice bucket "igloo" jugs with water.

(*Id.* at 8-9.) According to Plaintiff, "[t]hese pre-shift work activities could take between an estimated 10 and 15 minutes per day." (*Id.* at 10.) He asserts post-shift work was also required without compensation, such as: returning the tools, equipment, and iPads; submitting driver logs, vehicle inspection sheets, and other paperwork; and talking with dispatch. (*Id.*) Further, Plaintiff contends the "field technicians were required to wear fire retardant company uniforms," but they "were not paid for the time that they spent dropping off dirty uniforms and picking up clean uniforms." (*Id.* at 11-12.)

In addition, Plaintiff argues field technicians should have been paid for this transportation time. (*See* Doc. 1-3 at 11, 15.) He alleges that field technicians were originally "allowed to clock in and clock out at the Bakersfield base office and were paid for the travel time between the Bakersfield base office and the field locations." (Doc. 43-1 at 13.) He contends this policy changed "around 2014 or 2015," and field technicians were informed "the company no longer was going to pay them for their travel time to and from the Bakersfield base office and certain field locations." (*Id.* at 13-14.) Plaintiff asserts, "The field technicians were told that, unless they were driving a company vehicle between the

Bakersfield base office and these field locations (such as Belridge or Taft), they were not permitted to clock in until they reached the field location and that they had to clock out at those field locations before they left for the day and could no longer clock out at the Bakersfield base office." (*Id.* at 14.)

Plaintiff asserts the meal break policies of Defendants failed to comply with California law. (Doc. 43-1 at 19-21.) He contends the employees "were not allowed to leave the work sites during their meal periods," and as a result "the time of their meal periods constitutes 'hours worked' for which they were entitled to be paid, but for which they were not paid." (*Id.* at 19.) According to Plaintiff, the meal periods were also untimely because "when the unpaid travel time from Bakersfield to the oil fields is considered, employees were not provided with timely meal periods prior to the start of the sixth hour of work." (*Id.* at 21.) Thus, Plaintiff argues the putative class members are "entitled to meal period premiums for all shifts where they were not provided with such timely meal periods." (*Id.*)

Plaintiff also asserts "Defendants required all field technicians to take training courses scheduled at the Bakersfield base office on certain afternoons and evenings." (Doc. 43-1 at 17.) The training included courses on leadership, CPR, and Auto Crane training. (Doc. 43-5 at 14, Garcia Decl. ¶ 68.) He reports that on training days,

> [F]ield technicians were required to clock out at the field location where they normally clocked out and then ride in company vehicles back to the Bakersfield base office. Once at the Bakersfield base office, they performed their typical end-of-shift duties and then were required to wait at the Bakersfield office until the scheduled start of the training class. This waiting time could be up to an hour or more of time. Only upon the scheduled start of the training class were the field technicians permitted to clock back in for the duration of the class.

(*Id.* at 17-18.) Plaintiff contends that he once "attempted to stay clocked in while [he] waited for a training class," but was later reprimanded for clocking in early, and informed he would not be paid for the time waiting for the training class. (Doc. 43-5 at 14, Garcia Decl. ¶ 68.)

Finally, Plaintiff asserts Defendants failed to pay all wages due and "provided deficient wage statements." (Doc. 43-1 at 21-22, emphasis omitted.) He claims the "Defendants willfully failed to pay all wages owing to terminated employees and is liable for Section 203 waiting time wages." (*Id.* at 21.) In addition, based upon the claims that "Defendants failed to pay for all hours worked and to pay the required meal period premiums," Plaintiff maintains the wage statements provided were deficient. (*Id.* at 22.)

10

Based upon these facts and allegations, Plaintiff requested certification of nine classes of individuals who were employed by Defendants, defined as follows:

**Class 1. Unpaid Wages Class – Reporting to Dispatch:**  All non-exempt field technicians of Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. who worked in California at any time from June 5, 2014 through the date of class certification who were not compensated for reporting to the dispatch manager at the Bakersfield base office in person or telephone before they clocked-in at the beginning of the workday and after they clocked out at the end of the day.

**Class 2. Unpaid Wages Class – Pre-shift and Post-Shift off-the-clock Work:** All non-exempt field technicians of Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. who worked in California at any time from June 5, 2014 through the date of class certification who were not compensated for off-the-clock pre-shift and/or postshift work.

**Class 3. Unpaid Wages Class - Travel after Reporting:**  All non-exempt field technicians of Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. who worked in California at any time from June 5, 2014 through the date of class certification who were required to report in person to the Bakersfield office and who were not paid for the travel time between the Bakersfield office and the field locations.

**Class 4. Unpaid Wages Class – iPads:**  All non-exempt field technicians of Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. who worked in California at any time from June 5, 2014 through the date of class certification who were crew leads and who were not compensated for pre-shift check-out and/or post-shift check-in of [iPads].

**Class 5. Unpaid Wage Class – Meal Period Time:**  All non-exempt field technicians of Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. who worked in California at any time from June 5, 2014 through the date of class certification who were required to take their meal periods at their daily work site locations and who were not paid for the time of their meal periods.

**Class 6. Meal Period Premium Class:**  All members of Class 3 who received meal periods that began after the end of the 5th hour of work calculated from when the travel time began and who were not paid a meal break premium for that workday.

**Class 7.  Unpaid Wages - Training Class:**  All non-exempt field technicians of Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. who worked in California at any time from June 5, 2014 through the date of class certification who were not compensated for the time that they were required to wait at the Bakersfield base office after clocking out before the beginning of the afternoon or evening training classes at the Bakersfield base office.

**Class 8. 203 Waiting Time Class:**  All class members of Class Nos. 1 through 7 whose employment with Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. terminated within the period beginning June 5, 2015 to the date of class certification who have not settled their 203 claims.

**Class 9.  Wage Statement Class:**  All class members of Class Nos. 1 through 7 who received a wage statement from Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. within the period beginning June 5, 2017 to the date of class certification who have not settled their wage statement claims.

11

(Doc. 43 at 2-3, emphasis added.)

In support of certification for these classes, Plaintiff submitted a declaration, as well as declarations from eleven field technicians and a former human resources employee.  (Docs. 43-5 to 43-17.)  Plaintiff contends the evidence demonstrates the Rule 23(a) prerequisites are satisfied for each class, and the classes may be maintained under Rule 23(b)(3).  (*See* Doc. 43-1 at 24-35.)

## A.    Numerosity

Plaintiff contends the numerosity requirement is satisfied for the each of the proposed classes because "over 500 field technicians" were employed by Defendants during the class period.  (Doc. 43-1 at 24, citing Dion-Kindem Decl. ¶ 9 [Doc. 43-3 at 5])  He reports over more than 40 iPads were assigned to workers, and "20 to 40 or more crew leaders … had to check out [iPads] each day."  (*Id.* at 26.)  Further, Plaintiff estimates "there were normally more than 100 field technicians that rode transport vans out of the Bakersfield base office each day."  (*Id.* at 27.)  Finally, Plaintiff reports that "at least 60 field technicians were terminated from Defendants' employment and have not settled their 203 claims."  (*Id.* at 28.)

## B.    Commonality

In support of his assertion that the commonality requirement is satisfied, Plaintiff identifies the following common "questions of law and fact" for the proposed classes:

- Whether the time spent reporting to dispatch was compensable hours worked.
- Whether the pre-shift and post-shift time spent by class members was compensable hours worked.
- Whether employees who were required to report in person to the Bakersfield office and who were not paid for the travel time between the Bakersfield office and the field locations are entitled to compensation for such travel time.
- Whether employees who were crew leads were entitled to compensation for the time incurred for pre-shift check-out and/or post-shift check-in of [iPads].
- Whether class members were required to take their meal periods at their daily work site locations and whether they were entitled to be paid for such meal periods as "hours worked."
- Whether class members who received meal periods that began after the end of the 5th hour of work calculated from when the travel time began and who were not paid a meal break premium for that workday are entitled to meal period premiums.
- Whether who were not compensated for the time that they were required to wait at the Bakersfield base office after clocking out before the beginning of the afternoon

12

or evening training classes at the Bakersfield base office are entitled to compensation for such time.

- Whether terminated class members are entitled to Section 203 penalties.

- Whether class members who were not paid for all hours worked or paid the required meal period premiums are entitled to Section 226(e) penalties for deficient wage statements.

(Doc. 43-1 at 29.)

### C. Typicality

Plaintiff asserts his "claims are typical of those of the putative class members because both Plaintiff and the putative class seek recovery based upon the same legal theories and course of conduct by Defendants," including the failure to pay for required off-the-clock work, meal periods, and "waiting time between the end of work time and afternoon and evening training classes." (Doc. 43-1 at 30.)

### D. Adequacy

According to Plaintiff, this prerequisite is satisfied because "neither Plaintiff nor his counsel have any conflicts of interest with other class members." (Doc. 43-1 at 31.) Plaintiff asserts he will "take all necessary steps to fairly and adequately represent the classes." (*Id.*) In addition, he reports proposed class counsel "are competent and experienced in handling class action lawsuits and have done extensive factual and legal research regarding the claims asserted herein." (*Id.*)

### E. Rule 23(b) Requirements

Plaintiff contends this class action meets the requirements of Rule 23(b)(3), because "[t]he elements of Plaintiff's substantive claims are subject to proof by generalized, common evidence." (Doc. 43-1 at 32.) He contends: "Whether the pre-shift and post-shift, travel time, and meal period time are compensable as 'hours worked' under California law are issues that apply to all class members because all class members were subject to the conduct." (*Id.*) Plaintiff also asserts that "[a] class action is the superior method of adjudication because individual litigation is not feasible and the claims are manageable." (*Id.* at 33, emphasis omitted.)

## IV. DEFENDANTS' OPPOSITION

Defendants oppose certification of each of the proposed classes. According to Defendants, certification should be denied because the classes are not properly defined. (Doc. 58 at 9, 30.) In

addition, Defendants contend Plaintiff "lacks standing to even represent" three of the classes, including the "Unpaid Wage Class – Meal Period Time" class, the "203 Waiting Time Class" and the "Wage Statements" class.  (*Id.* at 9, 36.)  Defendants also assert "Plaintiff has not shown that Rule 23 is satisfied as to any of his proposed classes."  (*Id.* at 9.)  Defendants maintain Plaintiff fails to establish the numerosity requirement is satisfied for the classes, and "common issues do not predominate for the proposed classes.  (*Id.* at 9, 17-29.)

### A.    Class Definitions

As an initial matter, Defendants assert the proposed class definitions are flawed because the term "field technicians" is "an undefined term in [the] motion."  (Doc. 58 at 30.)  Defendants explain it is "a job title utilized by KBA to describe entry-level workers," and "[i]t is not clear whether Plaintiff's proposed classes include, as they appear to, only those employees holding the job title of field tech (which would exclude Plaintiff, who held the position of 'lead'), or whether they include all field employees."  (*Id.*)  Further, Defendants contend "Plaintiff fails to propose a realistic way of determining which individuals satisfy each definition," and there is no objective way to identify the class members.  (*Id.* at 29-30.)

### B.    Numerosity

According to Defendants, "it is impossible to tell, based on Plaintiff's circular class definitions, who falls within each class."  (Doc. 58 at 33.)  Defendants assert that "though Plaintiff's counsel estimates that KBA employed more than 500 field employees during the four-years preceding the filing of this action, he has not shown that a sufficient number of 'field technicians' were victims of any of the practices alleged in each of the proposed classes to satisfy Rule 23(a)(1)."  (*Id.*)  Defendants contend, "even if the ambiguity with the 'field technician' label is disregarded, Plaintiff still has not shown that the sizeable numbers referenced in his Motion bear any reasonable connection to the classes proposed, as was his burden."  (*Id.*, citing, *e.g.*, *Chavez v. Air Prod. & Chemicals Inc.*, 2016 WL 9558905, at *9 (C.D. Cal. Feb. 24, 2016) ["where a putative class is some subset of a larger pool, the trial court may not infer numerosity from the number in the larger pool alone"].)

### 1.    Individuals who reported to dispatch and completed pre-and post-shift work

Defendants contend "Class 1… is necessarily limited to employees who traveled in KBA vans

14

after the time period that van travel ceased to be compensated and before van transportation ceased altogether, and even further limited to those employees who were (allegedly) 'required' to travel in the vans." (Doc. 58 at 34.) Defendants assert Plaintiff failed to provide an "analysis as to the actual numbers involved, let alone a reasonable estimate, as the 500+ field employee estimate includes all employees (field, administrative, shop, etc.) during all six years of the class period." (*Id.*, emphasis omitted.) Similarly, Defendants assert Plaintiff fails to establish numerosity with Class 2, because he "relies on an unsupported estimate of 200+ field employees at the Belridge and Taft locations and also appears to include employees who clocked in at Bakersfield as drivers, those that drove themselves to Belridge and Taft and did not 'report' to Bakersfield at all, as well as those employed exclusively within the one-year time period during which all field employees clocked in and out at Bakersfield." (*Id.* at 33-34.)

### 2.    Employees to whom iPads were issued

Defendants assert Class 4 encompasses "all non-exempt field technicians not compensated for checking in/out iPads, though the testimony is clear that only crew leads, not field techs, were assigned iPads." (Doc. 58 at 34.) In addition, Defendants note that Plaintiff's "declarants speculate that there were 30-50 crews," yet "witnesses contradicted these estimates in their depositions." (*Id.* at 34, n.1, citing Hearn Decl. Ex. FF [Doc. 58-1 at 866-871].) Defendants assert:

> Plaintiff provides no specific numerosity analysis regarding the number of hourly, non-exempt crew leads who were employed during the time period that iPads were in use, let alone during the time period when iPads were stored exclusively at Bakersfield (before being moved to the Belridge and Taft locations – where Plaintiff does not allege off the clock work was performed), and were required to pick up/drop of those iPads off the clock.

(Doc. 58 at 34.) Defendants note that during discovery, they produced information to Plaintiff that included "a list of iPads and the persons to whom they were assigned," and many of the individuals identified "were exempt managers and supervisors." (*Id.* at 34, n. 48, citing Sellers Depo. 133:9-139:22 [Doc. 58-1 at 738-744] and Compendium § III [Doc. 58-1 at 849].)

### 3.    Employees and training attendance

According to Defendants, "though Plaintiff contends that all non-exempt field technicians attended training classes at Bakersfield in the afternoons or evenings and were required to clock out for

15

a period before such classes began but could not leave Bakersfield, testimony from Plaintiff's own witnesses proves this allegation false." (Doc. 58 at 34.)  Defendants contend, "The <u>only</u> afternoon or evening training courses offered by KBA during the class period were leadership programs for crew leads and other supervisory employees, including many exempt, salaried personnel. These classes were not offered to all field personnel." (*Id.*)  In addition, Defendants assert that "[w]hile witness declarations state that attendees were required to travel back to Bakersfield off the clock and wait at the office until clocking back in just before training, deposition testimony confirms this is not even true as to all of Plaintiff's declarants." (*Id.*, emphasis omitted.)  To the contrary, Defendants observe "the vast majority confirmed they *were* paid for travel time and *were not* required to remain on site after clocking out.' (*Id.*)

### 4.    Relevant time period

Defendants maintain Class 3 for unpaid travel compensation and Class 6 for meal period violations "fail to tailor" the class definitions "to the relevant time period and population." (Doc. 58 at 34.)  Thus, Defendants contend the numerosity requirement is not satisfied for these classes. (*Id.*)

### 5.    Untimely meal periods and individuals entitled to premiums

Class 7 "includes employees whose lunch was provided after the fifth hour worked as calculated from the start of travel time." (Doc. 58 at 35.)  Defendants argue, "Plaintiff has not shown that such a class exists – and certainly not one sufficiently numerous to justify class treatment." (*Id.*)  According to Defendants, "KBA policy requires employees to take their meal period before the end of the fifth hour worked." (*Id.*, citing Chicca Depo. 189:18-190:10 [Doc. 58-1 at 173-174].) In addition, Defendants report:

> [C]rews were expected to take their breaks together based on the earliest crew member's start time. Chicca Dep. 190:18-191:4 (everyone on crews took breaks at same time); McClain Dep. 35:18-36:4 (same); Birdwell Dep. 28:7-29:2 (same); Merino Dep. 57:18-20 (same). Because crew leads were also typically van drivers, and because crews were supposed to take their breaks together, crew lunches should have occurred before the end of the fifth hour worked by the van driver –who had in many cases clocked in at least an hour before the rest of his crew. *Id.*; Haislip Dep. 71:22-73:11 (always had a driver on his crew and crew always took breaks together).

(*Id.*, footnotes omitted.)  Defendants contend the practical result of the policy of taking lunch based on the earliest clock-in time meant "most crews took their meal breaks before the end of the fifth hour

worked, *even when drive time is taken into account*."  (*Id.*, emphasis in original.)

### 6.    Individuals terminated after the partial settlement

Defendants assert that "Plaintiff's cursory numerosity analysis as to his eighth and ninth proposed classes fails to properly take into account the partial settlement in this case."  (Doc. 58 at 35.) Defendants note the Court granted final approval of the settlement on December 15, 2020, and no former employees opted out of the settlement class.  (*Id.*)  Defendants argue Plaintiff failed to explain how he arrived at the estimate that 60 field technicians were not included in the Settlement Class.  (*Id.*) Further, Defendants contend it is unclear whether the number of putative class members identified by Plaintiff "is appropriately tailored to the three-year statute of limitations for claims under Section 203 (and Section 226) instead of the broader four-year limitations period for the underlying wage claims (the latter of which would result in claims under Sections 203 and 226 being time-barred)."  (*Id.*) Therefore, Defendants contend Plaintiff failed to demonstrate the numerosity requirement is satisfied for Class 8 and Class 9.  (*Id.*)

### C.    Typicality and Plaintiff's Membership in the Proposed Classes

Defendants contend Plaintiff's "claims are not typical or common of those in Classes 5-9." (Doc. 58 at 36.)  According to Defendants, "Plaintiff is not a member of the fifth, eighth, and ninth proposed classes."  (*Id.*)  Defendants observe: "Classes 8 and 9 appropriately exclude all individuals who have settled their Section 203 and/or Section 226 claims…. Because Plaintiff has settled those claims, his claims are not typical of putative class members in those classes."  (*Id.*, internal citation omitted.)  In addition, Defendants note that during his deposition, Plaintiff admitted "he was not required to clock out and then back in before any training classes, and that he was paid for time spent in training classes."  (*Id.* at 36, citing Garcia Depo. Vol.II 40:12-22 [Doc. 58-1 at 326].)  Therefore, Defendants contend Plaintiff "is not a member of Class 5," and cannot satisfy the typicality requirement.  (*Id.*)

Further, Defendants argue Plaintiff cannot show the typicality requirement is satisfied for Class 6 and Class 7—which relate to meal periods—because Plaintiff was a crew lead and "bears a substantially different burden in demonstrating liability as to the meal period classes."  (Doc. 58 at 37.) Defendants contend that as a crew lead, Plaintiff "dictated both the timing and location of those meal

periods."  (*Id.*)  Defendants conclude there is a conflict between Plaintiff and the non-supervisory

putative class members he seeks to represent.  (*Id.*)

### D.    Commonality and Rule 23(b)(3) Requirements

Defendants assert that Plaintiff is unable to meet the commonality requirements of Rule 23(a)

and Rule 23(b)(3) because "[n]one of [the] proposed classes rest upon unlawful, documented company

policies."  (Doc. 58 at 18.)  Instead, Defendants contend the "written policies prohibit the very practices

that Plaintiff now alleges."  (*Id.*, emphasis omitted.)  Defendants argue that "[a]t best, Plaintiff has

presented only anecdotal evidence of alleged occasions when policies were disregarded and not

"substantial evidence" of an unlawful policy or practice, as is required in order to support certification."

(*Id.* at 19, citing *e.g.*, *In re AutoZone, Inc., Wage & Hour Employment Practices Litig.*, 789 Fed. App'x

9, 11-12 (9th Cir. 2019); *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959 (9th

Cir. 2009); *Brinker Restaurant Corp. v. Superior Court*, 53 Cal.4th 1004, 1051 (2012).)

#### 1.    Class 1 (Reporting to Dispatch) and Class 3 (Travel after Reporting)

Defendants contend "there is no dispute that van passengers were, after May 20, 2015, not

compensated for time spent riding in optional, company vans."  (Doc. 58 at 20, n. 19.)  Thus,

Defendants assert the "third proposed class is indistinguishable from and fully encompassed by [the]

first proposed class."  (*Id.*)  According to Defendants, "even assuming that Plaintiff could present

substantial evidence that all van riders (and not just "field technicians"—as the classes are defined)

spoke with dispatch each morning, the simple act of confirming attendance and presence on a company

van is insufficient to start an employee's workday."  (*Id.* at 20.)  Defendants assert the proper inquiry

for these classes is "whether KBA *required* [employees] to check in and obtain work assignments

*before* they clocked in.  (*Id.*)  Defendants contend the evidence before the Court "demonstrates no

common answer."  (*Id.* at 20-21.)

In addition, Defendants contend the California Department of Labor Standards Enforcement

"already concluded that some of the same claims Plaintiff alleges here are wholly without merit."

(Doc. 58 at 19.)  According to Defendants, "Putative class member Robert Zuniga … previously filed a

complaint with the DLSE seeking compensation for time spent traveling in the optional KBA vans –

the same theory Plaintiff alleges here."  (*Id.*)  Zuniga testified the van travel was optional, and the

1   reason he felt time should be paid was that during the van ride, he was under the control of his

2   employer and could not stop anywhere before the job location.  (*Id.*, citing Hearne Decl. Exhs. CC and

3   DD.)  Defendants report the DLSE dismissed Zuniga's claims, and assert this "undermines Plaintiff's

4   contention that one or more cohesive classes exist on this issue."  (*Id.* at 20.)

5                    2.      Off-the-clock work

6           Defendants argue "Plaintiff has not and cannot show a common, unlawful policy or practice" in

7   place that required off-the-clock work.  (Doc. 58 at 22.)  Defendants contend statements from putative

8   class members "highlight[] critical differences with respect to the off the-clock work alleged."  (*Id.*)

9   For example, while Plaintiff alleged "field technicians were required to fill water jugs at Bakersfield off

10  the clock," Defendants note deponents indicated "crews assigned to Taft filled their water jugs at Taft

11  site <u>after</u> clocking in, and crews assigned to Kern River filled their jugs at Bakersfield <u>after</u> clocking

12  in."  (*Id.*)  Similarly, Defendants contend Plaintiff cannot establish commonality based on use of the

13  laundry service because use of the service was not mandatory, and only some putative class members

14  "testified that they used the laundry services."  (*Id.* at 23.)  Defendants argue that "site specific

15  variations as well as variations from year to year render class treatment untenable," noting several

16  putative class members reported they did not perform pre-shift activities while assigned to locations in

17  Kern River, Coalinga, or Belridge.  (*Id.* at 25.)  Given the conflicting anecdotal evidence, Defendants

18  conclude the classes related to off-the-clock work cannot be certified.  (*Id.*, citing *Coleman v. Jenny*

19  *Craig, Inc.*, 2013 WL 6500457, at *8 (S.D. Cal. Nov. 27, 2013), *aff'd* 649 F. App'x 387 (9th Cir. 2016).)

20          To the extent Plaintiff contends all 'field technicians' were required to pick up and turn in

21  iPads, paperwork, tools, and timecards while off the clock," Defendants contend that "only crew leads

22  are assigned iPads, so any contention that this requirement is universal to all 'field technicians' is

23  unsupported."  (Doc. 58 at 23.)  Defendants acknowledge that "[v]an drivers, supervisors, and/or other

24  clocked in employees were responsible for picking up and turning in all tools, equipment, iPads, and

25  paperwork for everyone on their crew and/or in their van," and but maintain that doing these tasks off

26  the clock "directly violates company policy."  (*Id.*)  Further, Defendants contend Plaintiff fails to

27  present evidence that supervisors knew these tasks were performed while employees were off-the-

28  clock.  (*Id.* at 23-24.)

                                          19

### 3. Attendance at training courses

Defendants note Class 5 "purports to include all field technicians who were not compensated for time they were (allegedly) 'required' to wait at the Bakersfield office after clocking out and before beginning their afternoon or evening training class." (Doc. 58 at 25.) Defendants contend that even if membership in the class could be objectively determined, "Plaintiff has not set forth sufficient evidence of a common policy or practice requiring employees to clock out in the field, travel back to Bakersfield off the clock, and then remain at the Bakersfield yard before clocking back in for training." (*Id.*) Defendants observe that putative class members gave inconsistent statements regarding whether they were required to clock out, what they were permitted to do if clocked out, and even whether "this practice occurred during the class period *at all*." (*Id.* at 25-26.) Thus, Defendants contend there is not "sufficient evidence of a common unlawful practice." (*Id.* at 26.)

### 4. Meal period policies

Defendants contend KBA had a written policy that indicated "employees are 'relieved of all active responsibilities and … are free to leave the premises' during meal periods." (Doc. 58 at 26, quoting Birdwell Depo. 16:4-20:5, Exh. 4 at p.54 [Doc. 58-1 at 125].) Defendants observe that employees gave conflicting statements regarding whether they could, and did, leave locations during meal periods:

> While some employees said they did not leave the worksite during meal periods, their reasons for this vary. A few contend they were not permitted to use company vehicles to leave though some did anyways. Others said they could and did leave if there were places near enough to go - another site-specific variation, though not one upon which liability may be attributed to KBA. [Citation.] Still others said they could have left but chose not to.

(*Id.*, internal footnotes and citations omitted.) Defendant argues that, "at most, Plaintiff has identified a handful of individuals who believed they could not leave the worksite during lunch, despite a clear, written company policy to the contrary." (*Id.*) Given the lack of a uniform company policy requiring individuals to remain on site, Defendants contend there is no "common method of proof" as required for certification under Rule 23(b)(3).

Further, Defendants contend Plaintiff fails to show "a common policy or practice" related to the timing of meal periods. (Doc. 58 at 27.) Defendants assert Class 7 "is derivative of Classes 1 and 3

1  related to travel time," and "for the same reasons that Classes 1 and 3 fail under Rule 23(b)(3), so too

2  does Class 7." (*Id.*)  Defendants also reiterate that "because crew leads determine when the crew

3  members take breaks or lunch," their claims differ from those of other putative class members, "whose

4  breaks they dictated." (*Id.*)

5         5.     Classes 8 and 9

6       Defendants contend Plaintiff also fails to show "t common issues predominate as to his eighth

7  and ninth proposed classes, which rely on labor code statutes applying penalties only when a failure to

8  pay wages at termination was willful… and/or where injury results from a 'knowing and intentional

9  failure' to include all required information on the pay statement." (*Id.* at 27-28.)  Defendants conclude

10  that "[b]ecause common issues do not predominate as to Classes 1-7, the same is true for derivate

11  Classes 8 and 9." (*Id.* at 28.)

12  **V.    PLAINTIFF'S REPLY**

13       According to Plaintiff, many arguments set forth by Defendants are "inappropriate" at the class

14  certification phase. (Doc. 60 at 4.)  Plaintiff contends Defendants' arguments addressing the

15  substantive merits of his claims are improper, and "[t]he fact that Defendants have presented evidence

16  purporting to contradict the evidence submitted by Plaintiff does not mean that the issues … cannot be

17  determined on a class-wide basis." (*Id.*)

18       Plaintiff asserts that the "proposed classes can be amended to address any of the concerns

19  raised by Defendants." (Doc 60 at 8, emphasis omitted.)  First, he asserts the argument regarding the

20  term "non-exempt field technicians… is disingenuous" because counsel "have discussed on numerous

21  occasions that this class would include all non-exempt employees who worked at field locations,

22  including nonexempt 'leads' who worked there." (*Id.*)  Second, Plaintiff contends a class definition is

23  not required to be exact, and "[a]ll that is required for class definition is that it set forth 'common

24  characteristics sufficient to allow a member of that group to identify himself or herself as having a

25  [potential] right to recover based on the description.'" (*Id.*, quoting *Krueger v. Wyeth, Inc.*, 2011 WL

26  8984448, at *1 (S.D. Cal. July 13, 2011).  Thus, Plaintiff proposes several class definitions be

27  amended as follows:

28      **Class 1. Unpaid Work Subclass:** All non-exempt field technicians of Schlumberger
    Lift Solutions LLC or Schlumberger Rod Lift, Inc. who worked in California at any

time from June 5, 2014 through the date of class certification who performed duties before or after their shifts, including reporting to the dispatch manager at the Bakersfield base office in person or by telephone, checking in or checking out [iPads] or company phone, picking off or dropping of uniforms, or waiting at the Bakersfield base office after clocking out before the beginning of the afternoon or evening training classes.

**Class 2. Unpaid Wages Sub-class - Travel:**  All non-exempt field technicians of Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. who worked in California at any time from June 5, 2014 through the date of class certification who were not paid for the travel time between the Bakersfield office and the Belridge and Taft field locations.

**Class 3. Unpaid Meal Period Subclass:**  All non-exempt field technicians of Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. who worked in California at any field location at any time from June 5, 2014 through the date of class certification who were not paid for the time of their meal periods while at such location.

(Doc. 60 at 12-13.)

Plaintiff maintains the numerosity requirement is satisfied for each of the classes.  (Doc. 60 at 14.)  In addition, he argues that "Defendants' adequacy arguments are either moot or meritless."  (*Id.* at 15, emphasis omitted.)  Plaintiff asserts he "located a new class representative named Brian Wallace who was terminated after June 25, 2020 the ending date of the settlement in this action," and requests leave to substitute Mr. Wallace as a "class representative to assert the Section 203 and Section 226(a) wage statement claims."  (*Id.*)  Plaintiff contends with the new class representative, the challenges to Classes 8 and 9 are moot.  (*Id.*)  Plaintiff also asserts the combination of the unpaid work classes moots "Defendants' attack on Plaintiff's adequacy."  (*Id.* at 16, emphasis omitted.)  Consequently, Plaintiff concludes the Rule 23 requirements are satisfied.

## VI.    DEFENDANTS' SUR-REPLY

Defendants contend the revised class definitions identified in the reply "suffer from [the] same problems as the previously proposed classes."  (Doc. 63-1 at 10, emphasis omitted.)  For example, Defendants maintain Plaintiff has not satisfied the numerosity requirement, and argue that with the revised class definitions, "Plaintiff seeks to tether his numerosity analysis to a group far broader than the claims reasonably support."  (*Id.* at 17-18.)  In addition, Defendants argue Plaintiff cannot identify common questions that are likely to generate common answers from the putative class members, and the classes are not manageable.  (*Id.* at 8-18.)  Finally, Defendants contend Plaintiff should not be

permitted to add a new class representative at this juncture.  (*Id.* at 19.)

### A.    Unpaid Work Class

Defendants contend the combination of the previous first, second, fourth, and fifth classes "does not address the deficiencies with the prior classes that it has subsumed."  (Doc. 63-1 at 11.)  For example, Defendants argue there is conflicting evidence "as to whether class members were on or off the clock" when they reported to the dispatcher, and "divergent testimony as to whether all field employees were required to report at all (much less off the clock)."  (*Id.* at 11-12.)  Defendants observe there are also conflicting statements related to the laundry service and picking up and using iPads.  (*Id.* at 12-13.)  Further, Defendants contend the evidence does not support Plaintiff's claim that training occurred off-the-clock, because "not one of Plaintiff's timecards indicate that he clocked out and then back in on any occasion except for meal periods."  (*Id.* at 14, citation omitted.)  Defendants conclude that "Plaintiff's purportedly common question of whether class members worked off the clock, with Defendant's knowledge, cannot be resolved with a common answer."  (*Id.* at 15.)

### B.    Unpaid Travel Class

According to Defendants, "There is no dispute that non-drivers were not compensated for time spent riding in optional company vans to and from Belridge or Taft."  (Doc. 63-1 at 15.)  Defendants contend "Plaintiff appears to have dropped his contention that van travel was mandatory" and "the only basis upon which this voluntary travel time can be deemed compensatory is if employees were required to perform work at Bakersfield before boarding the vans or upon returning to Bakersfield at the conclusion of the van ride—rendering this class a subset of New Class 1."  (*Id.* at 15-16.)  However, Defendants maintain the "off the clock" work alleged by Plaintiff "is neither universal nor itself capable of class-wide resolution, even when limited to crews traveling to/from Belridge or Taft."  (*Id.* at 16.)

### C.    Unpaid Meal Period Class

Defendants contend the "New Class 3 suffers from the same problems as Prior Class 7."  (Doc. 63-1 at 17.)  Defendants observe "there is no question that meal periods were managed by crew leads."  (*Id.*, citing Garcia Depo. Vol. II at 63:2-66:18 [Doc. 58-1 at 330], Merino Depo. at 59:15-18 [Doc. 58-1 at 556].)  Defendants argue that while Plaintiff "presented evidence that a handful of crew leads did not permit their crew members to leave the lease during lunch[,]…site and supervisor-specific variations on

this point make class treatment inappropriate as to this claim." (*Id.*)  Defendants contend Plaintiff is unable to show a "generally-applicable policy" for the class.  (*Id.*)

### D.      Manageability

Defendants argue Plaintiff "failed to show that his proposed classes are manageable, [and] certification should be denied on this basis alone."  (Doc. 63-1 at 18.)  Defendants contend Plaintiff has not cured the manageability problem, but instead "combined multiple unmanageable classes into three new classes…" without identifying "a reasonable methodology for managing the vastly varied claims and experiences of putative class members."  (*Id.*)

### E.      New Class Representative

Defendants oppose Plaintiff's request to add a plaintiff to the action, noting "Plaintiff has neither obtained a permission to nor filed an amended complaint as required under Rule 15(a)(2)." (Doc. 63-1 at 19.)  In addition, Defendants observe that "[c]ourts have routinely found that defendants are unduly prejudiced under Rule 16 by introducing a new class representative after individual discovery for the named representative plaintiff and substantial discovery have been completed." (*Id.* at 20, citing, e.*g., Hitt v. Arizona Beverage Co., LLC*, 2009 WL 4261192, at *4 (S.D. Cal. Nov. 24, 2009); *Velazquez v. GMAC Mortgage Corp.,* 2009 WL 2959838, at *4 (C.D. Cal. Sept. 10, 2009).) Defendants contend the addition of a new class representative would "severely prejudice" them because "discovery has closed," and they had no opportunity to depose the proposed representative or conduct discovery related to his claims.  (*Id.* at 21.)

## VII.    EVIDENTIARY OBJECTIONS

In evaluating a motion for class certification, the Court may consider all material evidence submitted by the parties to determine Rule 23 requirements are satisfied.  *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975).  Strict adherence to the Federal Rules of Evidence is not required.  *Gonzalez v. Millard Mall Servs., Inc.*, 281 F.R.D. 455, 459 (S.D. Cal. 2012).  Nevertheless, both parties have raised objections to the evidence submitted related to the motion for class certification.

### A.      Defendants' Request to Disregard Declarations

Declarations may be used to support or oppose a motion when presented in writing, subscribed as true under penalty of perjury, and dated. 28 U.S.C. § 1746.  Defendants assert the "[d]eclarations

submitted in support of Plaintiff's motion should be disregarded." (Doc. 58 at 37.) They acknowledge "courts typically do not assess credibility at the class certification stage," but assert "the blatant contradictions between the Plaintiff's witnesses' declarations and deposition testimony (as well as contradictions between their deposition testimony and prior sworn testimony in other matters) …call the reliability of Plaintiff's evidence into question." (*Id.*)

For example, Defendants observe Adan Lopez stated in his declaration that he was "told by management at worker meetings that it was company policy that all field technicians who were not required to check into the Bakersfield dispatch office in person were required to personally call into the Bakersfield dispatch office by telephone more than an hour before the scheduled start time for the day." (Doc. 58 at 38, quoting Lopez Decl. ¶ 14 [Doc. 43-6 at 4].) Defendants note "[i]dentical language appears in each of the declarations submitted in support of the motion," but during the deposition, Lopez "admitted he had no 'specific recollection' of a particular person saying that." (*Id.*, n.56; *see also* Lopez Depo. 118:19-119:13 [Doc. 58-1 at 476-77].) In addition, Defendants report that during the deposition, Lopez admitted the statements in Paragraphs 63, 64, and 65—related to the training courses and clocking out while waiting—were not correct. (*Id.* citing Lopez Depo. 124:7-25 [Doc. 58-1 at 479].) Lopez indicated, contrary to the statements in his declaration, the training sessions were not required for "all the field technicians," and he did not clock out and then clock back in for the training. (Doc. 58-1 at 479, Lopez Depo. 124:13-25.) In addition, Defendants prepared a table entitled "Examples of Contradictions," to which they direct the Court's attention in support of the objections to the declarations. (*See* Doc. 58 at 38; *see also* Doc. 58-1 at 866-871.)

Notably, the Ninth Circuit determined "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). Here, however, the situation is reversed: deposition testimony contradicts prior declarations. Defendants have not cited any authority for the proposition that declarations must be stricken when contradicted—in whole or in part— by later depositions, and the Court has located none. Contradictions in the testimony affect the weight given to the evidence, rather than its admissibility, and at the class certification stage the Court is unable to weigh the evidence. *See Marlo v. UPS, Inc.*, 639 F.3d 942, 949 (9th Cir. 2011) (characterizing the district court's statement that it "could not 'weigh

1  the evidence'" when evaluating the requirements of Rule 23 as "a correct statement of law").  Thus,

2  Defendants' objections based on contradictions in testimony are overruled, and the request to

3  "disregard" the declarations is denied.

4  **B.       Objections to Deposition Transcripts Excerpts**

5  Plaintiff objects to the each of the excerpts of deposition transcripts attached to Defendants'

6  opposition because "[i]t is unclear which portions of the deposition are being offered."  (*See, e.g.,* Doc.

7  60-3 at 2.)  According to Plaintiff, "Defense counsel should therefore be ordered to identify by page

8  and line number the answers that Defendants are seeking to have the Court consider so that Plaintiff

9  can specifically respond to the specific answers.  (*Id.*)

10  Notably, the deposition transcripts offered by Defendants were presented to the Court in the

11  same manner as the deposition transcripts filed by Plaintiff.  Each page clearly indicates the page

12  number of the deposition, and review of Defendants' opposition clearly indicates what testimony is

13  quoted or cited.  Plaintiff's contention is without merit, and the request that the Court order Defendants

14  to identify "page and line number" of the cited evidence is denied.

15  **C.       Other Objections Made by the Parties**

16  Significantly, "[o]n a motion for class certification, the court may consider evidence that may

17  not be admissible at trial."  *Mazza v. Am. Honda Motor Co*., 254 F.R.D. 610 (C.D. Cal. 2008) (citing

18  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (class certification is based on "tentative

19  findings, made in the absence of established safeguards" and describing a class certification as "of

20  necessity… not accompanied by the traditional rules and procedures applicable to civil trials"); *see also*

21  *Keilholtz v. Lennox Hearth Prods*., 268 F.R.D. 330, 337 (N.D. Cal. 2010) ("On a motion for class

22  certification, the Court may consider evidence that may not be admissible at trial"); *Williams v. Veolia*

23  *Transp. Services, Inc.* 2009 WL 5252831 at *3 (C.D. Cal. Mar. 20, 2009) ("Unlike evidence presented

24  in a summary judgment motion, evidence presented at the class certification stage need not be

25  admissible at trial.")  Regardless, the Court reviewed all evidentiary objections raised by Plaintiff and

26  Defendants and has considered only evidence deemed relevant and admissible in its analysis.[3]

27

28       [3] Further, to the extent that the evidentiary material submitted by either party is speculative or represents a legal conclusion, the Court, as a matter of course, will not factor that material into the analysis.  *See Burch v. Regents of the*

1    ## VIII.   DISCUSSION AND ANALYSIS

2         As an initial matter, the Court may consider class definitions first raised in a plaintiff's reply

3    brief.  *See, e.g., Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.,* 209

4    F.R.D. 159, 161 (C.D. Cal. 2002) (in response to the defendant's objections that individual factual

5    assessments precluded class certification, to "alleviate[] these concerns," the plaintiffs proposed an

6    amended definition in their reply brief, which was considered by the court in evaluating the Rule 23

7    requirements); *Conant v. McCaffrey,* 172 F.R.D. 681, 683 (N.D. Cal. 1997) (finding the plaintiffs

8    "substantially alleviated" a problem resulting from an overly broad class definition by "revising the

9    class definition in their reply brief").  Moreover, the Court has the authority to redefine a class, and as

10   such there is no reason the Court should not consider the amended definitions proposed by a plaintiff.[4]

11   *See Kamar v. Radio Shack Corp.*, 254 F.R.D. 387, 391, n.2 (C.D. Cal. 2008).

12        ### A.      Unpaid Work Class

13        Under California law, an employer must "pay for all hours that it engages, suffers, or permits

14   and employee to work."  *Adoma v. Univ. of Phoenix, Inc.*, 270 F.R.D. 543, 548 (E.D. Cal. Aug. 31,

15   2010) (internal quotation marks omitted); *see also Morillion v. Royal Packing Co.,* 22 Cal. 4th 575,

16   586 (2000).  Plaintiff contends Defendants violated California law because they "failed to pay

17   [employees] for all hours worked."  (Doc. 1-3 at 12, ¶ 32.)  According to Plaintiff, Defendants

18   required work off the clock, both before and after shifts.  (Doc. 43-1 at 8-12.)  Specifically, Plaintiff

19   contends the pre-shift activities included:

20        checking in with Bobby Sellers (dispatch), talking to HR (including Sara Sackewitz)
        about employment issues, talking to foremen and other managers about the work
21        assignments, picking up keys, picking up safety equipment, dropping off and picking
        up uniforms for laundering or that had been laundered; picking up and calibrating H2S
22        monitors, picking up parts, supplies and chemicals at the warehouse, picking up tools,
        dropping off tools at the repair workshop, picking up paperwork such as job orders,
23        filling out and dropping off paperwork, picking up [iPads], picking up cell phones,
        discussing customer and customer job issues, discussing equipment and work vehicle
24        maintenance and repair issues, and filling up ice bucket "igloo" jugs with water.

25   _____

26   *University of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) ("statements in declarations based on speculation or
     improper legal conclusions, or argumentative statements, are not *facts* and likewise will not be considered…. Objections on
     any of these grounds are simply superfluous in this context.") (citation omitted, emphasis in original).

27   [4] Toward that end, the Court accepts the explanation in Plaintiff's reply brief that the term "non-exempt field
     technician" as used in the proposed class definitions is intended to "include all non-exempt employees who worked at field
28   locations, including non-except 'leads' who worked there," as agreed upon by counsel.  (*See* Doc. 60 at 8, citing Dion-
     Kindem Supp. Decl. ¶ 2.)

(Doc. 43-1 at 8-9.)  Similarly, he contends the post-shift work without compensation included returning the tools, equipment, and iPads; submitting driver logs, vehicle inspection sheets, and other paperwork; talking with dispatch; and laundry-related tasks.  (*Id.* at 10.)  He also asserts Defendants required field technicians to take training courses, and they were required to clock out and wait without pay until the classes started.  (*Id.* at 17-18.)  Plaintiff seeks to certification of an "Unpaid Work Class" that includes:

> All non-exempt field technicians of Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. who worked in California at any time from June 5, 2014 through the date of class certification who performed duties before or after their shifts, including reporting to the dispatch manager at the Bakersfield base office in person or by telephone, checking in or checking out [iPads] or company phone, picking off or dropping of uniforms, or waiting at the Bakersfield base office after clocking out before the beginning of the afternoon or evening training classes.

(Doc. 60 at 12.)

On the other hand, Defendants note their company policy informed employees: "You should not complete any work for the company while off the clock."  (Doc. 58 at 15, quoting Sackewitz Depo. 102-1:103:1, Exh. 6 [Doc. 58-1 at 608]; *see also* Doc. 43-3 at 56.)  Defendants argue certification of this class is improper, because Plaintiff has not established numerosity and he "has not and cannot show a common, unlawful policy or practice."  (Doc. 58 at 22, 33; *see also* Doc. 63-1 at 8.)

### 1.     Numerosity

Plaintiff contends the numerosity requirement for this class is satisfied, because "there are over 500 field technicians who worked for Defendants during the class period."[5]  (Doc. 60 at 14, citing Dion-Kindem Decl. ¶ 9 [Doc. 43-3 at 5].)  However, Plaintiff does not address the numerosity requirement for the proposed "Unpaid Work" Class or identify a specific number of individuals who were required to perform the identified tasks without pay.  (*See* Doc. 60 at 14-15.)  Instead, Plaintiff

---

[5] It is unclear which data Plaintiff's counsel reviewed to conclude there were over 500 field technicians who worked for Defendants during the class period.  (*See* Doc. 43-3 at 5, ¶ 9.)  Plaintiff also reports, "Defendants' PMK testified that there were over 400 field technicians that worked in the field location oil field since 2014."  (Doc. 43-1 at 27, citing Sackewitz Depo. 64:24-65:12.)  Specifically, Ms. Sackewitz estimated that between January 2014 and the present, 150 employees worked the Kern River lease, 80 employees worked in Taft, 150 employees worked in Beldridge, 8 worked in Coa linga, 5 worked in San Ardo, and 8 worked in Lost Hills.  (Doc. 43-3 at 20, Depo. 64:24-65:20.)  She explained employees could switch locations from Belridge, so these estimated "numbers include the possibility of working at Kern River or Taft."  (*Id.*)

refers the Court to various pieces of evidence related to the classes as originally defined in the motion. (*Id.*)  Thus, the Court must parse the evidence identified by Plaintiff to determine whether he has carried the burden to show the "Unpaid Work" class is sufficiently numerous.

a.      *Total number of field technicians and van users*

Originally, Plaintiff asserted the "Unpaid Wages- Reporting to Dispatch" Class—now encompassed in the revised "Unpaid Work" class— was "comprised of all field technicians."  (Doc. 43-1 at 24.)  Plaintiff asserted the numerosity requirement was satisfied for the "Unpaid Wages Class-Pre-shift and Post-Shift off-the-clock work" because "there were at least 150 employees that worked at the Belridge field location since 2014 at a particular time and at least 80 field technicians that worked at the Taft location alone."  (Doc. 43-1 at 25, citing Sackewitz Depo. 64:24-65:12 [Doc. 43-3 at 19-20].)  However, as discussed below, Plaintiff fails to present evidence of a policy requiring *all* field technicians to perform the alleged off-the-clock tasks at the Bakersfield office, as it is undisputed that field technicians could commute straight to a location, including Belridge and Taft, without going to the Bakersfield office.  (*See* Sackewitz Depo. 25:15-18 [Doc. 58-1 at 614]; Sellers Decl. ¶ 11 [Doc. 58-3 at 3].)  Without evidence of such a policy, the number of field workers—including the numbers at Belridge and Taft— does not assist the Court in its analysis regarding the number non-exempt field technicians required to perform pre-shift and post-shift work without pay.

Plaintiff also contends "at least 11 or 12 transport vans that went out of Bakersfield each day," and "6 to 7 technicians" could travel in each van.  (Doc. 43-1 at 25, citing Sackewitz Depo., 87:23-88:5 [Doc. 43-3 at 21-22]; Garcia Decl. ¶17; Zuniga Decl. ¶18; Hendrix Decl. ¶17; Gomez Decl. ¶18.) However, there is no evidence—or even an estimation—of how many of the field technicians using the van transportation were required to check out an iPad or picked up and dropped off uniforms while off the clock.  Thus, the number of individuals who took vans from the Bakersfield office to other locations does not establish numerosity.

b.      *Field technicians to whom iPads were issued*

Plaintiff contends Defendants' "policy required the crew leaders to check the [iPads] out at the secured place at the Bakersfield base office before clocking in and required the crew leaders to check them back into the secured room at the end of the workday after the crew leaders had clocked out."

29

1 (Doc. 43-1 at 13.)  In arguing the original "Unpaid Wages Class" related to iPads was numerous,

2 Plaintiff asserted:

> Certain field technicians (including but not limited to crew leads) were assigned and signed into the I-Pads each day and also submitted electronic reports to the company. The I-Pad Assignment log attached as *Exh. 7* to the Dion-Kindem Decl., Bate No. D-001778-D-001794 clearly shows that there were over 40 I-Pads assigned to field service techs, crew leads and other non-exempt workers. All crew leaders were required to have and use I-Pads. Crew leads submitted reports on I-Pads to Defendants which identified them as crew leads.

(*Id.* at 26, internal footnotes omitted.)

 Importantly, the iPad assignment log to which Plaintiff refers does not explain whether the individuals identified were non-exempt field technicians.  Although job titles are included in the log—such as crane operator, lead oiler, belts specialist, belts lead, and lube lead—there is no additional evidence that these jobs were all classified as non-exempt, or the individuals holding the positions also fall in the category of "field technicians" as the term is used in the class definition.  (*See* Doc. 43-3 at 60-61, 68-75.)  Thus, this evidence does not support Plaintiff's assertion that more than 40 field technicians were required to check out iPads.

 Plaintiff also asserts that "[f]ield service techs estimate that there were about 20 to 40 or more crew leaders who had to check out I-Pads each day."  (Doc. 43-1 at 26, citing Garcia Decl. ¶¶41-42, Zuniga Decl. ¶¶43-44, Haislip Decl. ¶38, Hendrix Decl. ¶¶41-42; Flores Decl. ¶39, Chicca Decl. ¶38, Duran Decl. ¶39, Gomez Decl. ¶44, Merino Decl. ¶37, Muñeton Decl. ¶39, Kaspar Decl. ¶39, Lopez Decl. ¶39, and Martinez Decl. ¶¶44- 45.)  Notably, there is a significant difference in the estimated number of iPad users in the evidence cited by Plaintiff.  For example, Jose Merino, "observed that there were at least 10 to 30 workers who were required to check out an [iPad] each day at the Bakersfield office." (Doc. 43-11 at 8, ¶ 37.)  Robert Zuniga, who reported he was a field technician crew leader required to check out an iPad, estimated that "[b]ased upon [his] observations, there were… at least 20 or more employees or more who needed to check out an [iPad] each day at the Bakersfield base office."  (Doc. 43-17 at 10, Zuniga Decl. ¶¶ 43-45.)  Several believed there were between 20 and 30 workers who were required to check out iPads.  (*See*, *e.g.,* Doc. 43-7 at 9, Chicca Decl. ¶ 38; Doc. 43-10 at 8, Duran Decl. ¶ 39.)

 Ricardo Gomez, Kyle Kaspar, and Emmit Hendrix believed "at least 30 field technician crew

1   leaders or more" were required to check out iPads, based upon their observations that about 100 field

2   technicians worked out of the Bakersfield office each day and there were "30 to 40 or so separate

3   crews working in the oil fields each day." (Doc. 43-8 at 10, Hendrix Decl. ¶ 41-42; Doc. 43-16 at 10-

4   11, Gomez Decl. ¶¶ 43-44; Doc. 43-12 at 9, Kaspar Decl. ¶¶ 38-39.)  The highest estimate came from

5   Reatus Haislip, who also observed that 100 field technicians worked out of Bakersfield, and believed

6   this meant "there were therefore about 30 or 50 or so separate crews working each day in the oil fields

7   and there were at least 30 to 50 employees who needed to check out an [iPad] each day at the

8   Bakersfield base office."  (Doc. 45-15 at 9, Haislip Decl. ¶ 38.)

9          Defendants argued the evidence was insufficient to establish numerosity for the original

10   "Unpaid Wages- iPads" class because the cited evidence showed "only crew leads, not field techs,

11   were assigned iPads."  (Doc. 58 at 34.)  In addition, Defendants asserted that "Plaintiff provides no

12   specific numerosity analysis regarding the number of hourly, non-exempt crew leads who were

13   employed during the time period that iPads were in use, let alone during the time period when iPads

14   were stored exclusively at Bakersfield (before being moved to the Belridge and Taft locations – where

15   Plaintiff does not allege off the clock work was performed), and were required to pick up/drop of those

16   iPads off the clock."  (*Id.*)

17          Notably, Plaintiff did not clarify the issue related to the number of possible iPad users in his

18   reply brief.  (*See* Doc. 60 at 14-15.)  Instead, Plaintiff asserted: "Defendants offer no evidence

19   disputing numerosity.  If there were evidence that the classes are not numerous, Defendants could have

20   and should have produced the evidence in their opposition that proves that all or some of the classes

21   are not actually numerous."  (*Id.* at 15, emphasis omitted.)  However, this argument fails to

22   acknowledge that the burden is on *Plaintiff* to establish numerosity—not for Defendant to disprove it.

23   *See Wal-mart Stores*, 546 U.S. at 350; *see also Kincaid v. City of Fresno*, 244 F.R.D. 597, 601 (E.D.

24   Cal. 2007) ("Plaintiffs must show some evidence of or reasonably estimate the number of class

25   members. Mere speculation as to satisfaction of this numerosity requirement does not satisfy Rule

26   23(a)(1)) (citation omitted).

27          As Defendants argue, Plaintiffs have not directed the Court's attention to evidence that

28   establishes the number of non-exempt field technicians to whom iPads were issued during the class

period, and who performed tasks related to the iPads without pay.  This lack of clarity is particularly troublesome because there is also conflicting evidence whether *all* field technicians with iPads were required to check them in and out, and whether the tasks were off the clock.  The Court cannot merely presume a sufficient number of field technicians were required to check in the iPads "before or after their shifts," as contemplated in the proposed class.  *See Wal-mart Stores*, 546 U.S. at 350; *Shields v. Walt Disney Parks & Resorts*, 279 F.R.D. 529, 546 (C.D. Cal. 2011) (where plaintiff fails to present show numerosity, "the Court cannot substitute its imagination—no matter how commonsensical—in place of facts").  Thus, the evidence related to iPad users does not establish numerosity for the proposed "Unpaid Work Class."

<i>c.    Field technicians who used the laundry service</i>

Plaintiff does not provide any evidence related to the number of field technicians who used the laundry service and states only that "Defendants… have records of which field technicians had their uniforms laundered by Aramark through the Bakersfield base office location that identify which field technicians dropped off and picked up uniforms at the Bakersfield base office."  (Doc. 43-1 at 25, citing Dion-Kindem Decl., Exh. 6 [Doc. 43-3 at 58].) The cited invoice is redacted and reflects only the name of Plaintiff.  (*See* Doc. 43-3 at 58.)  The lone page does not provide any information regarding who turned in uniforms for washing, including whether the individuals were non-exempt field technicians, or what time the laundry was submitted such that it could be determined the uniforms were picked up and dropped off while off-the-clock.  (*See id.*)

<i>d.    Number of field technicians who waited for classes off-the-clock</i>

Plaintiff does not identify any evidence related to the number of non-exempt field technicians who "wait[ed] at the Bakersfield base office after clocking out before the beginning of the afternoon or evening training classes."  (*See* Doc. 60 at 14-15.)  The Court is unable to presume that all field technicians are encompassed in the proposed class, and Plaintiff has not presented evidence regarding the number of workers who attending training sessions, or how many clocked out after arriving at the

1  Bakersfield location and then waited to clock back in for the training session.[6]

2                        *e.*       *Conclusion*

3       Plaintiff had the burden of demonstrating "there are *in fact* sufficiently numerous parties" when

4  the Court conducts its "rigorous analysis" of the requirements. *Wal-Mart Stores*, 546 U.S. at 350

5  (emphasis in original); *see also Conn. Ret. Plans & Trust Funds v. Amgen Inc*., 660 F.3d 1170, 1175

6  (9th Cir. 2011).  Ultimately, there is no evidence before the Court regarding the number of non-exempt

7  field technicians who performed the identified pre-shift and post-shift work without compensation, as

8  required by the proposed class definition.  Moreover, given the conflicting evidence related to

9  company policies, the Court is unable to presume that all non-exempt field technicians are members of

10 the "Unpaid Wages Class."  Therefore, Plaintiff has failed to meet his burden to demonstrate the

11 numerosity requirement is satisfied, and the Court recommends certification be denied on this basis.

12 *See Wal-Mart Stores*, 546 U.S. at 350; *see also Amgen Inc*., 660 F.3d at 1175.

13               2.       Commonality[7]

14      Defendants argue they had a policy that prohibited off-the-clock work, and employees were

15 informed: "You should not complete any work for the company while off the clock."  (Doc. 58 at 15,

16 quoting Sackewitz Depo. 102-1:103:1, Exh. 6 [Doc. 58-1 at 608]; *see also* Doc. 43-3 at 56.)

17 According to Defendants, Plaintiff is unable to show company-wide practices that required off-the-

18 clock work.  (*See* Doc. 58 at 18-26.)  Plaintiff does not dispute the existence of the written policy.

19 However, Plaintiff argues that whether Defendants had policy prohibiting off-the-clock work "can be

20 resolved on a class-wide basis."  (Doc. 60 at 5.)  According to Plaintiff, "The fact that there is

21 conflicting evidence on the issue does not preclude resolution of this issue."  (*Id.*)

22      Significantly, however, Plaintiff fails to acknowledge his burden in seeking class certification.

23 Plaintiff bears the burden of showing Defendants had a uniform practice or policy; if Defendants did

24

25         [6] Indeed, as discussed below, the evidence indicates *Plaintiff* himself did not clock out before training sessions.

26 (*See* Doc. 63-3 at 7, Garcia Depo. Vol. II, 43:15-23; *see also* Doc. 63-1 at 14, citing Garcia Depo. Exh. 21 [Doc. 63-3 at 14-72].)

27         [7] Plaintiff's failure to present evidence that the class encompassing field employees required to perform off-the-clock work is sufficiently numerous is dispositive. Nevertheless, the Court also evaluates the issue of commonality, to

28 address significant conflicting anecdotal evidence presented by putative class members related to whether Defendants required off-the-clock work.

not, the commonality requirement is not satisfied.  *See Gonzalez v. Millard Mall Service, Inc.*, 281

F.R.D. 455, 462 (N.D. Cal. 2012) (observing courts have denied class certification where "a plaintiff

failed to show common proof" of a company practice); *see also Coleman v. Jenny Craig, Inc.*, 2013

WL 6500457 (S.D. Cal. Nov. 2, 2013) (finding the plaintiff failed to show the commonality

requirement was satisfied where there was "insufficient evidence that any alleged off the clock work

was due to a uniform policy or practice").  Thus, Plaintiff's anecdotal evidence must demonstrate

Defendants had a uniform policy or practice that required the non-exempt field technicians to perform

unpaid work, despite the written policy.  However, as discussed below, there is significant conflicting

anecdotal evidence related to the alleged off-the-clock tasks encompassed in the class definition.

a.      *Reporting to dispatch*

Plaintiff asserts there was a "company policy that all field technicians report to the Bakersfield

base office dispatch manager at least one hour before the scheduled clock-in time each workday in

person or by telephone."  (Doc. 43-1 at 7, citing Bi-Annual Policy Review dated September 27, 2018;

Dion-Kindem Decl., Exh. 3 [Doc. 43-3 at 43]; Sackewitz Depo., 30:3-18 [Doc. 43-3 at 13]; Decl. of

Patty Martinez, ¶¶ 27, 28 [Doc. 43-13 at 7].)  Plaintiff contends:

> Defendants' field technicians have also confirmed that except for a limited exception,
> they were told by company management that it was company policy that they must
> report to the Bakersfield base office dispatch manager in person more than one hour
> before the scheduled clock-in time on each workday.[] These field technicians were
> told by management that it was company policy that the only field technicians who
> were allowed to report to the Bakersfield dispatch manager by telephone were field
> technicians who lived near the Belridge or Taft field locations and had special
> permission to drive directly to those field locations and report to the Bakersfield
> dispatch manager by telephone more than an hour before the scheduled clock-in time
> for the day.

(Doc. 43-1 at 7-8, internal footnotes and emphasis omitted.)

The cited "Bi-Annual Policy Review" indicates employees not using the company's

transportation "are required to communicate dispatch" to "eliminate any assumptions and allow

dispatch to fill crew positions accordingly."  (Doc. 43-3 at 43.)  There is no information regarding

when this communication must occur, such as whether an employee could elect to not use the

transportation and inform dispatch only once, whether it was required each day, or how much advance

notice was required.  (*See id.*)  Further, the "Bi-Annual Policy Review" indicates that only employees

34

who "are unable to report for work… must under all but the extenuating circumstances call dispatch at least one hour before the time you are to report to work." (*Id.*)  In addition, Sarah Sackewitz testified that employees could be informed "[f]ace to face or over the phone" regarding location assignments, either the day before or the morning of work—but provided no information as to whether these communications occurred on the clock.  (*See* Doc. 43-3 at 13-14, Sackewitz Depo. 30:19-31:2.)

Plaintiff Cristobal Garcia reports he was told by unidentified "management and supervisors" that company policy required "all field technicians to check in with the Bakersfield dispatch office manager every morning before starting [the] workdays… more than an hour before [the] start time." (Doc. 43-5 at 3, Garcia Decl. ¶ 13.)  Garcia asserts that "each morning, … [he] went in person to the Bakersfield base office to speak with the dispatch manager (almost always Bobby Sellers) at the dispatch desk," and at that time was informed of the work location, the crew he was with, and "who [his] lead was."  (*Id.* at 4-5, ¶ 18.)  Several putative members made similar—if not identical— statements in their declarations that "management" informed them of a policy requiring check in with dispatch an hour before the start time, and they did so daily.  (*See, e.g.*, Doc. 43-6 at 3-5, Lopez Decl. ¶¶ 13, 18; Doc. 43-7 at 3-5, Chicca Decl. ¶¶ 12, 17; Doc. 43-8 at 3-5, Hendrix Decl. ¶¶ 12, 19; Doc. 43-9 at 4, Muñeton Decl. ¶ 15.)

On the other hand, Defendants argue that "[a]t no point during the class period has Defendant required field employees to check in with dispatch, personally or telephonically, while they are off the clock, unless they are calling to say they will not be at work that day."  (Doc. 58 at 13, citing Sellers Depo. 179:25-180:8.) In addition, Defendants observe several putative class members "testified that they never checked in with Bobby if they were off the clock, nor were they required to."  (Doc. 58 at 20, n.22, citing, *e.g.*, Asensio Depo. 44:7-45:25 [Doc. 58-1 at 19-20], Birdwell Depo. 56:23-61:14 [Doc. 58-1 at 62-63], McClain Depo. 39:17-41:16 [Doc. 58-1 at 515].)  For example, Jeremy Birdwell testified that he learned of assignments the day before, either by phone or in person—while "still on the clock" — including the location and start time for the crew prior to the introduction of a company portal.  (Doc. 58-1 at 62-63, Birdwell Depo. 59:1-61:7.)  Birdwell stated, "While I was on the clock I would call Bobby and find out for my crew, my members and for myself, and I would let them know the time, while we're still all clocked in."  (*Id.* at 63-64, Depo. 60:22-61:1.)

Further, Defendants present evidence the company began using an "on-line portal," which eliminated the need to check in with dispatch at any time for assignments.  (Doc. 58 at 13, n.9, citing Sellers Depo. 20:9-22, Sackewitz Depo. 29:10-25 [Doc. 58-1 at 617, 701].)  According to Defendants, "crew assignments for the following day are posted on the Company's on-line portal, which all employees have access to."  (Doc. 58 at 13, citing Sellers Depo. 19:25-21:15; Sackewitz Depo. 29:10-25 [Doc. 58-1 at 617, 700-702].)  Defendants report the "[e]mployees are expected to check the portal daily before they clock out."  (*Id.*)  Notably, Plaintiff and putative class members do not address use of this portal in their declarations.  However, during their depositions, putative class members testified that after the portal was created, the portal could be used for learning location assignments.  (*See, e.g.*, Asensio Depo. 45:2-19 [Doc. 58-1 at 20]; Birdwell Depo. 57:11-21 [Doc. 58-1 at 60]; Haislip Depo. 114:9-12 [Doc. 58-1 at 410].)  For example, Victor Asensio, a field employee, reported that he checked the portal every day for information on the next day's work.  (Doc. 58-1 at 16, 21.)  He explained employees would "check it the day before, that way you can know where you're going to go" and "already know where you're working."  (*Id.* at 21, Asensio Depo. 45:2-25)

Consequently, there is conflicting anecdotal evidence related to whether field technicians were required to report to dispatch while off-the-clock each day, both before and after the implementation of the company "on-line portal."

<em>b.      Waiting on training classes</em>

In seeking certification, Plaintiff asserted that "[w]orkers were not compensated for waiting time before training classes."  (Doc. 43-1 at 17, emphasis omitted.)  However, proposed class representative Cristobal Garcia and putative class members present inconsistent evidence regarding whether the field technicians were required to clock out on training days and wait for the training to begin to clock back in.

Plaintiff indicated in his declaration that he "was told by management that it was company policy that… field technicians must clock out the end of the workday and wait, clocked-out, at the Bakersfield base office until the training class started."  (Doc. 43-5 at 13, Garcia ¶ 69.)  He asserted the training "generally did not start for at least 40 minutes to an hour or more after [they] arrived back at the Bakersfield base office from [the] oil field assignments."  (*Id.* at 13-14, ¶ 69.)  Plaintiff reported

36

he once "attempted to stay clocked in while [he] waited for the training class," but "was told that [he] was not allowed to clock in" early.  (*Id.* at 14, ¶ 72.)  With the exception of that occasion, Plaintiff said he "waited clocked-out at the Bakersfield base office for the training class and did not clock back in until just before the training class started."  (*Id.*, ¶ 73.)  However, during his deposition, Plaintiff testified: "I don't remember clocking in and out for the classes."  (Doc. 58-1 at 326, Garcia Depo. Vol. II, 40:12-22.)  He also indicated that he did not recall stating a claim related to being required to clock out prior to training sessions.  (Doc. 63-3 at 7, Garcia Depo. Vol. II, 43:15-23.)  Further, Defendants observe that "not one of Plaintiff's timecards"—which he was asked to review during the deposition— "indicate that he clocked out and then back in on <u>any</u> occasion except for meal periods."[8]  (Doc. 63-1 at 14, citing Garcia Depo. Exh. 21 [Doc. 63-3 at 14-72].)

Similarly, Robert Zuniga indicated in his declaration that field technicians were required to clock out, and he once attempted to remain clocked in but "was told that [he] was not allowed to clock-in until the training class started."  (Doc. 43-17 at 16, Zuniga Decl. ¶ 77.)  However, during the deposition counsel asked Zuniga if he was clocked in for training classes and Zuniga stated: "I don't remember clocking in and out for the classes."  (Doc. 58-1 at 326, Zuniga Depo. 40:9-22.)

Several putative class members reported they were required to clock out and wait for the training to start.  For example, Jorge Duran reported he attended meetings in Bakersfield after work.  (Doc. 58-1 at 247-48, Duran Depo. 76:4-77:25.)  According to Duran, the employees "were off the clock on the way to Bakersfield" and remained off the clock until training started, but "weren't allowed to leave."  (*Id.*)  Likewise, Fernando Muñeton reported the employees waited for training while off the clock.  (Doc. 58-1 at 591, Muñeton Depo. 76:7-15.)  He explained he would "clock out in Belridge, drive to town, and then wait for everybody to get there so [they] could all go in together and start the meeting together, and then clock in for the meeting."  (*Id.*)

Other putative class members reported clocking out was permitted, and employees were not told they had to remain while waiting for the training to start.  (*See, e.g.*, Doc. 58-1 at 387-88, Haislip Depo. 59:9- 60:10; Doc. 58-1 at 547-48, Merino Depo. 45:3-13.)  Jose Moreno testified those

---

[8] Notably, in light of the evidence that Plaintiff was not required to clock out for training classes, this also raises as issue to the typicality of Plaintiff's claims with those of putative class members.

attending trainings were told what time the class started but were "never told" they could not leave before the training.  (*Id.* at 547-58, Merino Depo. 45:3-13.)  Moreno stated they usually "only had a couple of minutes so it was wise to not take off," so "people would change to their different clothes or go outside and smoke." (*Id.*)  Similarly, Reatus Haislip testified people could clock out and go home if there were several hours between a shift ending and training class beginning.  (*Id.* at 387-88, Haislip Depo. 59:21-60:10.)

Finally, many putative class members—including individuals who provided declarations in support of the motion—testified they were not required to clock out, wait, and then clock back in before training sessions.  (*See, e.g.,* Doc. 58-1 at 18, Ascensio Depo. 18:10-21; Doc. 58-1 at 456, Lopez Depo. 57:14-22; Doc. 58-1 at 52-53, Birdwell Depo. 44:17-45:22; Doc. 58-1 at 367, Grajeda Depo. 42:2-23; Doc. 58-1 at 514, McClain Depo. 39:6-10.)  For example, Adan Lopez reported he "attended a lead person" training, which included several evening sessions.  (*Id.* at 455-56, Lopez Depo. 53:22-55:7.)  Lopez explained: "The first four sessions, there was one every week, and then the last three sessions were two weeks apart from each other."  (*Id.* at 456, Lopez Depo: 55:3-7.)  Lopez testified he was not required to clock out between the end of his workday and the beginning of the training sessions.  (*Id.*, Lopez Depo: 55:14-17.)  Likewise, Jeremy Birdwell testified he attended training after his shift, and "stayed on the clock the entire time until [attendees] were relieved of the classroom duty." (*Id.* at 53, Birdwell Depo. 45:11-15.)  Rafael Grajeda also reported he attended evening training and "stayed on the clock all day long," without clocking out while waiting for the training.  (*Id.* at 367, Grajeda Depo. 42:2-23.)

Based upon the testimony of putative class members, it is clear there is conflicting evidence regarding whether field technicians attending training were required to remain at the Bakersfield office before the training, and whether the field technicians remained on the clock while doing so.  Thus, the anecdotal evidence fails to show a uniform practice or policy resulting in uncompensated wages for "waiting at the Bakersfield base office after clocking out before the beginning of the afternoon or evening training classes," as required by the proposed class definition.  (*See* Doc. 60 at 12.)

      *c.*    *Conflicting evidence*

Evidence before the Court regarding the off-the-clock work appears to be directly in conflict.

Previously, this Court noted, "[C]onflicting testimony poses a significant concern for managing [a] class action." *Garcia v. Sun Pacific Farming Coop.*, 2008 U.S. Dist. LEXIS 111969 (E.D. Cal. May 14, 2008), *aff'd* 359 Fed.Appx. 724 (9th Cir. Nov. 13, 2009).  In *Garcia*, the plaintiffs presented seven employee declarations in which they claimed the defendant instituted employment policies that required off-the-clock work, failed to permit meal and rest periods, and did not reimburse workers for tool expenses.  In opposition to the motion, the defendants presented 33 declarations from employees—some of whom were from the same crews as the plaintiffs' declarants —who reported they did not work off-the-clock, and that defendants provided meal and rest periods and provided necessary tools.  *Id.*, 2008 U.S. Dist. LEXIS 111969 at *28-32.  The Court observed: "Based on the evidence before the Court, there is not consistent application of the wage and hour laws between and among the various Crews…. Unlike the evidence in *Dukes*, there is no strong evidence of company wide policies and corporate structure."  *Id.* at *31-32.  Therefore, the Court concluded the plaintiff was unable to satisfy the commonality requirement.  *Id.* at *32.  Likewise, in *Arrendondo v. Delano Farms Co.*, 2011 U.S. Dist. LEXIS 44134 (E.D. Cal. Apr. 19, 2011), the Court observed that "conflicting evidence warrants denial of certification."  *Id.*, 2011 U.S. Dist. LEXIS 44134, at *25.

The Southern District also found the commonality requirement was not satisfied where the court was presented with conflicting anecdotal evidence regarding whether off-duty tasks were required.  *See Coleman v. Jenny Craig, Inc.,* 2013 WL 6500457 (S.D. Cal. Nov. 2, 2013) (finding the plaintiff failed to show the commonality requirement was satisfied where there was "insufficient evidence that any alleged off the clock work was due to a uniform policy or practice").  The court noted Jenny Craig had an "official policy" that "expressly prohibit[ed] off the clock work," and presented declarations from putative class members who reported they were not required to perform off-duty tasks.  *Id.* at *8.  The plaintiff presented also presented "anecdotal evidence to the contrary"— including declarations from several other putative class members— which the court found was "insufficient to demonstrate that a contrary policy or practice existed and was uniformly applied to employees companywide."  *Id.* *7-8.  Due to the conflicting evidence, the court opined "the individualized assessment necessary to ascertain whether there were in fact any employees who were told to work off the clock would not be susceptible to common proof." *Id.* at *8, quoting *Washington*

*v. Joe's Crab Shack*, 271 F.R.D. 629, 642 (N.D. Cal. 2010).

The conflicting anecdotal evidence now before the Court is similar to the evidence presented in *Garcia* and *Coleman*. Further, as in *Coleman,* Defendants had an express policy that prohibited off-the-clock work. Though putative class members identified by Plaintiff assert they were required to perform off-the-clock work without compensation, Defendants present evidence that such off-the-clock work was not required, consistent with the written policy. Given the dissimilarities and conflicting testimony of putative class members related to whether off-the-clock work was required by Defendants, the Court is unable to find a contention that is "capable of class wide resolution." *See Wal-Mart Stores*, 546 U.S. at 350. Consequently, Plaintiffs failed to demonstrate the commonality requirement is satisfied.[9]

### 3.    Conclusion

Plaintiff fails to carry the burden to demonstrate the Unpaid Work Class is sufficiently numerous. Further, the conflicting anecdotal evidence fails to demonstrate Defendants had a policy of requiring the non-exempt field technicians to perform off-the-clock work. Consequently, Plaintiff fails to show the Rule 23(a) factors are satisfied, and the Court recommends certification of the Unpaid Work Class be denied.

### B.    Unpaid Travel Class[10]

Under California law, "All employer-mandated travel that occurs after the first location where the employee's presence is required by the employer shall be compensated at the employee's regular rate of pay or, if applicable, the premium rate that may be required by the provisions of Labor Code Section 510 and Section 3, Hours and Days of Work…" *Griffin v. Sachs Elec. Co.*, 390 F.Supp.3d 1070, 1096 (N.D. Cal. 2019) (quoting Paragraph 5(A) of Wage Order 16). Plaintiff contends Defendants were required "to compensate Plaintiff and class members for…travel time" after their arrival at the Bakersfield office. (Doc. 43-1 at 19.) Therefore, Plaintiff seeks certification of a class

---

[9] Moreover, the conflicting evidence demonstrates the Court would be required to conduct individual inquiries to determine which field technicians were required to perform off-the-clock work without compensation, while other field technicians were not, and why.

[10] In the reply, Plaintiff titled this class the "Unpaid Wages Sub-class- Travel." (Doc. 60 at 13.) For the sake of clarity—and to further distinguish this class from the various unpaid wage classes that Plaintiff originally proposed—the Court will refer to the class as the "Unpaid Travel Class."

including "[a]ll non-exempt field technicians of Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. who worked in California at any time from June 5, 2014 through the date of class certification who were not paid for the travel time between the Bakersfield office and the Belridge and Taft field locations."  (Doc. 60 at 13.)

### 1. Numerosity

Plaintiff reports "at least 11 or 12 transport vans that went out of Bakersfield each day."  (Doc. 43 at 25, citing Sackewitz Depo., 87:23-88:5; Garcia Decl. ¶17; Zuniga Decl. ¶18; Hendrix Decl. ¶17; Gomez Decl. ¶18.)  In addition, Plaintiff reports "[t]here were 100 or more that worked out of the Belridge and Taft locations."  (*Id.,* citing Martinez Decl., ¶¶24, 31.)  Because the class is defined to include all field technicians who used the transportation from Bakersfield to Belridge and Taft, the Court finds the numerosity requirement is satisfied.

### 2. Commonality

Plaintiff asserts that "[t]he central issues concerning this subclass [are] whether defendants were required to compensate their employees for travel time between job sites and whether they did so."  (Doc. 60 at 12.)  Plaintiff notes this Court previously certified a similar class in *Aldapa v. Fowler Packing Co.*, 323 F.R.D. 316 (E.D. Cal. 2018). (*See* Doc. 60 at 12.)  In *Aldapa*, the Court found "common questions of fact and law … run through the proposed subclass," related to whether class members were required to be paid for travel between different locations during their shifts.  *Id.*, 323 F.R.D. at 341.

Defendants indicate "[t]here is no dispute that non-drivers were not compensated for time spent riding in optional company vans to and from Belridge or Taft."  (Doc. 63-1 at 15.)  Defendants maintain the class should not be certified because "the California Department of Labor Standards Enforcement (the 'DLSE') has already determined, consistent with California precedent, that the particular travel time claim at issue has no merit."  (Doc. 58 at 9.)  Defendants report Robert Zuniga—who filed a declaration in support of the motion for class certification—"previously filed a complaint with the DLSE seeking compensation for time spent traveling," and the DLSE dismissed his claims. (*Id.* at 19-20.)

Significantly, however, Defendants' arguments clearly go to the merits of the claim.  The Court

need not determine whether Plaintiffs may succeed on this theory of liability because "it is improper to advance a decision on the merits to the class certification stage." *Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 480 (9th Cir. 1983); *see also Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 983 n.8 (9th Cir. 2011) (the Court does not determine whether the class "could actually prevail on the merits of their claims").  Indeed, the Supreme Court has held that courts should not determine the merits at the class certification stage.  Instead, at this stage, "the question is not whether the plaintiff or plaintiffs have stated a cause of action, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974) (noting the judge improperly conducted a preliminary inquiry into the merits, rather than determine the propriety of class certification); *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978) (while the factual and legal issues are related, when determining class certification, the district court does not resolve the merits).  Consequently, at this juncture, it would be improper for the Court to evaluate the merits of Plaintiff's claim for travel compensation.

As Plaintiff argues, whether class members were entitled to compensation for travel is an issue that may be resolved on a class-wide basis.  *See Aldapa*, 323 F.R.D. at 341; *Lopez v. G.A.T. Airline Ground Support, Inc.*, 2010 WL 3633177 at *10 (S.D. Cal. Sept. 13, 2010) (finding the plaintiff's off-the-clock class related to travel satisfied the commonality requirement where there was a "common legal question of whether GAT should have compensated employees for their travel time" on a company shuttle); *see also* Parsons, 754 F.3d at 684 (commonality satisfied where "[t]he factual and legal questions … can be answered 'yes' or 'no' in one stroke as to the entire class").

### 3.    Typicality

According to Plaintiff, he was subjected to the "same course of conduct" as the putative class members.  (Doc. 43-1 at 30.)  Defendants did not argue that Plaintiff's claims are not typical of this class.  (*See* Doc. 58 at 36.)

Notably, Plaintiff reported to the Bakersfield office and "was not paid for the travel time' from Bakersfield to Belridge or Taft.  (Doc. 43-5 at 10, Garcia Decl. ¶¶ 48-50.)  Because Plaintiff was subjected to the same unpaid travel practices as putative class members, he has identified a "same or similar injury" as putative class members.  *See Hanon*, 976 F.2d at 508. Further, the pay practices

were "not unique to the named plaintiff[s]," and other class members were subject to "the same course of conduct." *Id.* Accordingly, Plaintiff demonstrated that typicality requirement is satisfied.

### 4.    Adequacy of representation

Rule 23(a)(4) requires Plaintiff to demonstrate that he will "fairly and adequately protect the interests of the class." Representation is "adequate" if the attorneys representing the class are qualified and competent, and the proposed class representative has claims that are interrelated with interests of the class members. *Falcon*, 457 U.S. at 157-58; *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978).

#### a.    *Proposed class representative*

Plaintiff reports he has "no interests that conflict with those of any other class member," and he is "ready, willing and able to serve as a representative." (Doc. 43-5 at 16, Garcia Decl. ¶ 80.) Further Plaintiff reports, "I have considered and will consider the interests of the other class members just as I would my own interests and I also understand that I may need to put the interests of the other class members before my own." (*Id.* at 15, ¶ 78.) Further, Defendants do not challenge the adequacy of representation by the named plaintiff related to the unpaid travel class. Thus, the Court finds Plaintiff has demonstrated he would be an adequate representative for the putative class members.

#### b.    *Proposed class counsel*

Lonnie C. Blanchard, III and Peter R. Dion-Kindem seek appointment as counsel. (Doc. 43-1 at 31.) Counsel reported they do not have conflicting interests with class members and "are experienced in handling class action lawsuits." (*Id.*, citing Dion-Kindem Decl. ¶¶ 2-8, 16-17 [Doc. 43-3]; Blanchard Decl. ¶¶ 2-9 [Doc. 43-4].) In addition, Mr. Blanchard reported "[t]he focus of [his] practice is almost exclusively civil litigation," with "extensive experience in wage and hour litigation, including class actions." (Doc. 43-4 at 2, ¶ 2.) Similarly, Mr. Dion-Kindem asserted he has "extensive experience in wage and hour litigation, including class actions." (Doc. 43-3 at 2, ¶ 3.) Both attorneys identified numerous class action cases in which they were counsel of record. (*See* Doc. 43-3 at 2-5; Doc. 43-4 at 2-4.) Therefore, the Court finds Mr. Blanchard and Mr. Dion-Kindem will provide adequate representation.

///

### 5.     Conclusion

Plaintiff has met the burden to demonstrate the requirements of Rule 23(a) are satisfied, and the Court recommends certification of the Unpaid Travel Class be granted.

### C.     **Meal Period Premium Class**

"Under California law, employers must generally provide employees with one 30-minute meal period that begins no later than the end of the fifth hour of work."  *Donahoe v. AMN Services, LLC*, 11 Cal.5th 58, 61 (2021) (citing Cal. Lab. Code § 512(a), Industrial Welfare Commission (IWC) wage order No. 4-2001, § 11(A).  "If an employer does not provide an employee with a compliant meal period, then 'the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each workday that the meal … period is not provided.'" *Id.* (quoting Cal. Lab. Code § 226.7(c), modification in original).

Plaintiff seeks to certify a class predicated on liability for the unpaid travel, asserting that field technicians had late meal breaks when "the 'actual' work time started at the Bakersfield base office an hour or more before the scheduled clock-in times."  (Doc. 43-1 at 15.)  According to Plaintiff, when that travel is counted, "many, if not most of their meal breaks began after the 5th hour of work."  (*Id.* at 15-16, citations, emphasis omitted.)  Specifically, each declarant stated:

> If my real work time started at the Bakersfield office an hour or more before our scheduled clock-in time because the Bakersfield office was where my clock-in time should have begun, I believe that many of my meal breaks began after the end of the 5th hour of work.

(Doc. 43-5 at 12, Garcia Decl. ¶ 63; Doc. 43-6 at 13, Lopez  ¶ 57; Doc. 43-7 at 12, Chicca Decl. ¶ 56; Doc. 43-8 at 14, Hendrix Decl. ¶ 66; Doc. 43-9 at 12, Muneton Decl. ¶ 59; Doc. 43-10 at 12, Duran Decl. ¶ 59; Doc. 43-12 at 13, Kaspar Decl. ¶ 61; Doc. 43-16 at 16, Gomez Decl. ¶ 67; Doc. 43-17 at 14, Zuniga Decl. ¶ 66.)  However, Plaintiff and the other putative class members fail to explain the basis for their belief.  For example, Plaintiff does not state he routinely had a meal break five hours after the start of his shift, such that if an extra hour was added, his meal break would be untimely.  On the other hand, if Plaintiff routinely received a meal break four hours after starting his shift, then the additional hour would not render the meal break untimely.

The vague evidence by Plaintiff and the putative class members—without any facts to support

their belief—is not sufficient to establish a policy of delayed meal periods. Plaintiff fails to present evidence that *any* field worker had an untimely meal period due to travel time. Because Plaintiff fails to satisfy the numerosity requirement of Rule 23(a), the Court recommends certification of the "Meal Period Premium" class be denied.[11]

### D.   Unpaid Meal Period Class

California law provides: "Unless the employee is relieved of all duty during a 30 minute meal period, the meal period shall be considered an 'on duty' meal period and counted as time worked." Cal. Code Regs., tit. 8, § 11070, section 11; *Brinker Rest. Corp. v. Super. Court.*, 53 Cal.4th 1004, 1035 (2012) (defining an off-duty meal period as "an uninterrupted 30-minute period during which the employee is relieved of all duty"). What suffices as an off-duty meal period "may vary from industry to industry." *Brinker*, 53 Cal.4th at 1040. Courts construe the duty-free meal break requirement liberally, to accomplish the objective of protecting the welfare of affected workers. *Bono Enters., Inc. v. Bradshaw*, 32 Cal.App.4th 968, 974 (1995).

Plaintiff contends, "once field workers were at their daily work sites, they were not allowed to leave the work sites during their meal periods." (Doc. 43-1 at 19.) According to Plaintiff, "Because the workers were restricted from leaving their daily work areas during their meal periods, the time of their meal periods constitutes 'hours worked' for which they were entitled to be paid, but for which they were not paid." (*Id.*, citing, *Bono*, 32 Cal.App.4th at 968-72.)

In *Bono*, the court determined that "[w]hen an employer directs, commands or restrains an employee from leaving the work place during his or her lunch hour and thus prevents the employee from using the time effectively for his or her own purposes, that employee remains subject to the employer's control," and therefore must be compensated for that time. *Bono*, 32 Cal. App. 4th at 975.

---

[11] Notably, Defendants also present evidence that "crews were expected to take their breaks together based on the earliest crew member's start time." (Doc. 58 at 35, citing Chicca Depo. 190:18-191:4 [Doc. 58-1 at 174-75]); McClain Dep. 35:18-36:4 [Doc. 58-1 at 510-11]; Birdwell Dep. 28:7-29:2 [Doc. 58-1 at 39-40]; Merino Dep. 57:18-20. Defendants explain this practice meant crews took lunch based upon when the van driver clocked in, which was "in many cases at least an hour before the rest of his crew." (*Id.*)

For example, Jeremy Birdwell explained that sometimes he had a driver come from Bakersfield who started his time at 4:30 a.m., while Birdwell clocked in at 5:30 a.m. Birdwell stated his crew would "take [the] meal break with the driver's meal break at 9:30 because he clocked in at 4:30." (Doc. 58-1 at 39, Depo. 28:17-25.) Similarly, Erin McClain testified that "if there was a van driver that clocked in earlier than the rest of the crew, we would base our lunch break on his time," and that had always been the practice. (Doc. 58-1 at 510-11, Depo. 35:23-36:4.)

The employer in *Bono* required workers to remain on its premises during their thirty-minute lunch breaks for security reasons.  *Id.* at 972.  Employees claimed that because they "remained under the direction and control" of the employer during these lunch breaks, they were entitled to compensation under the California wage and hour laws.  *Id.*  In examining the phrase "subject to the employer's control" of the applicable IWC wage order, the court upheld the California Labor Commissioner's interpretation requiring an employer to compensate employees for meal periods in which they are precluded from leaving employer's premises.  *Id.* at 979.  As part of its decision, the court emphasized that the lack of required action and freedom from employer control were central to the determination of whether time was on or off duty.[12]  *Id.* at 975-96.

Based upon the standards identified in *Bono* and its progeny, Plaintiff seeks to hold Defendants liable for failure to provide proper meal periods that relieved field technicians of all duty.  (Doc. 43-1 at 19, 23.)  Specifically, Plaintiff seeks certification of a class including "[a]ll non-exempt field technicians of Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. who worked in California at any field location at any time from June 5, 2014 through the date of class certification who were not paid for the time of their meal periods while at such location."[13]  (Doc. 60 at 14.)

Defendants assert that Plaintiff fails to show "evidence of a uniformly applied companywide policy" that prohibited field technicians from leaving the worksite.  (Doc. 58 at 17 at 26-27.)  Furthermore, Defendants argue Plaintiff is unable to satisfy the typicality requirement, because Plaintiff was a crew lead and "dictated… the timing and location" of meal periods.  (*Id.* at 37.)

> 1.   Numerosity

Opposing certification, Defendants asserted that Plaintiff failed to "demonstrate[] numerosity as to any of the proposed classes."  (Doc. 58 at 33, emphasis omitted.)  Notably, however, Defendants did not present any specific argument related to numerosity of the original "Class 5," though all other classes were addressed and challenged.  (*See id.* at 33- 35.)  Because Plaintiff argues this class is

---

[12] In so finding, the court applied the FLSA standard for off-duty time to the California Wage Orders, finding "[t]he question of whether an employee is off duty depends upon whether the time is 'long enough to enable him to use the time effectively for his own purposes.'" *Bono*, 32 Cal. App. 4th at 976.

[13] Originally, Plaintiff proposed a class of field technicians "*who were required to take their meal periods at their daily work site locations* and who were not paid for the time of their meal periods." (Doc. 43-1 at 23, emphasis added.)

intended to address a company-wide policy, the Court finds the numerosity requirement is satisfied.

2.   Commonality

 "Plaintiff contends that once field workers were at their daily work sites at the oil fields, they were not allowed to leave the work sites during their meal periods," and asserts he "produced numerous declarations of workers sustaining this claim."  (Doc. 60 at 13.)  Plaintiff argues commonality is satisfied with the following inquiries: "[w]hether class members were required to take their meal periods at their daily work site locations and whether they were entitled to be paid for such meal periods as 'hours worked.'"  (Doc. 43-1 at 29; *see also* Doc. 60 at 13.)

Defendants assert that throughout the class period, employees were given "a thirty-minute meal period during which they are relieved of all responsibility."  (Doc. 58 at 17, citing Sackewitz Depo. 124:13-133:22.)  Defendants report a written policy stated: "During authorized and permitted meal periods, you are relieved of all active responsibilities and you are free to leave the premises."  (Doc. 58 at 17, quoting Birdwell Depo. Exh. 4 at p.54 [Doc. 58-1 at 125].)  This policy was included in the "Employee Handbook" section related to "Meal and Rest Periods.  (*See* Doc. 58-1 at 124-25.) Notably, however, the Handbook quoted by Defendants indicates it was revised in January 2019 (*see id.*), and Defendants have not presented evidence of a written policy in place earlier in the class period.

Putative class members assert that—contrary to the identified written policy—they were not permitted to leave during meal breaks.  (*See* Zuniga Decl. ¶ 68; Hendrix Decl. ¶ 68; Flores Decl. ¶ 58; Chicca Decl. ¶ 58; Duran Decl. ¶ 61; Gomez Decl. ¶ 69; Merino Decl. ¶ 56; Muñeton Decl. ¶61; Kaspar Decl. ¶63; Lopez Decl. ¶59; Martinez Decl. ¶59.)  Specifically, Plaintiff reports he "had to stay at [the] daily work site in the oil fields during [the] meal breaks and [they] were not allowed to go into town to get food or eat at any restaurants."  (Doc. 43-4 at 12-13, Garcia Decl. ¶ 65.)  In addition, Garcia asserts "there was no way to leave the oil filed locations during a meal or rest break without a field technician driving the company vehicle that they rode in to get to the field location at which they were working on a particular day," and "field technicians were not allowed to use the company vehicles to run personal errands."  (*Id.* at 13, ¶ 66.)

The deposition testimony of putative class members corroborates the declarations. For example, Reatus Haislip reviewed the policy in the handbook, and stated it "that's not true."  (Doc. 58-

47

1 at 389, Haislip Depo. 68:8-22.)  Haislip testified employees were not permitted to leave the lease

locations on meal breaks, and "were required to stay where [they] were working."  (*Id*.)  Haislip

reported that people would ask to go to the store and a supervisor would say "no," because "it [was] an

insurance issue."  (*Id.* at 391, Haislip Depo. 70:17-25.)  Likewise, Fernando Muneton testified they

could not leave the location, with all the equipment "rigged up, tools out and everything."  (*Id.* at 588,

Muneton Depo. 39:5-12.)  Jorge Duran stated he was told "by Bobby" that employees "weren't

allowed to leave … locations to go eat."  (Doc. 58-1 at 250, Duran Depo. 84:18-24.)

On the other hand, Jeremy Birdwell testified that throughout his employment, which began

prior to 2012, that employees were free to leave and were relieved of all duties, as indicated in the

handbook.  (Doc. 58-1 at 35, *see also id.* at 51.)  Birdwell testified he would inform a supervisor of

plans "to leave the lease to go get some to eat," but "not for… his approval." (*Id.* at 68, Birdwell Depo.

65:6-10.)  Similarly, Anthony Gage testified that "shortly after Schlumberger took over"—at an

unspecified time— employees were "able to leave the lease" for a meal break, but under the prior

owner of KBA, "you wouldn't be able to … leave and go get food."  (Doc. 58-1 at 292-94, Gage

Depo. 20:20-21:2, 22:13-22.)

Synthesizing this evidence, Plaintiff has presented evidence that during the class period, there

was a common practice under which they were not permitted to leave locations for meal breaks, which

appears related to a policy not permitting the employees to use company vehicles on their own time.

Nevertheless, with the testimonial evidence, Plaintiff carries the burden to show the putative class

members "suffered the same injury" related to meal breaks.  *See Wal-mart Stores*, 564 U.S. at 350;

*Falcon*, 457 U.S. at 157.  Therefore, the Court finds the commonality requirement is satisfied.

### 3.      Typicality

Defendants assert that "Plaintiff, as a former crew lead, bears a substantially different burden

in demonstrating liability as to the meal period classes (Classes 6 and 7)."  (Doc. 58 at 37.)  According

to Defendants, Plaintiff "dictated both the timing and location of those meal periods….To the extent

that his crews were allowed (or not allowed) to leave the lease during lunch, he made that call."  (*Id.*)

Importantly, however, Defendants do not cite any evidence to support the assertion that crew leads

such as Plaintiff determined the *location* of meal breaks, or whether field technicians could leave a

lease.  (*See id.*)  Instead, the only cited evidence relates to crew leads directing the time and duration of breaks.  (*See id.*, n. 52.)

As noted above, Plaintiff reports that he had to remain at the work location during meal breaks. (Doc. 43-4 at 12-13, Garcia Decl. ¶ 65.)  Because Plaintiff was subjected to the same meal break practice as the putative class members, he carries the burden to identify the "same or similar injury" as putative class members. *See Hanon*, 976 F.2d at 508.  Thus, the typicality requirement is satisfied.

### 4.      Adequacy of representation

As addressed above, Plaintiff demonstrated that he is an adequate representative without conflicts with the putative class members, and proposed class counsel are qualified and competent. Accordingly, Plaintiff has satisfied the requirement of Rule 23(a) that the class be "fairly and adequately" represented.

### 4.      Conclusion

Plaintiff met the burden to demonstrate the requirements of Rule 23(a) are satisfied, and the Court recommends certification of the Unpaid Meal Period Class be granted.

### E.      203 Waiting Time and Wage Statement Classes

Plaintiff contends "[t]erminated class members were not paid all wages owing upon their termination" in violation of Cal. Lab. Code § 203.  (Doc. 43-1 at 21, emphasis omitted.)  In addition, Plaintiff asserts that because "Defendants failed to pay for all hours worked and to pay the required meal period premiums," class members received "deficient wage statements."  (*Id.* at 22, emphasis omitted.)  Based upon these allegations, Plaintiff seeks to certify a "203 Waiting Time" class for "[a]ll class members of Class Nos. 1-7 whose employment with Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. terminated within the period beginning June 5, 2015 to the date of class certification who have not settled their 203 claims."  (*Id.* at 23.)  Plaintiff also seeks certification of "Wage Statement Class" that encompasses class members "who have not settled their wage statement claims."  (*Id.*)

Defendants contend Plaintiff fails to establish numerosity for these classes, and they should not be certified because Plaintiff settled his claims and is not a member of the proposed "203 Waiting Time" and "Wage Statement Classes."  (Doc. 58 at 35-36.)  In response, Plaintiff maintains the

numerosity requirement is satisfied, and requested leave to name a new class representative for the proposed classes.  (Doc. 60 at 14-15.)

### 1.    Numerosity

Plaintiff asserts that "during the class period, at least 60 field technicians were terminated from Defendants' employment and have not settled their 203 claims." (Doc. 43-1 at 28, citing Dion-Kindem Decl. ¶ 13 [Doc. 43-3 at 5].)  Defendants contend Mr. Dion-Kindem did not explain this number:

> While Plaintiff's counsel posits that at least "60 field technicians" were terminated from KBA's employment and have not settled their Section 203 claims, Plaintiff's counsel has not stated how he arrived at that figure nor whether it is appropriately tailored to the three-year statute of limitations for claims under Section 203 (and Section 226) instead of the broader four-year limitations period for the underlying wage claims (the latter of which would result in claims under Sections 203 and 226 being time-barred).

(Doc. 58 at 35.)  However, in the declaration, Mr. Dion-Kindem also indicated that he reviewed data produced by Defendants and "the employment of over 200 class members was terminated during the three-year limitations period applicable to Section 203 claims."  (Doc. 43-3 at 5, ¶ 9.)  He also reports "Defendants' payroll records… show [the] identities" of the "field technicians [who] were terminated from Defendants' employment and have not settled their 203 claims."  (*Id.*, ¶ 13.)  Based upon the information provided by counsel, the Court finds the numerosity requirement for the "203 Waiting Time" Class is satisfied.  Likewise, because the "Wage Statement Class" encompasses class members from the "Unpaid Travel" and "Unpaid Meal Period" class, the numerosity requirement is satisfied.

### 2.    Plaintiff's status as a class member

Previously, the parties reached an agreement of a partial settlement in the action, and certified a Settlement Class defined as:

> All non-exempt employees of Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. who do not opt out of the settlement and who, at any time within the period beginning June 5, 2014 and ending on January 19, 2019 ("Class Period"), worked in California and received a safety bonus by Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. pursuant to a safety bonus program of Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. at any time within the Class Period.

(Doc. 55 at 38; Doc. 56 at 2; *see also* Doc. 41-2 at 20, Settlement ¶ 6.)  Plaintiff was appointed the class representative of the Settlement Class, for which the released claims included:

> all claims for waiting time penalties under 203 (fifth cause of action) in full as to Class Members who are terminated on or prior to June 25, 2020 and all claims for

1
2

wage statement penalties under Section 226 (fourth cause of action) between June 5, 2015 and January 19, 2019.

3
4

(*See* Doc. 55 at 7; Doc. 41-2 at 38, Settlement ¶ 51.)  Thus, it is undisputed that Plaintiff settled his claims under Section 203 and Section 226.  (*See* Doc. 58 at 36; Doc. 60 at 15.)

5
6
7
8
9
10
11
12
13

Importantly, a named plaintiff must have a "personal stake in the outcome" and be a member of the class that he or she seeks to represent for the class to be certified. *O'Shea v. Littleton*, 414 U.S 488, 494 (1974).  The Supreme Court explained: "That a suit may be a class action … adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis v. Casey*, 518 U.S. 343, 347 (1996) (internal quotation marks and citation omitted).  Moreover, when a class is divided into subclasses, it is "[o]f particular importance … that the court be certain that each subclass is adequately represented." *Betts v. Reliable Collection Agency, Ltd*, 659 F.2d 1000, 1005 (9th Cir. 1981).

14
15
16
17
18

Because Plaintiff is not a member of the "203 Waiting Time" and "Wage Statement" Classes, he is unable to show a personal injury related to these classes.  Consequently, Plaintiff is unable to satisfy the Rule 23(a) requirements related to these classes.  *See* Fed. R. Civ. P. 23(a)(3) (requiring "the claims or defenses of the representative parties are typical of the claims or defenses of the class"); *Falcon*, 457 U.S. at 156 ("a class representative must be a part of the class").

19

### 3.    Request to add a new class representative

20
21
22
23
24
25

Acknowledging the challenge to his qualification as a class representative for these classes, Plaintiff asserts in the reply brief that he "should be allowed to substitute a new class representative to assert the Section 203 and Section 226(a) wage statement claims, which will moot Defendants' adequacy arguments."  (Doc. 60 at 15, emphasis omitted.)  Plaintiff asserts he "located a new class representative named Brian Wallace who was terminated after June 25, 2020 the ending date of the settlement in this action," and requests Mr. Wallace be substituted.  (*Id.*)

26
27
28

Significantly, there is no right to substitute a proper class representative.  *See Moreno v. Autozone, Inc*., 410 Fed. Appx. 24, 25 (9th Cir. 2010); *Lierboe v. State Farm Mut. Ins. Co*., 350 F.3d 1018, 1022 (9th Cir. 2003).  Plaintiff executed the settlement agreement releasing his claims on May

1, 2020.  (*See* Doc. 41-2 at 48.)  Class counsel make no effort to explain how the fact that Plaintiff

released his claims and would not have standing as a class representative for the proposed "203

Waiting Time" and "Wage Statement" Classes escaped their notice.  (*See* Doc. 60 at 15.)  Similarly,

counsel do not explain why they believe substitution of a class representative would be appropriate at

this juncture, when the case has been pending for more than two years and Defendants would suffer

obvious prejudice.  (*See id.*)  The request to substitute a new class representative to cure the identified

standing deficiency is denied.

## F.       Rule 23(b) Certification[14]

Once a class satisfies the prerequisites of Rule 23(a), the party seeking certification must

demonstrate the action is appropriate also under Rule 23(b). *Amchem Prods*, 521 U.S. at 614. Here,

Plaintiff contends the proposed classes meet the requirements of Rule 23(b)(3).  (Doc. 43-1 at 31-34.)

Federal Rule of Civil Procedure 23(b)(3) requires a finding that (1) "the questions of law or

fact common to class members predominate over any questions affecting only individual members,"

and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the

controversy."  These requirements are generally called the "predominance" and "superiority"

requirements.  *See Hanlon*, 150 F.3d at 1022-23; *see also Wal-Mart Stores*, 564 U.S. at 363 ("(b)(3)

requires the judge to make findings about predominance and superiority before allowing the class").

### 1.       Predominance

Plaintiffs must show more than the mere existence of a single common question of law or fact

required by Rule 23(a)(2)—a common question must predominate.  *Wal-Mart Stores*, 564 U.S. at 363.

The predominance inquiry focuses on "the relationship between the common and individual issues"

and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by

representation."  *Hanlon*, 150 F.3d at 1022 (citing *Amchem Prods.*, 521 U.S. at 623).  The Ninth

Circuit explained, "[A] central concern of the Rule 23(b)(3) predominance test is whether

---

[14] The Court only reaches the requirements of Rule 23(b) when a party seeking class certification demonstrates the proposed classes satisfy the prerequisites of Rule 23(a).  *See Amchem Prods.*, 521 U.S. at 614.  As discussed above, Plaintiff failed to demonstrate the Unpaid Wages Class and the Meal Period Premium Class satisfied the requirements of Rule 23(a). Further, Plaintiff is unable to bring claims for the 203 Waiting Time Class and the Wage Statements Class. Therefore, the Court declines to address whether these classes satisfy the requirements of Rule 23(b).

1   'adjudication of common issues will help achieve judicial economy.'"  *Vinole v. Countrywide Home*

2   *Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009) (quoting *Zinser*, 253 F.3d at 1189).

3          According to Defendants, Plaintiff cannot satisfy the requirements of Rule 23(b)(3) because

4   "common issues do not predominate" over each of the proposed claims.  (*See generally* Doc. 58 at 18-

5   28.)  However, as discussed above, it is undisputed that Defendants did not provide compensation for

6   travel to those using the company's transportation to Belridge and Taft.  Resolution of the question

7   regarding whether the travel time *should* have been compensated is clearly an issue that will assist

8   judicial economy.  Similarly, the common questions of whether Defendants had a practice requiring

9   individuals to remain on location during meal breaks, and whether such meal breaks should be paid

10  time, predominate over any individual issues with the Unpaid Meal Period Class.

11         Because the anecdotal evidence established demonstrated commonality regarding Defendants'

12  policies, the proposed classes are "sufficiently cohesive to warrant adjudication by representation."

13  *See Amchem Prods.*, 521 U.S. at 623; *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094

14  (9th Cir. 2010) ("because there are no individualized issues sufficient to render class certification

15  under Rule 23, class issues predominate").  Therefore, Plaintiff met the burden to show common

16  questions predominate over the class claims.

17                              2.      Superiority

18         The superiority inquiry requires a determination of "whether objectives of the particular class

19  action procedure will be achieved in the particular case."  *Hanlon*, 150 F.3d at 1023 (citation omitted).

20  This tests whether "class litigation of common issues will reduce litigation costs and promote greater

21  efficiency."  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).  Pursuant to Rule

22  23(b)(3), the Court should consider four non-exclusive factors to determine whether a class is a

23  superior method of adjudication, including (1) the class members' interest in individual litigation, (2)

24  other pending litigation, (3) the desirability of concentrating the litigation in one forum, and (4)

25  difficulties with the management of the class action.

26                      a.      *Class members' interest in individual litigation*

27         Plaintiff asserts, "Because the putative class members are hourly employees, with relatively

28  modest individual claims and limited resources, there is a strong likelihood that individual actions

                                              53

would never be brought."  (Doc. 43-1 at 34, citing, e.g., *Local Joint Executive Bd. of Culinary/*
*Bartender Trust Fund v. Las Vegas Sands, Inc*., 244 F.3d 1152, 1163 (9th Cir. 2001); *Deposit Guaranty*
*Nat. Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 339 (1980).  Furthermore, there is no evidence the
putative class members would have an interest in individually pursuing or controlling their own cases.
Therefore, this factor weighs in favor of class certification.

> **b.** **Other pending litigation**

The parties have not identified any other litigation regarding the claims presented, by or against
class members.  Accordingly, this factor does not weigh against class certification.

> **c.** **Desirability of concentrating litigation in one forum**

Because common issues predominate on Plaintiff's class claims, "presentation of the evidence
in one consolidated action will reduce unnecessarily duplicative litigation and promote judicial
economy."  *Galvan v. KDI Distrib.*, 2011 U.S. Dist. LEXIS 127602, at *37 (C.D. Cal. Oct. 25, 2011).
Moreover, because putative class members were employed within the Eastern District, their claims
arose within the same forum.  Thus, class-wide determination in one forum appears desirable.

> **d.** **Difficulties in managing a class action**

Because any individualized issues for the Unpaid Travel Class and Unpaid Meal Period Class
relate only to damages, this does not weigh against management of a class action.  Conducting this
matter as a class action would be less burdensome than numerous separate actions, which could
involve duplicative discovery and repeated adjudication of the same legal issues.  Based upon the
evidence before the Court, any difficulties in managing the class action appear to be outweighed by the
other factors.

## IX.    FINDINGS AND RECOMMENDATIONS

Based upon the foregoing, the Court **RECOMMENDS** Plaintiff's motion for class certification
be **granted in part and denied in part** as follows:

1.    The request to certify the Unpaid Work Class be **DENIED**;

2.    The request to certify the Unpaid Travel Class be **GRANTED** and defined as:

> All non-exempt field technicians of Schlumberger Lift Solutions
> LLC or Schlumberger Rod Lift, Inc. who worked in California at
> any time from June 5, 2014 through the date of class certification
> who were not paid for the travel time between the Bakersfield

54

office and the Belridge and Taft field locations.

3.      The request to certify the Meal Period Premium Class be **DENIED**;

4.      The request to certify the Unpaid Meal Periods Class be **GRANTED** and defined as:

> All non-exempt field technicians of Schlumberger Lift Solutions LLC or Schlumberger Rod Lift, Inc. who worked in California at any field location at any time from June 5, 2014 through the date of class certification who were not paid for the time of their meal periods while at such location.

5.      The request to certify the 203 Waiting Time Class be **DENIED**;

6.      The request to certify the Wage Statements Class be **DENIED**; and

7.      Within fourteen days of any order from the District Court addressing these recommendations, Plaintiff be **ORDERED** to file a proposed notice for the Court's approval.

These Findings and Recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within 14 days after being served with these Findings and Recommendations, any party may file written objections with the Court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be filed and served within fourteen days of the date of service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991); *Wilkerson v. Wheeler*, 772 F.3d 834, 834 (9th Cir. 2014).


IT IS SO ORDERED.

Dated:   __**April 6, 2021**__        _____ **/s/ Jennifer L. Thurston**
                                          CHIEF UNITED STATES MAGISTRATE JUDGE