1
2
3
4
5
6
7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   CRISTOBAL GARCIA, an individual, on        Case No. 1:18-cv-01261-KES-CDB
     behalf of himself and all others similarly
12   situated.,                                 FINDINGS AND RECOMMENDATIONS TO
                                                DENY DEFENDANTS' MOTION TO
13                 Plaintiff,                    DECERTIFY CLASS

14        v.                                    (Doc. 86)

15   SCHLUMBERGER LIFT SOLUTIONS,               **14-DAY DEADLINE**
16   *et al*.,

17                 Defendants.

18

19        Plaintiff Cristobal Garcia ("Plaintiff") initiated this action with the filing of a complaint on

20   behalf of himself and a putative class against Defendants Schlumberger Lift Solutions, LLC,

21   Schlumberger Rod Lift, Inc., and Schlumberger Technology Corporation ("Defendants"), for

22   violations of California wage and hour laws.  (Doc. 1-2).  Pending before the Court is

23   Defendants' motion to decertify a class, Plaintiff's opposition, and Defendants' reply.  (Docs. 86,

24   100, 113).  On May 17, 2024, the assigned district judge referred Defendants' motion to the

25   Undersigned for preparation of findings and recommendations or other appropriate action.  (Doc.

26   117).  The matter was submitted on the parties' written submissions without hearing or oral

27   argument.  *Id*.  For the reasons explained herein, the Undersigned will recommend that

28   Defendants' motion to decertify (Doc. 86) be DENIED.

1    **Procedural Background**[1]

2          On July 20, 2020, Plaintiff filed a motion for class certification seeking certification of

3    nine proposed classes alleging violations of California wage and hour laws.  (Doc. 43). The

4    proposed classes included:

5          (1)  unpaid wages class—reporting to dispatch, (2) unpaid wages class—pre-shift and
6          post-shift off-the-clock work, (3) unpaid wage class—travel after reporting, (4) unpaid
             wages class—I-pads, (5) unpaid wages—training class, (6) unpaid wage class—meal
7          period time, (7) meal period premium time, (8) 203 waiting time class, and (9) wage
             statement class.
8

9    (Doc. 43-1 at 22-23).  Defendants filed an opposition to Plaintiff's motion for class certification

10   on January 25, 2021.  (Doc. 58).  On March 1, 2021, Plaintiff filed a reply in support of his

11   motion and Defendants filed a request for leave to file a sur-reply with the accompanying sur-

12   reply brief.  (Docs. 60, 63).

13         On April 6, 2021, the Honorable Chief United States Magistrate Judge Jennifer L. Thurston

14   issued findings and recommendations to grant in part Plaintiff's motion for class certification.

15   (Doc. 64).  Judge Thurston recommended certifying only two of Plaintiff's proposed classes:  an

16   unpaid travel class and an unpaid meal period class.  *Id.*

17         Relevant to Defendants' pending motion to decertify Plaintiff's unpaid meal periods class,

18   Judge Thurston found Plaintiff had presented evidence that during the class period, Defendants

19   implemented a common practice of prohibiting class member-employees from leaving worksites

20   for meal breaks, which, Judge Thurston observed, "appears related to a policy not permitting the

21   employees to use company vehicles on their own time." *Id*. at 48.  Judge Thurston held this

22   common question of whether Defendants had a practice requiring individuals to remain on

23   location during meal breaks, and whether such meal breaks should be paid time, predominate

24   over any individual issues.  *Id.*

25         The parties filed objections, responses, and supplemental authority following the issuance

26   of Judge Thurston's findings and recommendations.  (Docs. 65-70).  On November 16, 2021, the

27   ───────────────
28   [1] The Undersigned incorporates the procedural history of this case from the April 6, 2021,
     findings and recommendations to grant in part Plaintiff's motion for class certification, which
     were adopted in full by the then-assigned district judge on November 11, 2021.  (Docs. 64, 71).

1   Honorable District Judge Dale A. Drozd issued an order adopting in full the findings and

2   recommendations and granting Plaintiff's motion for class certification in part.  (Doc. 71).  Judge

3   Drozd found Plaintiff presented substantial evidence in the form of testimony from putative class

4   members showing a common practice under which Defendants' employees were not permitted to

5   leave field locations for meal breaks, despite Defendants' written policy providing for employees'

6   uninhibited meal breaks.  *See* (Doc. 71 at 11) ("The magistrate judge did not err in concluding

7   that 'plaintiff carries the burden to show the putative class members suffered the same injury

8   related to meal breaks.'") (internal quotation marks omitted).  Thereafter, Judge Drozd certified

9   Plaintiff's unpaid meal period class and defined said class as:

10   > "All non-exempt field technicians of Schlumberger Lift Solutions LLC or Schlumberger
11   > Rod Lift, Inc. who worked in California at any field location at any time from June 5,
     > 2014 through the date of class certification who were not paid for the time of their meal
12   > periods while at such location."

13   (Doc. 71 at 13).

14   On November 30, 2021, Defendants filed a petition for permission to appeal under Federal

15   Rule of Civil Procedure 23(f) to the United States Court of Appeals for the Ninth Circuit.  (Doc.

16   73).  The Court of Appeals denied Defendants' petition on January 20, 2022.  (Doc. 75).

17   On April 22, 2024, Defendants filed the instant motion to decertify.  (Doc. 86).  Plaintiff

18   filed an opposition to Defendants' motion to decertify.  (Doc. 100).  Defendants filed a second re-

19   notice of motion to decertify on May 9, 2024.  (Doc. 104).  On May 16, 2024, Defendants filed a

20   reply in further support of their motion to decertify.  (Doc. 113).

21   Concurrent with their filing of the instant motion to decertify, Defendants filed four

22   motions for summary judgment challenging the claims of individual class members.  (Docs. 87-

23   90).  Those motions are fully briefed and pending disposition before the assigned district judge.

24   (Doc. 130).

25   ///

26   ///

27   ///

28

3

**Factual Background**[2]

Defendants "are the successive owner-operators of the KBA product line." (Docs. 64 at 2; 86-4 at 6-8). "KBA is an oil and gas servicing company that sells, distributes, and maintains customer pumping units throughout Southern California." (Doc. 64 at 2). In 2015, 2017, and 2019, Defendants published employee handbooks that contained the following language: "During authorized and permitted meal periods you are relieved of all active responsibilities and you are free to leave the premises." (Docs. 86-5 at 7, 61; 86-6 at 10; 86-9 at 10-11).

Defendants' administrative office and main yard are located in Bakersfield, California. Doc. 64 at 2). The company supplies workers, including "field technicians," to service wells located on six large, third-party "leases." (Doc. 86-4 at 9). "In general, the job duties of field technicians were installing and performing maintenance and repairs on pumping equipment in oil fields." (Doc. 100 at 51).

The Six Leases

Defendants estimate that "from January 2014 to the present," 150 employees worked at Kern River, 150 at Belridge, 80 at Taft, eight at Coalinga, five at San Ardo, and eight at Lost Hills. (Doc. 100-1 at 216-17).

1. Belridge Lease

The Belridge lease is located about 40 miles from KBA's headquarters in Bakersfield. (Doc. 86-4 at 16). The Belridge basin is approximately 34 square miles running adjacent to West Side Highway, which runs in a northwest-to-southeast direction. (Doc. 86-2). The lease was described as a "little city" 45-by-30 miles (or 1350 square miles). (Docs. 86-5 at 6; 86-7 at 12-13). During the class period, there were at least two commercial food establishments at or near the Belridge lease: a restaurant/deli/supermarket named the Missouri Triangle and a food truck referred to as "Gabby's." (Docs. 86-4 at 21-22; 86-9 at 13). And at times, a food truck "could be

---

[2]The facts relied upon hereunder are derived from the Undersigned's review of Plaintiff's operative complaint, the parties' class certification and decertification briefing, evidence, and the record. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 (3d Cir, 2008) ("Although the district court's findings for the purpose of class certification are conclusive on that topic, they do not bind the fact-finder on the merits.").

close, just down the road" or up to 20 minutes away from active wells.  (Docs. 86-13 at 6; 86-6 at 15-16).

### 2.  Taft Lease

The Taft lease is near the town of Taft.  (Doc. 86-4 at 14).  Some of the pumping units at the Taft lease "are right in town" while others are "[20] miles away."  *Id*.  According to Defendants, depending on where the pumping units are located, field technicians at the Taft lease can go to Burger King, McDonald's, or Wendy's for lunch.  (Docs. 86-4 at 25; 86-18 at 4-5).

### 3.  Kern River Lease

The Kern River lease is adjacent to Bakersfield and is approximately 20 square miles.  (Docs. 86-2; 86-4 at 15).  Employees assigned to this lease clocked in at KBA's office in Bakersfield and then drove company equipment to the Kern River worksite.  (Doc. 86-4 at 17).  A deli is located on the Kern River lease and a Wendy's, McDonald's, Jack in the Box, and Del Taco are nearby.  (Docs. 86-2 at 3; 86-4 at 26; 96-19 at 2).

### 4.  Lost Hills Lease

The Lost Hills lease is about 33 square miles in size and located next to the town of Lost Hills, 45 minutes from KBA's office in Bakersfield.  (Doc. 86-4 at 13).  A Gabby's food truck was in Lost Hills on Pole Line Road from February 2014 until at least December 2020 and was parked in the same location daily since December 2014.  (Docs. 86-9 at 6; 86-10 at 6-8).

### 5.  Coalinga Lease

The Coalinga lease is about two hours (100 miles) northwest of Bakersfield.  (Doc. 86-4 at 10).  Coalinga is approximately 78 square miles.  (Doc. 86-2 at 4-5).  Crews servicing the Coalinga lease typically worked remotely for the week and stayed at hotels near the lease.  (Doc. 86-6 at 11-12).  In the mornings, crews stopped at commercial food establishments so that crew members could pick up food for the meal period if they wished.  *Id*. at 13-14.

### 6.  San Ardo Lease

The San Ardo lease is further north of Coalinga.  (Doc. 86-4 at 11).  San Ardo is approximately 20 square miles.  (Doc. 86-2 at 5).  Like Coalinga, crews servicing San Ardo typically worked remotely for the week, stayed at hotels near the leases, and stopped at

1    commercial food establishments in the morning.  (Docs. 86-4 at 11-12; 86-6 at 13; 86-18 at 2).

2    According to Defendants, there also was a deli at San Ardo where crews could eat.  (Doc. 86-18

3    at 3).

4    Lufkin's acquisition of Defendants

5         In 2020, KPS Capital purchased Defendant Schlumberger Rod Lift, Inc., and the KBA

6    product line was rolled into Lufkin US Acquisition Company LLC ("Lufkin"), a fully owned

7    subsidiary of KPS Capital.  (Doc. 86-21 at ¶¶ 2-3).  This transaction was completed in January

8    2021.  *Id*. at ¶ 3.  Lufkin had a "Land Transportation Safety" policy, a "California Meal Break

9    policy," and an "Industries Code of Conduct."  (Doc. 86-21 at ¶¶ 5-7 and referenced exhibits).

10   Lufkin's meal break policy allows employees to sign an on-duty meal period agreement.  (Doc.

11   21 at ¶ 8).  The agreement provides that "[o]n the days when the nature of [the employees'] work

12   prevents [them] from taking a non-duty meal period, [they] understand that KBA

13   Engineering/Lufkin Industries will pay [them] for all hours worked, including the on-duty meal

14   period."  (Doc. 86-25).

15   Class Members Allegations

16        On or about April 2015, Plaintiff began working for Defendants as a field technician.

17   (Doc. 100 at 51).  Plaintiff worked at the Belridge, Taft, and Kern River leases.  (Doc. 86-7 at 9-

18   10).  At some point, Plaintiff became a "crew lead" of a team.  *Id*. at 17-18.  As a crew lead,

19   Plaintiff would notify his team of a time to stop work for lunch within the window that the

20   supervisors identified.  (Docs. 86-7 at 18; 86-8 at 5-6).  Plaintiff continued to work as a field

21   technician until approximately late-March 2018, when he was laid off.  *Id*. at 2.

22        Plaintiff was aware that Defendants had written meal and break policies.  *See* (Doc. 86-7

23   at 14) ("The policy said within five hours of our clock-in time").  However, Plaintiff attests he

24   was told by management at the morning meeting and on location by the supervisors that it was

25   company policy that field technicians were not allowed to leave their daily work sites in the oil

26   field during their meal breaks.  (Doc. 100-1, Garcia Declaration at ¶ 65).  Plaintiff attests that

27   field technicians were not allowed to go into town to get food or eat at any restaurants and were

28   not allowed to go to the taco truck or company store in Belridge.  *Id*.

1    Plaintiff attests "[b]ecause of the distances involved, there was no way to leave the oil

2    field locations during a meal or rest break without a field technician driving the company vehicle

3    that they rode in to get to the field location at which they were working on a particular day." *Id*.

4    Plaintiff alleges he was told that field technicians were not allowed to use company vehicles to

5    run personal errands or use company property for personal purposes. *Id*. "Based upon this, as a

6    crew leader, [Plaintiff] understood that [he] did not have permission to allow crew members to

7    drive a company vehicle to run personal errands." *Id*.

8    Plaintiff also attests he was told by management and his supervisors that the company

9    wanted field technicians to stay at their daily work sites during breaks because they did not want

10   anyone coming back late from a break and to leave the company equipment unsupervised. *Id*.

11   Plaintiff claims he was told by management and supervisors that if field technicians went into

12   town and/or left their daily work sites during their breaks, they could be disciplined or fired. *Id*.

13   Plaintiff asserts as a result of these rules, the crews he worked on all stayed at the daily work sites

14   during their meal break. *Id*. at ¶ 67.

15   In his deposition, Plaintiff testified that "[s]upervisors told us that we could not drive

16   around in the KBA trucks.  We couldn't leave and get food at the Triangle, and we also couldn't

17   go to the taco trucks."  (Doc. 86-7 at 11).  Plaintiff was asked whether, if he wanted to leave the

18   lease, he "could get up and go for a walk as long as [he was] back; correct?" *Id*. at 19.  In

19   response, Plaintiff testified it "[w]asn't safe to be walking around there, and we couldn't leave the

20   lease if we wanted to walk because there's nothing around, and if we wanted to walk to the

21   Missouri Triangle, that's a write-up.  We could not be seen at the Missouri Triangle even if we

22   walked." *Id*. at 19-20.

23   In declarations offered by Plaintiff in support of his motion for class certification, 12 other

24   class members largely repeated Plaintiff's meal break allegations.  (Doc. 100-1 at 17, 32-33, 47,

25   82-83, 98, 116, 133, 149-50, 163-64, 178-79, 209-10).   Some putative class members assert they

26   were "told that [they] could not go to the food trucks or into town because it would not look

27   professional and the company did not want the customer thinking they were being taken

28   advantage of seeing company vans driving out to the food trucks." *Id*. 17, 33, 47, 133, 149, 164,

178.  Putative class member Reatus Haislip ("Haislip") attests he was advised by Defendants' employees that field technicians were prohibited from leaving their work sites for food due to safety and other reasons.  *Id*. at 98.  Additionally, putative class member Jose Merino ("Merino") attests he "and the rest of the field technicians started seeing the leads and supervisors go out to the food trucks and not being disciplined for it."  *Id*. at 164.

Putative class member Victor Asensio ("Asensio") testified that when there were places that were near enough to go buy lunch, crew members were allowed to leave the lease.  (Doc. 87-3 at 13).  Asensio noted crew members could go to a taco truck or a store to buy lunch.  *Id*. at 13-14.  Asensio stated, "[w]hat we'll do is order the food before, and then by the time lunch comes, they'll grab one of the vehicles and they will go get the lunch, yes."  *Id*. at 14.  Asensio claimed this had been the case since he started working for Defendants and he was not aware of a policy against employees leaving the lease during lunch.  *Id*.

Putative class member Anthony Gage, Jr. ("Gage") testified that Defendants' policy in 2015 prohibited employees from leaving the premises during their lunch break.  (Doc. 87-4 at 6-7).  Gage claimed, "after a period of time…shortly after [Defendants] took over" the practice changed and if there was a food truck in your area you could go get some food or you could ask your supervisor to get it for you."  *Id*. at 7.  Gage asserted crews were allowed to leave the lease to grab lunch.  *Id*. at 13.  As a supervisor, Gage noted he did not restrict employees from leaving the lease to grab lunch and sometimes, if they asked him, he would go get lunch for employees.  *Id*.

Putative class member Adrian Saldivar testified that as a field supervisor, he understood that crew members were free to leave the premises during permitted meal breaks.  (Doc. 86-15 at 7).  Putative class member John Simmons ("Simmons"), as a field supervisor, allowed his crew to go get lunch off of the lease.  (Doc. 86-11 at 9).  However, Simmons admitted he did not know if his crew did leave the lease during meal periods.  *See id*. ("And do you know if they do?  It's never been brought to my attention, no.").

Putative class member Brandon Kevin Will Turner ("Turner") testified he did not see a policy against employees leaving the lease during lunch.  *See* (Doc. 86-10 at 8) ("What you do off

the clock is your own business.")  Turner testified, "I can speak for myself as in supervision that I have never had to reprimand anybody for going to a taco truck or leaving on anything on their own time."  *Id*. at 9.  Turner asserted he would "get lunch somewhere."  *Id*. at 10.  Specifically, Turner stated: "I would—prior to—it's getting close to lunchtime, this job is done, let's go pick up a taco, burrito, whatever you want in between.  Get to where we're going, then clock out for lunch, take your lunch.  I mean that's what we did every day."  *Id*.

Turner reported during his employment with Defendants, he had lunch at a taco truck many times.  (Doc. 88-5 at 20).  Turner confirmed that Gabby's taco truck was parked in the same location the entire time during his employment with Defendants.  (Doc. 88-6 at 5).  Turner noted that when he worked with Plaintiff, they "weren't even around" Gabby's, they "worked probably about 45 minutes away from that taco truck most of [the] time."  *Id*.  Turner asserts they were in that area occasionally, "but most of the time we were so far away from that place, there's no way we could have made it over there to get a burrito."  *Id*.

Putative class member Jeremy Todd Birdwell ("Birdwell") testified he was aware of Defendants' meal break policy throughout his employment.  (Doc. 88-3 at 7, 12-13).  Birdwell noted he did not go anywhere to eat his lunch.  *Id*.  Birdwell affirmed Defendants' counsel's assessment that "at some of these leases there are not places that are close enough you could go to [] grab lunch and be back within the 30 minutes."  *Id*. at 15.  Birdwell testified that there were some locations within the lease that were close enough to grab lunch.  *Id*.  Birdwell claimed crew members were allowed to go off-lease for lunch if they wanted.  *Id*. at 15-16.

Birdwell asserted if someone on his crew had to leave to go grab something to eat, "we would let the supervisor know, 'Hey, we're going to leave.  So and so's going to go down the road to get a cheeseburger for his lunch,' just to let him know that he's going to be driving down the road on a lunch break."  *Id*. at 18-19.

Putative class member Erin McClain ("McClain") testified he was aware of Defendants' meal break policy.  (Doc. 87-5 at 7).  McClain claimed if you were close enough to Missouri Triangle or the food trucks at Belridge, "where you can make it there, order your food, and be back and have your food ate in 30 minutes, then yeah, feel free.  We let them go."  *Id*. at 10-11.

9

1    McClain asserted he told the crews that he supervised they were allowed to go off lease for lunch.

2    *Id*. at 11.  McClain testified as an hourly employee he would leave the lease to go grab lunch and

3    was not aware of any of Defendants' employees ever being disciplined for leaving the lease

4    during lunch.  *Id*. at 12.

5         Putative class member Adan Lopez Canedo ("Lopez") testified that he was not allowed to

6    go to the taco truck or Missouri Triangle at Belridge for lunch at any point during his

7    employment.  (Doc. 89-5 at 20).  Lopez testified he believed he was not allowed because there

8    was a safety issue and "they didn't want us to drive more than we needed to."  *Id*. at 20-21 ("I

9    think it was most safety—for safety reasons.  And driving, the less percentage of us being in an

10   accident.").  Lopez testified he was informed of this policy at a safety meeting.  *Id*.  Lopez noted

11   he had never seen a written policy requiring him to stay on the lease for lunch.  *Id*.  However,

12   Lopez did receive an employee handbook in 2015 and 2017.  *Id*. at 22-23.  Lopez also testified he

13   heard that somebody had been disciplined for leaving the lease during lunch.  *Id*. at 21.

14        Putative class member Merino testified he was not permitted to leave the lease during his

15   meal period.  (Doc. 90-5 at 5).  Merino asserted employees were told "we couldn't stop nowhere"

16   and had supervisors on location in different stores.  *Id*.  Merino asserted he was told in a meeting

17   that they were "not allowed to go out" and Defendants did not want the customer "seeing us

18   outside and taking advantage of their time or thinking that we're taking advantage of their time."

19   *Id*.  Merino noted everybody started to see supervisors going to stores and taco trucks but "a lot of

20   people still didn't want to get in trouble so they wouldn't go nowhere."  *Id*. at 5-6.

21        Merino testified that he did not leave the lease because "we didn't want to be seen with

22   [Defendants] truck over there…[s]o we just stay in location."  *Id*. at 6.  Merino reiterated that he

23   was told he could not leave the lease for lunch and testified "they never changed that we were

24   allowed to go nowhere."  *Id*.  Merino reported that "[o]nce they saw the supervisors do it" he

25   heard one or two people would go to the store but "mostly nobody would go because they're

26   scared that they're going to get in trouble."  *Id*.  Merino was unable to recall anybody getting

27   disciplined for leaving the lease during lunch.  *Id*. at 6-7.

28

1    Merino was asked whether he didn't leave the lease for lunch because it took too long.  *Id*.

2    at 7.  Merino responded that in his current work location, it would take a while to get to a taco

3    truck so he wouldn't go.  *Id*. at 7-8.  However, Merino asserted "[i]f we were close enough, I still

4    wouldn't go so I wouldn't get our crew in trouble."  *Id*. at 8.

5    Putative class member Emmit Hendrix ("Hendrix") testified he never left to go grab lunch

6    somewhere else.  (Doc. 90-6 at 6).  Hendrix noted if you worked at the yard "you could…[t]ime

7    management-wise, you could probably try" to leave for lunch.  *Id*. at 7.  Hendrix asserted he was

8    not allowed to leave the lease for lunch.  *Id*. at 12-13.  When questioned why he thought he

9    wasn't allowed to leave, Hendrix responded it would have been impractical to drive the

10   equipment to a place or establishment to eat.  *See id*. at 12 ("Drive a semi that is fully loaded to

11   get something to eat?  We drive every equipment.  So there's no way possible we can take that

12   equipment to a place or establishment to eat.")  Hendrix asserted "not having transportation and

13   time" were reasons he was not allowed to leave.  *See id*. at 12-14 ("[Q:] And did [the leads and

14   field supervisors] tell you why you couldn't go anywhere for lunch? [A:] Due to the

15   transportation and the time it would take for us to get to a place to eat and come back.  That's two

16   reasons they told us we couldn't do it.").  Hendrix testified he was not aware of other crews that

17   left the lease to grab lunch.  *Id*. at 13.

18   Putative class member Haislip testified that he was aware of Defendants' meal policy.

19   (Doc. 90-4 at 8-9).  Haislip asserted he was required to stay where he was working during meal

20   periods.  *See id*. at 18 ("We were required to stay where we were working.  So that's the only

21   thing different.  When we were on lunch, we couldn't leave.  We were required to stay on

22   location.").  Haislip testified that "all crews" were required to stay on location.  *Id*. at 18-19.

23   Haislip testified he was aware that some field employees went off the lease for meal periods, but

24   they risked getting caught and disciplined.  *Id*. at 19-20.  Haislip was not aware of anybody being

25   disciplined for leaving the lease.  *Id*. at 20-21.

26   Haislip agreed that Defendants' written policy said he was permitted to leave the lease

27   "but that's not what the supervisors would say."  *See id*. at 20 ("You know, 'I want to go get

28   something from the store.' 'No.'").  Haislip claimed supervisors called it an insurance issue, that

11

1    "[t]hey didn't want us out there on our time in a company vehicle making a store run…we

2    weren't allowed by our supervisors to take these out—to go out to have lunch." *Id*. at 20-21.

3          Haislip confirmed some on his lease did get lunch off the lease. *Id*. at 23. Haislip noted

4    "[i]f the store was close, then we would go and make a store run. But it didn't happen very often

5    because it all depended on where you worked." *Id*. Haislip testified there may not have been a

6    store close to where he was working, "especially out in Coalinga or other places like that." *Id*.

7          Haislip testified at Belridge, he could run over to Missouri Triangle or a food truck and

8    grab some lunch "[i]f we didn't get caught." *Id*. at 23-24. Haislip asserted the supervisor

9    "wouldn't let you go. But you know what? We'd still go." *Id*. at 24. Haislip claimed if you were

10   close to the Missouri Triangle, you could go. *Id*. Haislip also noted if an employee was by a taco

11   truck, you could send a guy over to the truck, and if a supervisor asked "where he's at, he's at the

12   bathroom." *Id*.

13         Marrio Desmon Hart ("Hart") provided a declaration in support of Defendants' pending

14   motion to decertify. (Doc. 86-19). Hart worked in Project Controls at Defendants' office located

15   on its Kern River lease and at Defendants' main office in Bakersfield. *Id*. at ¶¶ 2-3. Hart attests

16   he was free to leave if he wanted to eat elsewhere for lunch. *Id*. at ¶ 7. Hart notes there were fast

17   food restaurants about five miles away from the Kern River lease and he had grabbed lunch from

18   them at some point during his workday at the site. *Id*. Hart asserts he routinely observed

19   employees from the Kern River crews off-site during their meal periods. *Id*.

20   **Request for Judicial Notice**

21         Fed. R. Evid. 201 permits a court to take judicial notice of any facts "generally known

22   within the trial court's territorial jurisdiction" or that "can be accurately and readily determined

23   from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). A

24   court "must take judicial notice if a party requests it and the court is supplied with the necessary

25   information." Fed. R. Evid. 201(c); *Indemnity Corp v. Weisman*, 803 F.2d 500, 504 (9th Cir.

26   1986) (a court may take judicial notice of matters of public record outside the pleadings).

27         In support of their pending motion to decertify, Defendants request that the Court take

28   judicial notice of screenshots from the Geologic Energy Management Division of the California

Department of Conservation's, online mapping application.  (Doc. 86-2).  The Court has examined Defendants' proffered document and finds it is suitable for judicial notice as a matter of public record that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  *Eidson v. Medtronic, Inc.*, 981 F. Supp. 2d 868, 878-79 (N.D. Cal. 2013). *See, e.g., United States v. Perea-Reay*, 680 F.3d 1179, 1182, n.1 (9th Cir. 2012) (taking judicial notice of Google maps and satellite images as a source whose accuracy cannot be reasonably questioned); *Malheur Forest Fairness Coalition v. Iron Triangle LLC*, No. 2:22-cv-01396-HZ, 2023 WL 6811871, at *4 (D. Or. Oct. 13, 2023) (accepting as authentic maps prepared by the Oregon Departments of Forestry and Transportation).  Moreover, Plaintiff has not opposed Defendants' request.  Therefore, the Court takes judicial notice of the proffered document.

**Legal Standard**

    1.  Decertification

       The same standards used for analyzing class certification under Rule 23 of the Federal Rules of Civil Procedure are applied when determining whether to decertify a class.  *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 947 (2011).  Because "[t]he party seeking [to maintain] class certification bears the burden of demonstrating that the requirements of Rules 23(a) and (b) are met,"  *United Steel, Paper, Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union v. ConocoPhillips Co.*, 593 F.3d 802, 807 (9th Cir. 2010), a plaintiff bears the burden throughout litigation to maintain that certification remains proper, *Marlo*, 639 F.3d at 947-48. *Accord Lightfoot v. District of Columbia*, 246 F.R.D. 326, 332 (D.D.C. 2007) ("As the proponent of continued class certification, Plaintiffs [retain] the burden of establishing that [all] of the requirements for class certification…are met.").

       In resolving a motion for class decertification, the court may rely on "previous substantive rulings in the context of the history of the case…subsequent developments in the litigation," and "the nature and range of proof necessary to establish the class-wide allegations."  *Munoz v. Phh Mortg. Corp.*, 478 F. Supp. 3d 945, 985 (E.D. Cal. 2020) (citing *Arredondo v. Delano Farms Co.*, 301 F.R.D. 493, 502 (E.D. Cal. 2014)).

1          2.   Rule 23[3]

2          The second Rule 23(a) prerequisite (commonality) and the predominance requirement of

3    23(b)(3) ask whether the class members' interests are "sufficiently cohesive to warrant

4    adjudication by representation." *Amchem Prods. v. Windsor*, 521 U.S. 591, 623 (1997). The

5    inquiry "logically entails two steps" – first, whether the issues in the case are individual or

6    common; and second, whether the common issues predominate over the individual issues.

7    Newberg on Class Actions § 4:50.

8          As for the first step, an individual issue is one where "the members of a proposed class

9    will need to present evidence that varies from member to member." *Tyson Foods, Inc. v.

10   Bouaphakeo*, 577 U.S. 442, 453 (2016) (citing Newberg on Class Actions § 4:50).  By contrast, a

11   common issue is one either where "the same evidence will suffice for each member to make

12   prima facie showing," *id*., or, similarly, where the issue is "susceptible to generalized, class-wide

13   proof."  *In re Nassau County Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006).

14         Rule 23(a) "sometimes [requires] the court to probe behind the pleadings before coming to

15   rest on the certification question." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir.

16   2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).  "[T]he merits of the

17   class members' substantive claims are often highly relevant when determining whether to certify

18   a class," and "a district court must consider the merits" if they overlap with Rule 23(a)'s

19   requirements.  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011).  As such, a

20   court must resolve any factual disputes "to determine whether there was a common pattern and

21   practice that could affect the class *as a whole*."  *Id*. at 983 (emphasis in original); *see Wang*, 737

22   F.3d at 544 (noting that even as to a class consisting only of 200 members, "there are potentially

23   significant differences among the class members.").

24         As for the second step, common issues likely will not predominate if "a great deal of

25   individualized proof" would need to be introduced to address most or all of the elements of a

26   claim, *Gomez v. J. Jacobo Farm Labor Contr., Inc.*, 334 F.R.D. 234, 256 (E.D. Cal. 2019) (citing

27
─────────────────────
28         [3] Defendants' motion to decertify challenges the commonality-predominance and
     adequacy of representation elements of Rule 23.  (Doc. 86).  Therefore, the Undersigned will
     limit its review of Defendants' motion to these components of Rule 23.

1    *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004)), or "a number of individualized

2    legal points" would need to be established after common questions were resolved, *id.* (citing

3    *Klay*, 382 F.3d at 1255), or "the resolution of . . . [an] overarching common issue breaks down

4    into an unmanageable variety of individual legal and factual issues." *Id.* (quoting *Cooper v.*

5    *Southern Co.*, 390 F.3d 695, 722 (11th Cir. 2004)). By contrast, common questions likely will

6    predominate if "individual factual determinations can be accomplished using computer records,

7    clerical assistance, and objective criteria — thus rendering unnecessary an evidentiary hearing on

8    each claim," *id.* (citing *Smilow v. Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32, 40 (1st

9    Cir. 2003)), or "when adding more plaintiffs to the class would minimally or not at all affect the

10   amount of evidence to be introduced." *Id.* (citing Newberg on Class Actions § 4:50). A finding

11   of predominance will generally not be defeated merely because there is a need to make

12   individualized damage determinations. *See Just Film, Inc. v. Buono*, 847 F.3d 1108, 1121 (9th

13   Cir. 2017); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).

14          Rule 23(a)(4) requires that "the representative parties fairly and adequately protect the

15   interests of the class." *Id.* In determining whether that requirement is met, the Court asks two

16   questions: (1) do the representative plaintiff and his counsel have any conflicts of interest with

17   other class members; and (2) will the representative plaintiff and his counsel prosecute the action

18   vigorously on behalf of the class. *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (citing

19   *Hanlon*, 150 F.3d at 1020).

20   **Discussion**

21       1.  Whether Decertification Requires New Evidence or Authority.

22          Plaintiff argues Defendants have presented no new relevant facts or new law that supports

23   decertification of the meal period class. (Doc. 100 at 5) (citing G*eneral Telephone Co. of*

24   *Southwest v. Falcon*, 457 U.S. 147, 160 (1982) ("In deciding whether to decertify, a court may

25   consider subsequent developments in the litigation.")). Specifically, Plaintiff claims "Defendants

26   cite no new precedential court rulings addressing the substantive law underlying Plaintiff's meal

27   period claim that Defendants had a policy and practice of instructing class members that they

28   could not leave the oil fields at which they worked for their meal periods." *Id.* at 5-6. Plaintiff

asserts Defendants have not taken any additional discovery since their opposition to the certification motion. *Id*. at 7.  Plaintiff contends the evidence submitted in support of Defendants' motion to decertify is "nothing more than the same evidence that Defendants submitted in opposition to Plaintiff's certification motion." *Id*. at 6-7.

In response, Defendants argue decertification does not require new evidence or authority. (Doc. 113 at 7-8).  Defendants also assert, "[n]otwithstanding the absence of a requirement to cite new case law or evidence, [it] nonetheless put forth both, and clearly established legal and factual grounds to justify decertifying the meal period class here." *Id*. at 8.  Defendants contend their motion for decertification relies largely on three-post certification cases "clearly stating that an employer has no obligation to provide vehicles to employees to go to lunch" and the employer's only obligation is to fully release employees from their duties. *Id*. at 8.  Further, Defendants claim they presented detailed evidence "as to the availability and nearness (or lack thereof) of commercial food establishments to various wells." *Id*.

An order granting or denying class certification may be altered or amended at any time before the entry of final judgment. Fed. R. Civ. P. 23(c)(1)(C).  Until a final judgment has been entered, the class certification order is "not final or irrevocable, but rather, it is inherently tentative." *Officers for Justice v. Civil Serv. Comm'n of the City & Cty. of S.F.*, 688 F.2d 615, 633 (9th Cir. 1982).  The rule provides district courts with broad discretion to determine whether a class should be certified and to revisit that certification as appropriate "throughout the legal proceedings before the court." *Armstrong v. Davis*, 275 F.3d 849, 871 n.28 (9th Cir. 2001). "[T]he judge remains free to modify [a certification order] in light of subsequent developments in the litigation." *Falcon*, 457 U.S. at 160.  This gives the district court flexibility to address problems with a certified class as they arise up to and even after a jury trial.  *See generally Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) (reviewing class certification order after jury trial).  "A district court may decertify a class at any time*." Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009).

"[A] motion to decertify a class is not governed by the standard applied to motions for reconsideration, and does not depend on a showing of new law, new facts, or procedural

16

developments after the original decision." *NEI Contracting and Engineering, Inc. v. Hanson Aggregates, Inc*., No. 12-cv-01685-BAS(JLB), 2016 WL 2610107, at *5 (S.D. Cal. May 6, 2016) (*citing inter alia Ballard v. Equifax Check Serv., Inc*., 186 F.R.D. 589, 593 n.6 (E.D. Cal. 1999)). However, "[i]n the absence of materially changed or clarified circumstances, or the occurrence of a condition on which the initial class ruling was expressly contingent, courts should not condone a series of re-arguments on the class issues by either the proponent or the opponent of class, in the guise of motions to reconsider the class ruling." 3 William B. Rubenstein, Herbert Newberg & Alba Conte, Newberg on Class Actions § 7.47 (4th ed. 2012) (citations omitted); *e.g., Brady v. Deloitte & Touche*, 587 F. App'x 363, 364 (9th Cir. 2014) (affirming decertification based on intervening circuit precedent regarding California law exemptions from overtime); *Brown v. Wal-Mart Store, Inc.*, No. 09-cv-03339-EJD, 2018 WL 1993434, at *2-3 (N.D. Cal. Apr. 27, 2018) ("the defendant seeking decertification must make a showing that the change is sufficient to warrant reconsidering the certification decision."). If the defendant makes the requisite showing of changed circumstances, then, of course, the plaintiff has the ultimate burden to show that Rule 23's requirements are met. *Marlo*, 639 F.3d at 947-48; *In re Korean Ramen Antitrust Litig.*, No. 13-CV-04115-WHO, 2018 WL 1456618, at *2 n.1 (N.D. Cal. Mar. 23, 2018).

Here, the Court's certification of the unpaid meal period class was based on the claim that "there was a common practice under which [class members] were not permitted to leave locations for meal breaks, 'which appears related to a policy not permitting the employees to use company vehicles on their own time.'" (*Supra* 2). Defendants challenge the validity of the "related policy" in light of subsequent developments in the relevant case law. As set forth more fully below, the Undersigned concludes that the post-certification authority Defendants advance in support of decertification does not present a sufficiently changed circumstance warranting decertification.

2. Commonality and Predominance

Defendants claim Plaintiff's unpaid meal period class is "fatally flawed." (Doc. 86 at 27). First, Defendants argue that the class contains members (Asensio, Gage, Hart, and McClain), who could and did leave the lease when they chose to go buy food. *Id*. This evidence was before the Court on Plaintiff's motion for class certification. (Docs. 58, 66). In particular, in its findings

1 and recommendations to grant class certification in part, the Court acknowledged Gage's

2 testimony that for at least some duration of the class period, he was not permitted to leave his

3 worksite during lunch breaks.  (Doc. 64 at 48).  Nevertheless, the Court "synthesiz[ed]" this

4 evidence and concluded that certification of the unpaid meal breaks claim was warranted.  *Id.*  In

5 response, Defendants filed the instant motion claiming "[r]ecent case law makes clear that the

6 mere fact that fast food is not conveniently near the work location or that the employer does not

7 allow its employees to drive its trucks to lunch does not create a cause of action for a meal period

8 claim."  (Doc. 86 at 21-22).  Additionally, Defendants present case law that reaffirms employers

9 do not have a duty to provide transportation to their employees to leave the premises during a

10 meal period in order to satisfy meal period requirements.  *Id*. at 22.

11      Defendants cite and rely upon three unpublished cases to support their motion: (1)

12 *Cazares v. Host Int'l, Inc.*, No. 20-55803, 2021 WL 3667227 (9th Cir. Aug. 18, 2021); (2)

13 *Bouissey v. Swift Transp. Co., Inc.*, 2:19-cv-3203, 2023 WL 3400620 (C.D. Cal. Apr. 5, 2023);

14 and (3) *Mejia v. Inglewood Sportservice, Inc.*, No. 2:20-cv-09564, 2022 WL 3357656 (C.D. Cal.

15 Aug. 15, 2022).  (Doc. 86 at 22-23).  Defendants argue this recent case law supports and

16 amplifies the cases they previously cited to the Court in connection with opposing Plaintiff's

17 motion for class certification.  *See id*. at 23-24 (citing cases).  Defendants claim these cases

18 "[nullify] the Class's allegations that Defendants violated their rights" because class members

19 were unable to leave the lease and were not provided off-site transportation.  *Id*. at 24.  Under this

20 authority, Defendants contend as the employer, it "has no duties other than to leave the employee

21 free of all duties and has no responsibility for how the employee spends that time."  *Id*.

22      California law requires employers to pay workers minimum wage, "[n]otwithstanding any

23 agreement to work for a lesser wage."  Cal. Lab. Code § 1194; *see* Cal. Lab. Code § 1182.12;

24 IWC Wage Order 16 §§ 2, 4 (requiring minimum wage for all "hours worked").  California law

25 also requires providing workers with 30-minute meal periods, subject to certain exceptions. Cal.

26 Lab. Code § 512(a).

27      "California law does not require employers to provide meal breaks during which their

28 employees can easily leave and return to the premises, without any temporal cost or

1  inconvenience." *Mejia*, 2022 WL 3357656, at *7; *see Bouissey*, 2023 WL 3400620, at *7 (not all

2  practical limitations on an employee's movement constitute control); *Huerta v. CSI Electrical*

3  *Contractors*, 15 Cal. 5th 908, 935 (2024) (citing *Augustus v. ABM Security Serv. Inc.*, 2 Cal. 5th

4  257, 270 (2016) (the fact that features of a worksite make travel impractical in the time allotted is

5  not sufficient to establish employer control).  Rather, the law only requires that employers

6  relinquish control over their employees during a meal break and not discourage them from taking

7  meal breaks.  *Brinker Restaurant Corp. v. Super. Ct.*, 53 Cal. 4th 1004, 1040 (2012); *see*

8  *Morillion v. Royal Packing Co.*, 22 Cal. 4th 575, 583 (2000). ("An employer exercises control

9  when it "prevents [an] employee from using…time effectively for his or her own purposes.").

10       Defendants contend that class member testimony shows that Defendants did not possess

11  control over them during meal breaks.  First, Defendants assert four "class members" (Asensio,

12  Gage, Hart, and McClain), testified that they were free to leave the lease and used a company

13  vehicle to go to commercial food establishments.  (Doc. 86 at 13-14, 18, 27).[4]  Next, Defendants

14  argue Plaintiff's testimony was that employees were free to walk away from the well-site but did

15  not do so for safety reasons.  (Docs. 86 at 14, 21, 27; 113 at 5, 12-14).  Defendants also contend

16  two class members (Haislip and Hendrix) testified that they understood they were free to leave

17  the lease during their meal periods but chose not to because they were not allowed to use

18  company vehicles and because of their remote location.  (Docs. 86 at 14-15, 21, 27; 90 at 8-9, 13-

19  15).  Defendants claim one class member (Lopez), testified that he could leave the lease but that

20  the vehicle policy prevented him from using company vehicles to get lunch.  (Docs. 86 at 14-15;

21  89 at 9-10, 12).  Lastly, Defendants assert two class members (Birdwell and Turner), testified

22  they were free to leave the lease during their meal periods and allowed to use company vehicles,

23  but they chose not to as the commercial food establishments were too far away.  (Docs. 86 at 14-

24  15, 18, 28; 88 at 6, 12).

25

---

26       [4] Defendants' inclusion of Hart is inconsequential.  The Court previously determined,
"[b]ecause Mr. Hart worked in the offices rather than the field—and does not identify his work as
27  "field technician"—he was not encompassed in the proposed class definition, and whether he was
permitted to leave the office for lunch is therefore irrelevant to any issue before the court."  (Doc.
28  71 at 10).

As a preliminary matter, the Undersigned finds Defendants' arguments concerning class members Asensio, Gage, and McClain are not enough to warrant decertification of Plaintiff's unpaid meal period class.  The Undersigned acknowledges these class members' testimony indicates that they were not prohibited from leaving the lease, that they did leave the lease for lunch, and some advised others that they could leave as well.  However, this evidence was before the Court on Plaintiff's motion for class certification.  *See* (Docs. 58 at 26; 58-1; 63 at 9, 17; 66 at 20).  In fact, the Court acknowledged the divergent testimony of one of these class members (Gage) in its findings and recommendations.  (Doc. 68 at 48).  The Undersigned finds Defendants' renewed argument based on evidence previously before the Court alone is not enough to warrant departing from the Court's prior analysis and conclusion, given the Court's earlier acknowledgement of divergent testimony and conclusion nevertheless that common questions predominated over individual issues.

Turning to Defendants' new or supplemented arguments, the Undersigned finds Defendants' assertion that Plaintiff testified "employees could get up and stroll away from the well during meals and breaks but did not do so for safety reasons" is unavailing.  (Docs. 86 at 14; 113 at 13).  Simply put, Defendants mischaracterize Plaintiff's testimony.

As discussed above (*supra* 7), Plaintiff testified he was advised by supervisors he was not permitted to leave to get food.  (Doc. 86-7 at 11, 19) ("Don't leave the lease.  We couldn't go to the Missouri Triangle, couldn't go to the taco truck.  If we were seen there, it was a write-up.").  Defendants' counsel asked Plaintiff "if you wanted to, you could get up and go for a walk as long as you were back; correct?"  *Id*. at 19.  In response, Plaintiff testified it "[w]asn't safe to be walking around there, and we couldn't leave the lease if we wanted to walk because there's nothing around, *and if we wanted to walk to the Missouri Triangle, that's a write-up.*  We could not be seen at the Missouri Triangle even if we walked."  *Id*. at 19-20. (emphasis added).  Plaintiff's testimony indicates it was not "safety reasons" that prevented him from going to food vendors but the fear that he would be "written-up."  Thus, the evidence before the Court reflects Plaintiff was under the control of Defendants during his meal break.

Next, the Undersigned addresses Defendants' claim that class members Haislip and Hendrix had permission to leave the lease for lunch but chose not to because they were unable to use a company vehicle and did not have time due to the remoteness of their work.  (Docs. 86 at 14-15, 27; 90 at 8-9, 13-15).  As discussed above (*supra* 11-12), Haislip testified he was told by supervisors he was not allowed to leave the lease for lunch, that employees "were required to stay on location during our lunches," and that employees could be disciplined for leaving during lunch.  (Doc. 90-4 at 18-20).  It appears Haislip attributed the prohibition against leaving for lunch to an "insurance issue" – that Defendants did not want employees using a company vehicle to make a store run.  *See id*. at 21 ("They called it an insurance issue.  So we were required—that's straight from the supervisors…[t]hey didn't want us out there on our time in a company vehicle making a store run.").  Likewise, Hendrix asserted he was not allowed to leave the lease for lunch.  (Doc. 90-6 at 12-13). Hendrix testified that leads and field supervisors told him he could not go anywhere for lunch and attributed this prohibition "[d]ue to the transportation and the time it would take for us to get to a place to eat and come back."  *Id*. at 14.

Defendants argue Haislip and Hendrix were limited by the "consequence of practical realities" of their job's location like the plaintiffs in *Bouissey*.  (Doc. 86 at 25).  In *Bouissey*, the plaintiffs asserted "that because class members routinely drive for long distances, Defendant's restrictions on the off-duty use of company trucks have the practical effect of 'impos[ing] a geographic limit' on class members."  2023 WL 3400620, at *7.  The district court acknowledged that class members may travel for long distances and the fact that they may only be off duty for ten hours at a time could make it impractical for them to go home.  *Id*.  However, the district court found that the "geographic constraints" of this situation were a "consequence of practical realities" of the class members' job and not defendant's exercise of control.  *See id*. ("Defendant has not as a matter of policy imposed a geographic limit on the distance that class members can travel while off duty—such a limitation is common to the off-duty periods of all employees who work far from home.").

Further, the *Bouissey* court rejected plaintiffs' suggestion that defendant "could alleviate the geographic constraints class members face by permitting them broader use of company trucks

1  for personal conveyance, especially since alternative means of transportation are not always

2  readily available." *Id.* at *8. The district court found defendant was under no obligation to allow

3  the use of its trucks for personal reasons and to the extent it allowed the use of its trucks for

4  personal use, it was free to restrict that use in whatever way it saw fit. *Id.*

5       The Undersigned finds *Bouissey* does not effect a material change in the governing legal

6  standard warranting reversal of this Court's grant of class certification. No supervisor told the

7  plaintiffs in *Bouissey* that they were prohibited from going home. Instead, the employees' travel

8  limitation was a practical reality of their work and the employer's denial of employees using

9  company trucks for personal convenience. In contrast, Haislip and Hendrix attest supervisors told

10 them they were not allowed to leave the lease. (Docs. 90-4 at 20-21; 100-1 at 98, 116); *see* (Doc.

11 90-6 at 12-14) ("You had leads that did not prohibit you from leaving the lease during

12 lunch…No. We were not *allowed* to leave. Why do you think you weren't *allowed* to leave?")

13 (emphasis added); *see Estrada v. Royalty Carpet Mills, Inc.*, 76 Cal. App. 5th 685, 705 (2022));

14 *see also Ulin v. Alaea-72, Inc.*, No. C-09- 3160-EDL, 2011 WL 723617, at *6 (N.D. Cal. Feb. 23,

15 2011) ("no one directed, commanded or restrained Plaintiff from leaving [the premises]. Instead,

16 Plaintiff's inability to leave the premises during lunch was more likely a result of the fact that the

17 warehouse was in a relatively remote part of San Francisco and Plaintiff had no mode of

18 transportation.").

19       Both Haislip and Hendrix testified they feared they would be disciplined if they left the

20 lease. (Doc. 100-1 at 98, 116); *see* (90-4 at 20) ("There was a chance of getting caught because

21 you could be disciplined. They didn't want you leaving."). Indeed, Haislip's testimony indicates

22 that regardless of distance and access to a vehicle, field technicians were prohibited by their

23 supervisors from leaving for lunch. *See* (Doc. 90-4 at 23-24) ("If we didn't get caught…the

24 supervisor wouldn't let you go. But you know what? We'd still go… if you were close to

25 Missouri Triangle, you could go…send a guy over to the taco truck. If they ask where he's at,

26 he's at the bathroom.") Thus, it appears Haislip and Hendrix chose not to leave the lease due to

27 their supervisors' instructions, not because of a "consequence of practical realities." *Cf. Cazares*,

28 2021 WL 3667227, at *2 ("Cazares does not allege any facts suggesting that Host barred or

1   discouraged him from leaving his worksite at the Admiral Club during his meal break."); *see*

2   (Doc. 90-5 at 8) (class member Merino testified if he was close to a food vendor he "still

3   wouldn't go so [he wouldn't] get [his] crew in trouble.").

4        Defendants also argue that class member Lopez testified he was free to leave but chose

5   not to because he was unable to use a company vehicle.  (Docs. 86 at 14-15; 89 at 9-10, 12).

6   Defendants mischaracterize Lopez's testimony.  Like Haislip and Hendrix, Lopez attests he was

7   told by management and safety staff he was not allowed to leave the lease.  (Doc. 89-5 at 20; 100-

8   1 at 149-50).  When questioned why he thought he wasn't allowed to leave, Lopez attributed the

9   prohibition to "safety issues because they didn't want us to drive more than we needed to."  (Doc.

10  89-5 at 20-21).  The evidence reflects that Lopez stayed on the lease because he was explicitly

11  told he was not allowed to leave.  In other words, Lopez did not choose to stay on the lease

12  because of a consequence of the practical realities of his job and his testimony reflects nothing

13  more than his understanding about the reason for the prohibition.  Thus, the evidence

14  demonstrates Lopez, like Haislip and Hendrix, was restricted by Defendants' alleged unwritten

15  prohibition on traveling offsite for meal breaks.

16       Next, Defendants contend that class members Birdwell and Turner were free to leave the

17  lease during their meal periods and allowed to use company vehicles but chose not to as the

18  commercial food establishments were too far away.  (Docs. 86 at 14-15, 18, 28; 88 at 6, 12).  As

19  recounted above (*supra* 8-9), Birdwell and Turner claimed that sometimes they were working too

20  far away to be able to leave the lease to get lunch.  (Docs. 88-3 at 15; 88-6 at 6).  Unlike, Haislip,

21  Hendrix, and Lopez, it appears Birdwell and Turner's inability to sometimes leave the lease was

22  due to the location of their work.  Therefore, the decisions rendered in *Bouissey* and similar cases

23  cited by Defendants would tend to undermine the viability of Birdwell and Turner's claims

24  because the location of their worksite alone did not render their meal periods non-compliant.

25  However, this evidence already was considered by the Court in granting class certification.  *See*

26  (Docs. 58, 65).  Importantly, the Court expressly credited Birdwell's testimony that he was not

27  prohibited from leaving his worksite for lunch and nevertheless found that common issues

28  predominated, warranting class certification.  (Doc. 64 at 48).

The Undersigned finds Defendants' motion for decertification has properly identified that class members Asensio, Gage, McClain, Birdwell, and Turner may not have been affected by an alleged common unlawful practice by Defendants of restricting employees to the lease during meal periods.  In contrast, Defendants' motion does not persuade the Undersigned that Plaintiff and class members Haislip, Hendrix, and Lopez were not subject to Defendants' alleged common unlawful practice.

Against this backdrop, there is no indication in the relevant class certification recommendation and order that this Court misapprehended the legal standard governing unpaid meal break claims or that application of the holdings in the three recent decisions advanced by Defendants in their motion for decertification necessitate reversal of class certification.  Contrary to Defendants' argument (Doc. 64 at 10-11; 113 at 7), this Court's finding that the prohibition on class members' leaving worksites "appears related" to Defendants' reported restriction on using company vehicles (Doc. 64 at 48) does not favor decertification.  Instead, the comment appears merely to acknowledge what some class members testified as to their belief about the rationale for Defendants' unwritten meal break travel restriction.

In sum, having considered Defendants' arguments and cited evidence, the Undersigned finds that Plaintiff's showing of commonality and predominance on his unpaid meal period claim remain intact.

    3.  Adequacy of Representation

Defendants assert Plaintiff is not an adequate representative for the unpaid meal period class.  First, Defendants argue Plaintiff's purported testimony to facts that class members could leave their worksites for lunch undermines and is contrary to his theory of liability.  (Doc. 113 at 13).  As addressed above (*supra* 20) the Undersigned finds Defendants mischaracterize Plaintiff's testimony and this argument is without merit.

Next Defendants argue Plaintiff's status as a team lead in charge of a crew of field workers shows that he is not a suitable class representative.  (Doc. 86 at 30).  Defendants assert, "[a]s a team leader, he ensured all his crew took timely meal and rest breaks, that they stopped work completely, and that [they] were not interrupted during their breaks."  *Id*.  In response,

1   Plaintiff contends he has no conflict of interest with other class members.  (Doc. 100 at 13).

2   Plaintiff asserts "[t]he Magistrate judge found that Plaintiff was a suitable representative,

3   rejecting Defendants' contention" and "Defendants offer no new evidence that they could not

4   have provided in opposition to Plaintiff's certification motion."  *Id*. at 14.

5       In its findings and recommendation to grant class certification, the Court found that

6   "Defendants did not cite any evidence to support the assertion that crew leads such as Plaintiff

7   determined the *location* of meal breaks, or whether field technicians could leave a lease."  (Doc.

8   64 at 48-49) (emphasis in original).  Instead, the Court noted the only cited evidence related to

9   crew leads directing the time and duration of breaks.  *Id*. at 49.  Thus, because he was subjected to

10  the same meal break practice as the class, Plaintiff carried the burden to identify the "same or

11  similar injury" as the class.  *Id*. (citing *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.

12  1992)).  In moving for decertification, Defendants offer no new evidence that Plaintiff determined

13  the location of meal breaks.  As noted above, Plaintiff reported he was subjected to similar meal

14  break practices as the field technicians he was supervising.  (*Supra* 6-7).  Thus, the Undersigned

15  finds there is no conflict of interest between Plaintiff and the class.

16      Defendants separately contend Plaintiff is not a proper representative because he never

17  worked at three of the six leases where members of the class worked.  (Doc. 86 at 30).

18  Specifically, Defendants claim Plaintiff never worked at Coalinga and San Ardo, and that those

19  leases' workdays entailed materially different circumstances that Plaintiff did not experience.  *Id*.

20  at 30-31.  Defendants assert this "gap in his experiences" means he cannot adequately represent

21  the class.  *Id*.

22      While Defendants have identified the different workdays and circumstances that field

23  technicians experienced on Defendants' six leases (*supra* 4-5), the relevant question is whether

24  there were differences within each lease's meal period that would make Plaintiff's experience

25  atypical.

26      Plaintiff worked at the Belridge, Taft, and Kern River leases, and alleges he was

27  prohibited from leaving the lease during his meal breaks.  *Id*. at 6.  Relying on excerpts of class

28  members' depositions and declarations from employees who worked at Coalinga, San Ardo, and

1    Lost Hills, Defendants argue that field technicians at these locations were permitted to leave the

2    lease.  (Docs. 86-6; 86-9; 86-10; 86-11; 86-14; 86-18).  In contrast, Plaintiff's proffered

3    declarations do not identify class members who worked at Coalinga, San Ardo, and Lost Hills.

4    *See generally* (Doc. 100-1).  However, class member Haislip's deposition testimony reflects that

5    "[a]t one point or another," he worked at every lease.  (Doc. 90-5 at 6).  Haislip's testimony is

6    similar to Plaintiff as both class members assert they were prohibited from leaving the leases

7    during their meal period.  (*Supra* 6-7, 11-12).  Therefore, the Undersigned finds there is evidence

8    that Plaintiff's claim was typical of class members working in Coalinga, San Ardo, and Lost

9    Hills.[5]  Further, there is no requirement that a class representative have personal knowledge

10   pertaining to every class member's claim, including with respect to class members employed at

11   different locations.  *See Holloway v. 3M Co.*, No. 5:19-cv-00708-RGK-KK, 2021 WL 6618685,

12   at *4 (C.D. Cal. Mar. 9, 2021) ("Plaintiff's lack of knowledge of the details of what goes on in

13   other branches throughout California does not disqualify him as a class representative.") (citing

14   cases).

15         Separately, Defendants assert that Lufkin's acquisition of the relevant pump servicing

16   operations shortly before the class was certified requires the class to be decertified or, at a

17   minimum, limited in time, because the acquisition implicates commonality and typicality issues.

18   (Doc. 86 at 31-32).  First, Defendants assert Lufkin's on-duty meal agreement policy,

19   implemented a short time before the class was certified, standing alone is a sufficient reason for

20   decertification.  *Id.*  Defendants claim Plaintiff did not sign Lufkin's on-duty meal agreement

21   during his employment and courts regularly deny class certification regarding violations of the

22   labor code section that allows employers to utilize on-duty meal agreements.  *Id.*  Second,

23   Defendants argue that the policy changes implemented by Lufkin are significant enough that

24   Defendants cannot be described as the same company, and class members are decidedly not

25

26   _____

27         [5] Even if Plaintiff's claims were not typical of employees working in Coalinga, San Ardo,
     and Lost Hills, Defendants' request that the class be decertified on that basis alone is unavailing.
28   If anything, the class could be modified by limiting it to field technicians who worked in
     Belridge, Taft, and Kern River.

subject to the same practices. *Id*. at 33 (*citing Lorenzo v. Prime Commc'ns, L.P.*, No. 5:12-cv-69-H-KS, 2018 WL 2291295, at *4 (E.D. N.C. Jan. 31, 2018)).[6]

Plaintiff counters Defendants have "presented no testimony of class members or management that demonstrate that oil field employees were specifically told in any form by management after the Lufkin 'roll-in' that they were not restricted to their work sites in the oil field during their meal breaks as they were before the 'roll-in.'" (Doc. 100 at 13, 21). Plaintiff maintains that oil field written policies and practices were different from any written policy. *Id*.

Whether Defendants are correct that "Lufkin's new policies are fully compliant with California wage and hour law, including meal and break period requirements" (Doc. 113 at 6), that proposition is not a compelling ground for reexamining class certification here. That is because Defendants have maintained that their written meal break policies throughout the entire duration of the class period remained compliant with California law – but the written meal break policies are not tethered to the unwritten meal break practices that are at issue here. While it is possible that Defendants' unwritten policy and/or practice of prohibiting employees from departing worksites for meal breaks has ended following Lufkin's implementation of new, written policies, this is not enough to warrant decertification or, as Defendants seek in the alternative, a wholesale termination of the class period on the date of Lufkin's acquisition. In short, the Undersigned sees no reason to dispute that the basis for granting class certification has changed sufficient to find that Plaintiff's earlier showing of a predominating, common, noncompliant meal break policy/practice no longer exists following the Lufkin acquisition.

**Conclusion and Recommendations**

Based upon the preceding, the Court RECOMMENDS Defendants' motion for decertification (Doc. 86) be DENIED.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within 14 days after

---

[6] The Undersigned notes that Defendants did object to the findings and recommendations to grant class certification on any grounds relating to the post-Lufkin acquisition, notwithstanding they seemingly could have given that their objections were filed months after the acquisition was completed. *See* (Doc. 66).

1  being served with these findings and recommendations, Plaintiff may file written objections with

2  the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and

3  Recommendations."  Plaintiff is advised that failure to file objections within the specified time

4  may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir.

5  2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

6  IT IS SO ORDERED.

7     Dated:   **July 12, 2024**   _____

8                                    UNITED STATES MAGISTRATE JUDGE